# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 19, 2023        Decided July 18, 2023

No. 22-1015

WYNNEWOOD REFINING COMPANY, LLC AND COFFEYVILLE
RESOURCES REFINING & MARKETING, LLC,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

————

Consolidated with 22-1051, 22-1053

————

On Petitions for Review of a Final Action
of the Environmental Protection Agency

————

*Michael R. Huston* argued the cause for petitioners.  On
the briefs were *Ian S. Shelton*, *Jonathan G. Hardin*, *Alexandra
Magill Bromer*, *Eric B. Wolff*, and *Karl J. Worsham.*

*Jeffrey Hughes*, Attorney, U.S. Department of Justice,
argued the cause for respondent.  With him on the brief was
*Todd Kim*, Assistant Attorney General.

2

Before: SRINIVASAN, *Chief Judge*, PILLARD, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in the judgment filed by *Senior Circuit Judge* RANDOLPH.

PILLARD, *Circuit Judge*:  The Renewable Fuel Standard Program codified in the Clean Air Act requires all transportation fuel sold in the United States to contain an annually determined volume of renewable fuel.  As part of its role in implementing the Program, the Environmental Protection Agency (EPA) issues renewable fuel standards announcing the annual quantity of renewables that must be sold into United States commerce.  The standards apply to the businesses—refiners and importers—that introduce transportation fuels into the United States economy.  To ensure timely promulgation, Congress set annual deadlines in the Act for the agency's publication of those standards.

EPA has not always met those deadlines.  We have already considered challenges to EPA's belated issuance of renewable fuel standards on three other occasions.  In each case we upheld EPA's authority, provided that the agency reasonably mitigated delay-related harm to obligated parties.  Extending obligated parties' compliance deadlines has been a typical, approved form of mitigation.

EPA failed to meet its deadlines to publish the 2020-2022 renewable fuel standards.  As part of its mitigation, EPA issued a rule extending the corresponding compliance reporting deadlines.  The leeway provided in that Extension Rule ensures that obligated parties will not have to file compliance reports for 2020-2022 until after EPA has published the standards for

3

those years. To get the Program back on track, the Rule compresses the intervals between the 2020, 2021, and 2022 compliance deadlines, leaving obligated parties less time between compliance filings than they have had in the past. The Rule also establishes a new compliance schedule for 2023 and later years. In these consolidated petitions, a group of fuel refineries (the Refineries) challenge the Extension Rule. They argue that the Rule violates the Clean Air Act, or is at least arbitrary and capricious, insofar as it provides obligated parties less than 13 months' compliance lead time (*i.e.*, time from EPA's announcement of the relevant standard to the reporting deadline), and compliance intervals (*i.e.*, time between reporting deadlines for successive compliance years) shorter than 12 months.

We deny the petitions for review. When EPA fails to timely issue renewable fuel standards, the Clean Air Act does not bind the agency to provide obligated parties a minimum of 13 months' compliance lead time, nor does it require compliance intervals of at least 12 months. We likewise reject the Refineries' claim that EPA acted arbitrarily and capriciously in setting the compliance schedule in the Rule. Rather, the agency reasonably exercised its authority to establish the compliance timeframe for the Renewable Fuel Standard Program under the circumstances.

I.

A.

Congress established the Renewable Fuel Standard Program (RFS Program or Program) in 2005 as part of a suite of changes to the Clean Air Act (CAA or Act). Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Energy Independence and Security Act of 2007, Pub. L. No. 110-140, §§ 201-202, 121 Stat. 1492, 1519-28 (codified at 42 U.S.C.

4

§ 7545(o)) (amending the RFS Program provisions). The Program sets requirements for the volume of renewable fuel that our domestic transportation fuel supply must contain each year. *See* 42 U.S.C. § 7545(o)(2)(A), (B). In enacting the Program, Congress sought "[t]o move the United States toward greater energy independence and security" and "increase the production of clean renewable fuels" by imposing a volume requirement to stimulate demand for the renewables. Energy Independence and Security Act, preamble, 121 Stat. at 1492.

The Act vests EPA with primary responsibility for implementing the Program. It charges EPA with issuing regulations "to ensure that transportation fuel sold or introduced into commerce in the United States," excluding the noncontiguous states and territories, contains at least a specified volume of renewable fuel for each year. 42 U.S.C. § 7545(o)(2)(A)(i). The Act prescribes annual volumes for four categories of fuel: total renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel. *Id.* § 7545(o)(2)(A)(i). For the years 2005 through 2022, Congress set forth the "applicable volume" (*i.e.*, the minimum volume) of total renewable fuel, advanced biofuel, and cellulosic biofuel; for the years after 2022, the Act requires EPA to set those volumes by rule. *See id.* § 7545(o)(2)(B)(i), (B)(ii). As for biomass-based diesel, Congress prescribed the applicable volumes for 2005 through 2012 and instructed EPA to set the annual applicable volume by rule for 2013 and beyond. *See id.*

To ensure the Program's renewable fuel volume requirements are met, EPA translates the applicable volumes for each category of fuel for a given year into standards that regulated parties must meet. *Id.* § 7545(o)(3)(B). EPA calculates those standards by dividing the applicable volume for each renewable fuel type by an estimate of the national

5

volume of gasoline and diesel that the U.S. market will consume that year, subject to certain adjustments. *See id.* § 7545(o)(3)(A), (B)(i); 40 C.F.R. § 80.1405(c). The resulting percentages inform obligated parties how much of their fuel production must consist of renewable fuels. *See Monroe Energy, LLC v. EPA*, 750 F.3d 909, 912 (D.C. Cir. 2014) (citing 40 C.F.R. § 80.1405(c)). To use a simple example, if the applicable volume for a year is 15 billion gallons, and EPA estimates that the national volume of transportation fuel consumption for the year is 100 billion gallons, the applicable percentage will be 15 percent. *Id.* In that year, obligated parties must ensure that, for every gallon of nonrenewable fuel they produce or import, they introduce an additional 15 percent of that amount (0.15 gallons) of renewable fuel into the United States' fuel supply. *See id.*

The Act establishes an annual deadline by which EPA must publish the percentage standards for the upcoming year through 2022. For the renewable fuel categories relevant here, EPA must publish them by November 30 of the preceding calendar year—*i.e.*, one month before the year in which the standards will apply. 42 U.S.C. § 7545(o)(3)(B)(i). After 2022, the Act prescribes no deadline for when EPA must publish the percentage standards. *Id.* § 7545(o)(2)(B)(i), (ii). Instead, for 2023 and later years, the statute sets an annual deadline for EPA to publish the applicable volumes of renewable fuel (as distinct from the percentage standards). *Id.* § 7545(o)(2)(B)(ii). For those years, the Act directs EPA to publish the applicable volumes "no later than 14 months before the first year for which such applicable volume will apply." *Id.*

The Act does not set compliance deadlines. Instead, the CAA empowers EPA to promulgate regulations that "contain compliance provisions" to "ensure" the annual renewable fuel volumes are met. *Id.* § 7545(o)(2)(A)(iii). Existing EPA rules

6

require obligated parties to submit compliance reports on an annual basis demonstrating that they have met a given year's standards. 40 C.F.R. § 80.1451(f)(1).

Two components of the compliance framework established by EPA bear particular relevance here. First, what we call "compliance lead time" is the period between EPA's announcement of a renewable fuel standard and the relevant compliance reporting deadline. So, if EPA were to announce the 2020 renewable fuel standards on November 30, 2019, and require obligated parties to submit their compliance reports for that year on January 1, 2021, that schedule would provide obligated parties with roughly 13 months' compliance lead time. Second, what we refer to as "compliance intervals" are the periods between the reporting deadlines for consecutive compliance years. For instance, if EPA were to set the reporting deadlines for the 2020-2022 compliance years as January 1 of 2021, 2022, and 2023, respectively, that compliance schedule would provide obligated parties with 12-month compliance intervals. The lead times and compliance intervals set by EPA directly affect obligated parties' compliance burdens: The former governs how much notice obligated parties receive in preparing to meet their renewable fuel obligations for a given year, and the latter determines how long obligated parties have between reporting deadlines to take the steps necessary to satisfy their obligations across successive compliance years.

As for how obligated parties demonstrate compliance, the Act establishes a market-based program through which parties can purchase and trade credits. 42 U.S.C. § 7545(o)(5). The credits in this system are known as "Renewable Identification Numbers" or "RINs." *See* 40 C.F.R. § 80.1425. RINs are unique numbers that represent a given volume of renewable fuel. *Id.* § 80.1401; *see Monroe Energy*, 750 F.3d at 913. In

7

effect, RINs serve as the currency of the RFS Program. Parties acquire RINs and then demonstrate compliance with their renewable fuel obligations for the year by "retir[ing]" (*i.e.*, submitting) them to EPA by the compliance filing deadline. *Id.* § 80.1427(a).

The statute and regulations describe how RINs become available. A party that produces or imports renewable fuel for use in the United States thereby generates a quantity of RINs corresponding to the volume of ethanol-equivalent fuel gallons (a standardized measure across different fuel types) that it has introduced into the U.S. economy. *See Monroe Energy*, 750 F.3d at 913; 40 C.F.R. §§ 80.1415(a), 80.1425, 80.1426. When an entity blends renewable fuel into conventional transportation fuel (*e.g.*, gasoline or diesel), the RINs from the blended renewable batch are deemed "separated," meaning they may be traded in the market or used to demonstrate compliance. *See Monroe Energy*, 750 F.3d at 913 (citing 40 C.F.R. § 80.1426(e), 80.1429(b)). Parties may thus acquire "separated" (*i.e.*, usable) RINs either by blending renewable fuel into conventional transportation fuel themselves or buying separated RINs from another entity that did so. *See id.* The Act provides that RINs are "valid to show compliance for the 12 months as of the date of generation." 42 U.S.C. § 7545(o)(5)(C).

To provide compliance flexibility, the Act permits obligated parties "unable to generate or purchase sufficient credits to meet the [renewable fuel] requirements" for the given year to carry forward a "renewable fuel deficit" into the next compliance year. *Id.* § 7545(o)(5)(D). Any party carrying forward a deficit under this provision must accumulate sufficient credits the next year to pay off that deficit. *Id.* We refer to this provision as the deficit carry-forward provision.

8

Finally, as relevant here, the Act permits small refineries, which are defined in terms of their average daily crude oil throughput, *id.* § 7545(o)(1)(K), to petition for exemptions from Program requirements based on "disproportionate economic hardship," *id.* § 7545(o)(9). EPA must grant or deny such petitions "not later than 90 days after the date of receipt." *Id.* § 7545(o)(9)(B)(iii).

B.

This case centers on EPA's authority to alter obligated parties' compliance deadlines when the agency has fallen behind in administering the RFS Program and seeks to catch up.

A series of EPA delays precipitated the challenge before us. While these delays are not the subject of the Refineries' petitions here, we briefly recount them as context helpful to understanding the challenged Extension Rule. First, for the 2020-2022 compliance years, EPA failed to timely issue the Program's renewable fuel standards. The statutory deadlines for EPA to issue those standards fell on November 30 of 2019, 2020, and 2021, respectively. 42 U.S.C. § 7545(o)(3)(B)(i). EPA initially issued the 2020 standard approximately two months late, on February 6, 2020. *See* Renewable Fuel Standard Program: Standards for 2020 and Biomass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016, 7069 (Feb. 6, 2020). EPA then issued a revised, more lenient version of the 2020 standard on July 1, 2022—*i.e.*, 31 months after its statutory due date. *See* Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39,600 (July 1, 2022) (July 2022 Rule). EPA issued the 2021 and 2022 standards in that same July 2022 Rule, *see id.* at 39,601—so those announcements were late by 19 and 8 months, respectively, *see* 42 U.S.C. § 7545(o)(3)(B)(i).

9

Notably, those were not the first times EPA had missed its statutory deadlines to publish renewable fuel standards for a given year. *See Ams. for Clean Energy v. EPA* (*ACE*), 864 F.3d 691, 718-21 (D.C. Cir. 2017); *Monroe Energy*, 750 F.3d at 919-20; *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 154-58 (D.C. Cir. 2010).  Given EPA's track record, we have wondered in past cases whether some of the standard-setting deadlines Congress prescribed may be "unrealistic" in view of EPA resources and the nature of the task.  *Nat'l Petrochemical*, 630 F.3d at 156.

The Refineries also emphasize that EPA did not timely resolve many small refinery petitions for exemption from RFS Program requirements for the 2016-2021 compliance years.  *See* Notice of June 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program, 87 Fed. Reg. 34,873, 34,873-74 (June 8, 2022) (Notice of June 2022 SRE Denial); April 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program, 87 Fed. Reg. 24,300, 24,300 (Apr. 25, 2022).  As of early 2022, those petitions remained pending while EPA reevaluated its overall policies for adjudicating small refinery exemption petitions.  *See* Notice of Opportunity to Comment on Proposed Denial of Petitions for Small Refinery Exemptions, 86 Fed. Reg. 70,999, 71,000 (Dec. 14, 2021) (December 2021 Notice).

That brings us to the challenged rule:  As part of its efforts to mitigate the harm caused by its delayed standard-setting and the continued uncertainty surrounding its small refinery exemption policies, EPA issued the Extension Rule in February 2022.  *See* Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines, 87 Fed. Reg. 5,696 (Feb. 2, 2022) (Extension Rule

10

or Rule). The Rule makes two principal sets of changes to the Program's compliance schedule.

First, the Rule extends obligated parties' 2019-2022 compliance deadlines. It extends the 2019 compliance reporting deadline for small refineries from November 30, 2021, to the next quarterly reporting deadline after the effective date of the 2021 renewable fuel standards—*i.e.*, September 1, 2022. *See id.* at 5,698-99; Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines, 86 Fed. Reg. 17,073, 17,073 (Apr. 1, 2021); July 2022 Rule, 87 Fed. Reg. at 39,600. The Rule also pushes back the 2020 and 2021 compliance deadlines for all obligated parties to the next quarterly reporting deadline after the prior compliance year's reporting deadline. *See* Extension Rule, 87 Fed. Reg. at 5,699. And for 2022, the Rule sets the compliance deadline as the later of the next quarterly reporting deadline after (1) the effective date of the 2023 renewable fuel standards or (2) the compliance deadline for 2021. *See id.*

To put things more simply, those changes ensure obligated parties will not have to submit their 2020-2022 compliance reports before knowing their renewable fuel obligations for those years. The Rule also ensures small refineries will not have to submit their 2019 compliance reports before the agency resolves the pending small refinery exemption petitions—*i.e.*, before those small refineries know whether they are exempt from compliance reporting requirements.

Second, the Extension Rule establishes a new compliance schedule for 2023 and ensuing years. It sets the compliance deadline for each year starting in 2023 as the latest of (a) March 31 of the following calendar year; (b) the next quarterly reporting deadline after the effective date of the next compliance year's standards; or (c) the next quarterly reporting

11

deadline after the compliance deadline for the prior compliance year. *See id.* at 5,700. In practical terms, this provision automatically extends obligated parties' compliance reporting deadlines in the event EPA fails to timely issue the renewable fuel standards for a given year in the future.

Beyond the Extension Rule, EPA undertook several additional steps to mitigate the effects on regulated parties of its delays during the 2019 to 2022 compliance cycles. In the rule setting the 2020-2022 standards, EPA adjusted the 2020 renewable fuel volume downward to reflect the "volumes of renewable fuel actually used in" that year. July 2022 Rule, 87 Fed. Reg. at 39,618. EPA anticipated that this downward adjustment would decrease the risk of scarcity of RINs for obligated parties to use for compliance, which would in turn reduce the risk of "disrupt[ions] [to] the functionality of the RIN market." *Id.* EPA likewise eased the 2021 requirements, setting the "2021 volumes at the volumes of renewable fuel actually used in 2021." *Id.* Separately, the agency promulgated a rule that allows small refineries to opt into an alternative schedule giving them more time to satisfy their 2020 renewable fuel obligations. Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 54,158, 54,161 (Sept. 2, 2022) (Alternative Retirement Schedule). EPA offered that option to small refineries to "facilitate their transition into full compliance with the RFS program" following EPA's denial of their exemption petitions. *Id.* at 54,161.

C.

Several fuel refineries petitioned for review of the Extension Rule. We consolidated their petitions. Order, No. 22-1015, Dkt. No. 1941984 (Apr. 5, 2022). With the exception

12

of one refinery, Coffeyville Resources Refining & Marketing, LLC, all petitioners are small refineries under the CAA.

Shortly after filing their petitions, the Refineries moved for a stay of the Rule pending review, which EPA opposed. We held that the petitioners had not shown a likelihood of success on their claims, so denied the motion.

II.

We begin by confirming the Refineries' standing to seek review of the Extension Rule. In support of Article III standing, the Refineries noted that, "[a]s obligated parties," they are "subject to annual RFS compliance deadlines, 40 C.F.R. § 80.1406, and thus are directly regulated by the Extension Rule." Pets. Br. 18. Although EPA does not question it, we have an independent obligation to satisfy ourselves of our own jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

To meet the requirements of Article III standing in a case challenging agency action, a petitioner must show, supplementing the administrative record as needed, (1) that it suffered an injury that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged agency action; and (3) that judicial relief would likely redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 442 (D.C. Cir. 2013). In evaluating a petitioner's standing, we must assume it will prevail on the merits of its claims. *Ams. for Safe Access*, 706 F.3d at 443; *accord NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

"[T]here is ordinarily little question" that a regulated entity has standing to challenge a rule under which it is regulated.

13

*Lujan*, 504 U.S. at 560-61; *accord State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015); *Corbett v. Transp. Sec. Admin.*, 19 F.4th 478, 483 (D.C. Cir. 2021). And, where a petitioner's standing is "self-evident[,] no evidence outside the administrative record is necessary for the court to be sure of it." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2013); *cf. Concerned Household Elec. Consumers Council v. EPA*, No. 22-1139, 2023 WL 3643436, at *2 (D.C. Cir. May 25, 2023) (unpublished judgment) (faulting petitioners, who were not "directly regulated by the challenged rule," for failing to submit evidence to establish their standing) (quoting *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379 (D.C. Cir. 2021)).

Applying those principles, we conclude the Refineries have standing to challenge the Extension Rule. The Refineries have suffered an injury-in-fact caused by EPA's challenged actions. Assuming for purposes of the standing inquiry that the Refineries will prevail on their claim, the Extension Rule financially burdens the Refineries by requiring them to purchase RINs to satisfy their 2020-2022 renewable fuel obligations within a compressed timeframe. We need not credit any assertions that EPA's rulemaking caused an increase in RIN prices to recognize the burden of the shorter compliance interval: Instead of having three years to purchase RINs to meet those obligations—as the Refineries claim the CAA requires—the Extension Rule leaves Refineries potentially as little as nine months to do so. *See* 87 Fed. Reg. at 5,699. The cost of acquiring RINs for one compliance year often reaches into the tens of millions of dollars for small refineries, and it is readily apparent that expecting them to acquire enough RINs within a substantially shorter timeframe imposes a financial burden on them. One petitioner commented in opposition to the Extension Rule that abiding by the Rule's compliance schedule "would be an extreme financial shock to the system

14

of any obligated party, much less [small refineries]." *See* RFS Extension of Compliance and Attest Engagement Reporting Deadlines: Response to Comments, EPA-420-R-22-001, at 15 (Jan. 2022) (RTC) (Comment of Coffeyville) (J.A. 17); *accord id.* at 12 (Comment of Small Refiners Coalition) (J.A. 14). That financial burden is a cognizable injury-in-fact fairly traceable to the Extension Rule. *See Monroe Energy*, 750 F.3d at 915.

Finally, an order from this court would likely redress the Refineries' asserted injury. If we were to hold that the statute guarantees obligated parties a minimum of 12 months between compliance deadlines and 13 months' compliance lead time, as the Refineries contend, EPA could not impose the compressed compliance schedule set forth in the Extension Rule. Nor could EPA simply revert to the preexisting 2020-2022 compliance deadlines: Those deadlines also gave less than 13 months' compliance lead time. *See* 79 Fed. Reg. at 23,670. Rather, if the Refineries were to prevail, EPA would be required to either provide obligated parties more time to submit their 2020-2022 compliance reports or offer obligated parties relief from their renewable fuel obligations for those years by, for instance, waiving their renewable fuel requirements. *See* 42 U.S.C. § 7545(o)(7). Thus, assuming for purposes of the standing inquiry that the Refineries will succeed on the merits of their claims, their claimed injury is redressable. We therefore proceed to the merits.

III.

We review the Extension Rule pursuant to section 307(b)(1) of the Clean Air Act. 42 U.S.C. § 7607(b)(1). Under that section, we may reverse an agency action if it is arbitrary, capricious, an abuse of discretion, or not in accordance with law. *Id.* § 7607(d)(9)(A).

15

The Refineries challenge two aspects of the Extension Rule: the 2019-2022 compliance deadlines and the compliance schedule for 2023 and ensuing years. They argue both sets of provisions are contrary to law or, in the alternative, arbitrary and capricious. We address each set of provisions in turn.

A.

We begin with the Refineries' challenge to the Extension Rule's 2020-2022 compliance deadlines. The Refineries contend that, in light of EPA's late standard setting, the Extension Rule violates the CAA by giving obligated parties insufficient time to meet their compliance obligations. In particular, they argue that the Act requires EPA to afford obligated parties a minimum of 13 months' compliance lead time and a 12-month compliance interval, regardless of whether EPA timely issues the renewable fuel standards for the compliance years in question. They also contend that the agency acted arbitrarily and capriciously in setting the 2020-2022 compliance schedule.

Neither argument carries the day. We hold that, when EPA issues untimely renewable fuel standards, the CAA does not entitle obligated parties to 13 months' compliance lead time, nor does it require a minimum 12-month compliance interval. The agency, moreover, did not act arbitrarily and capriciously in establishing the 2020-2022 compliance schedule. Rather, the lead times and intervals are reasonable and reasonably explained.

1.

The Refineries' argument that the CAA binds EPA to an inflexible compliance schedule contravenes the statutory text and our precedent. The CAA calls on EPA to design a compliance regime for the RFS Program. It charges EPA with

16

"promulgat[ing] regulations to ensure that gasoline sold or introduced into commerce in the United States" contains at least the annual applicable volumes of renewable fuel required by the Act. 42 U.S.C. § 7545(o)(2)(A)(i). Further, the Act calls for regulations that "contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the requirements [of the Program] are met." *Id*. § 7545(o)(2)(A)(iii)(I). Importantly, the Act itself contains no compliance deadlines or intervals for obligated parties. *See id.* § 7545(o). Thus, rather than task EPA with overseeing a fixed compliance schedule, the Act gives EPA flexibility to craft and adjust a compliance regime in service of the Act's core mandate: to ensure the Act's annual renewable fuel volumes are met. *See id.* § 7545(o)(2)(A)(i).

Our precedent establishes that, when EPA misses its statutory deadline to issue the renewable fuel standards for a given year, the agency may—and in fact should—adjust compliance deadlines. We have thrice held that EPA is authorized to issue annual RFS standards after the statutory deadline, so long as it takes reasonable steps to mitigate any harm to obligated parties from the delay. *ACE*, 864 F.3d at 718-21; *Monroe Energy*, 750 F.3d at 919-20; *Nat'l Petrochemical*, 630 F.3d at 154-58. As relevant here, on two of those occasions we characterized EPA's extension of the Program's compliance reporting deadlines and compression of compliance intervals as vital to mitigating the harm to obligated parties caused by EPA's delay.

In *ACE*, for instance, we rejected a challenge to EPA's late issuance of the RFS Program's 2014-2017 annual volumes for biomass-based diesel. 864 F.3d at 719-21. We concluded EPA had "adequately considered various ways to minimize the hardship caused to obligated parties by virtue of EPA's delay," based in part on EPA's "very extensive extensions of the

17

normal compliance demonstration deadlines" for the 2014 and 2015 compliance years. *See id.* at 721, 722 (internal quotation marks omitted). Those extensions, like the ones at issue here, provided less than 13 months' compliance lead time and a compliance interval of less than 12 months. *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420, 77,491 (Dec. 14, 2015).

Similarly, in *Monroe Energy*, we affirmed EPA's authority to issue the 2013 renewable fuel standards after the statutory deadline, based in part on EPA's decision to "extend the compliance deadline by four months." 750 F.3d at 920; *see id.* at 920-21. EPA had determined "that the best way to balance obligated parties' interest in regulatory certainty with EPA's statutory obligation to ensure the renewable fuel volumes are annually met was to extend the compliance demonstration deadline by four months," while also shortening the parties' compliance interval. *Id.* at 920. Even with the extension, obligated parties received less than 13 months' compliance lead time. *See* Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794, 49,800, 49,823 (Aug. 15, 2013). We concluded that "EPA's decision to preserve the 2013 fuel standards while extending the compliance deadline to June 30, 2014[,] was reasonable." *Monroe Energy*, 750 F.3d at 921.

Our decisions in *ACE* and *Monroe Energy* thus contemplate that, when EPA misses its statutory deadlines, the agency may adjust obligated parties' compliance deadlines in order to mitigate the effects of its lateness.

EPA's extension of the 2020-2022 compliance deadlines in the Extension Rule heeds the guidance in those decisions. As noted, by the time EPA issued the Extension Rule it had

18

missed its statutory deadlines to publish the 2021 and 2022 renewable fuel standards. *See* 42 U.S.C. § 7545(o)(3)(B)(i); Extension Rule, 87 Fed. Reg at 5,697. The Extension Rule stated that EPA planned to issue a revised version of the 2020 standard, meaning publication of the final version of that standard would be late as well. *See* Extension Rule, 87 Fed. Reg at 5,697. Per our precedent, when publishing standards after the statutory deadline, EPA must "reasonably mitigate[] any burdens that its lateness [had] impose[d] on obligated parties." *ACE*, 864 F.3d at 717; *see also id*. at 718-21. In the Extension Rule, EPA sought to do just that: It endeavored to mitigate the harm caused by its "continued delay" in promulgating the final 2020-2022 standards by extending the compliance reporting deadlines for those years. Extension Rule, 87 Fed. Reg at 5,697.

And, rather than create a permanent lag in compliance deadlines as a result of those extensions, EPA established a timeline going forward that would enable the agency to get the Program's compliance cycle back on track. *See* Extension Rule, 87 Fed. Reg. at 5,698-99. To do so, EPA provided less than 13 months' compliance lead time and less than a full year compliance interval, *see* Extension Rule, 87 Fed. Reg. at 5,698-99—as it had done in the rules we considered in *ACE*, *see* 864 F.3d at 719-22; 80 Fed. Reg. at 77,491, and *Monroe Energy*, *see* 750 F.3d at 920-21; 78 Fed. Reg. at 49,800, 49,823.

Notwithstanding our prior rulings, the Refineries argue that the Extension Rule's "compressed" compliance timeline violates the CAA. Pets. Br. 19; *see id.* at 24-25. According to the Refineries, the Act "guarantees obligated parties at least a year between annual compliance deadlines and more than a year between the date EPA sets the volumes and the date obligated parties must comply with them." *Id.* at 17. The Refineries acknowledge that, if EPA misses its statutory

19

deadline, their theory prevents the agency from getting the Program back on track without excusing or reducing the parties' renewable fuel obligations for that year. *See* Reply Br. 6. In other words, the Refineries read the CAA to require EPA, when it fails to timely publish a renewable fuel standard, to either remain persistently behind schedule from year to year, or to catch up by abandoning its statutory duty "to ensure" the Program's annual renewable fuel volumes are met for the affected year. 42 U.S.C. § 7545(o)(2)(A)(i). We do not read the Act to prioritize the timeframes the Refineries see as implicit in the statute over EPA's express statutory obligation to implement the requisite use of renewable fuels.

To make their case that the Extension Rule abbreviates timeframes the Act implicitly prescribes, the Refineries first contend that EPA's annual statutory deadline to issue renewable fuel standards by November 30 before the start of the applicable compliance year means that they are entitled to 13 months' compliance lead time. *See* 42 U.S.C. § 7545(o)(3)(B)(i). The Refineries claim that, "[b]ecause the earliest possible deadline for compliance for any particular calendar year is the following January 1, obligated parties are entitled [to] *at least* 13 months' lead time between publication of the final annual volume obligation and the deadline for reporting compliance with that obligation." Pets. Br. 22.

That argument fails to persuade. We note, at the outset, that the Act contains no express requirement that EPA refrain from requiring any compliance reporting until the entire compliance year has elapsed. *See* 42 U.S.C. § 7545(o). Even assuming *arguendo* the Refineries are correct that the statute anticipates 13 months' lead time in the normal course, it does not follow that the Act binds EPA to that timeframe in the event EPA misses its statutory deadline. As discussed, such a reading of the Act would effectively preclude EPA from

20

fulfilling its primary mandate whenever it is late in setting a renewable fuel standard. In the Refineries' view, falling behind in setting the RFS for a given year would automatically curtail EPA's compliance authority: It could either protect the Refineries' compliance lead time by remaining equally far behind in subsequent years, or get the Program back on track by relieving parties' renewable fuel obligations for the compliance year at issue. Absent an express 13-month minimum requirement in the Act's text, we are not persuaded Congress intended EPA to abdicate its core statutory duty in service of that inflexible compliance lead time. To the contrary, Congress explicitly directed EPA to craft a compliance regime "as appropriate, to ensure that the requirements [of the Program] are met"—thereby mandating that any compliance framework work in service of the Act's renewable fuel goals, not against them. *Id*. § 7545(o)(2)(A)(iii)(I). In enacting the RFS Program, "Congress' focus [was] on ensuring the annual volume requirement [is] met regardless of EPA delay." *Monroe Energy*, 750 F.3d at 920 (quoting *Nat'l Petrochemical*, 630 F.3d at 163).

The Refineries next point to the Act's use of the term "calendar year" in setting the renewable fuel volume requirements as evidence that the statute mandates 12-month intervals between compliance deadlines. 42 U.S.C. § 7545(o)(2)(B); *see* Pets. Br. 20; Reply Br. 3. But Congress's specification that the Act's volume requirements be set on an annual basis does not mean that obligated parties' compliance reports must be submitted at 12-month intervals. Rather, the Act grants EPA the authority to establish reporting deadlines and compliance intervals "as appropriate, to ensure" the Act's requirements are met. 42 U.S.C. § 7545(o)(2)(A)(iii)(I).

21

The Refineries also contend the Act's deficit carry-forward provision supports their view that 12-month compliance intervals are "mandatory." Pets. Br. 20; *see id.* at 20-21. That provision permits any entity that lacks sufficient credits to meet its renewable fuel obligations for a given year "to carry forward a renewable fuel deficit," provided that, in the next year, the entity "(i) achieves compliance with [its] renewable fuel [obligations]; and (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year." 42 U.S.C. § 7545(o)(5)(D). The Refineries claim that the Extension Rule's compliance timeline renders the Act's deficit carry-forward provision "useless," because parties will only have three or five months rather than the full ensuing year to satisfy their deficit from a prior year. Pets. Br. 21.

That argument ignores the function that the carry-forward provision continues to serve under the Extension Rule. Obligated parties may carry forward a deficit into the following compliance year to satisfy their obligations even when the compliance interval is less than 12 months. For instance, under the Extension Rule, eligible obligated parties may carry forward a renewable fuel deficit from the 2020 compliance year into the 2021 compliance year—and thus avail themselves of the compliance flexibility envisioned by the Act—even when the compliance reporting dates for those years are set at quarterly rather than annual intervals. *See* Extension Rule, 87 Fed. Reg. at 5,698-99; 40 C.F.R. § 80.1428(c); RTC 19 (EPA Response) (J.A. 21). The deficit carry-forward provision thus plays a useful role even when compliance intervals are compressed.

Accordingly, we hold that, when EPA issues renewable fuel standards after the applicable statutory deadline for a given year, the agency is not statutorily bound to provide a minimum

22

of 13 months' compliance lead time or 12 months between compliance reporting deadlines. Rather, it may reasonably adjust the RFS Program's compliance schedule as appropriate to mitigate the harm caused by EPA's delay and to ensure the requirements of the Program are met. We thus reject the Refineries' claim that the Extension Rule's 2020-2022 compliance schedule violates the CAA.

2.

Next, we turn to the Refineries' argument that the Extension Rule's 2020-2022 compliance deadlines are arbitrary and capricious. Under the deferential arbitrary and capricious standard, we evaluate whether the challenged agency action is "reasonable and reasonably explained." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 409 (D.C. Cir. 2020) (quoting *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014)). Our role is not to substitute our policy judgments for those of the agency. *Id.* at 414. Rather, we "must exercise our 'narrowly defined duty of holding agencies to certain minimal standards of rationality.'" *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 805 (D.C. Cir. 2021) (quoting *Murray Energy Corp. v. EPA*, 936 F.3d 597, 608 (D.C. Cir. 2019)).

The Refineries contend that the Extension Rule is arbitrary and capricious because it fails to "reasonably mitigate" the harm caused by EPA's delays in taking other actions. Pets. Br. 2, 20, 25-29. They argue that the agency's delays in issuing the 2020-2022 standards and belated denial of a group of small refinery exemption petitions have subjected refineries, especially small ones, to a host of hardships. They assert that RIN market instability and elevated RIN prices add to the costs of compliance. According to the Refineries, "the only reasonable mitigation" under the circumstances is to give

23

obligated parties some form of reprieve from their renewable fuel obligations. *Id.* at 28. They suggest EPA could offer parties an alternative compliance demonstration approach that would reduce their obligations, exercise its waiver authority to eliminate their obligations entirely, or provide small refineries credits to compensate for changes in RIN prices. By failing to undertake these measures in the Extension Rule, the Refineries argue, EPA acted arbitrarily and capriciously.

The Refineries' reasonable-mitigation argument is misdirected. It is true that, in evaluating challenges to late-issued renewable fuel standards, we have looked to whether EPA reasonably mitigated any hardship to obligated parties caused by its delay in issuing those standards. *See ACE*, 864 F.3d at 718-19; *see Monroe Energy*, 750 F.3d at 920; *Nat'l Petrochemical*, 630 F.3d at 166. But other agency actions that could bear on refineries' obligations are not before us here. EPA's delayed issuance of the 2020-2022 standards is subject to a separate pending challenge, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1210 (D.C. Cir.), as is EPA's denial of several small refinery exemption petitions, *Sinclair Wyoming Refining Co. v. EPA*, No. 22-1073 (D.C. Cir.); *Hunt Refining Co. v. EPA*, No. 22-11617 (11th Cir.); *Calumet Shreveport Refining LLC v. EPA*, No. 22-60266 (5th Cir.). Any questions whether EPA has reasonably mitigated the asserted hardships caused by those delays are not before us in this case. Needless to say, we take no position on the merits of those petitions. The agency action on review here is limited to EPA's decision to alter obligated parties' compliance deadlines in the Extension Rule.

To the extent the Refineries argue that the specific compliance lead times and compliance intervals set forth in the Extension Rule are arbitrary and capricious, we reject that argument. The 2020-2022 compliance schedule established by

24

the Extension Rule is both reasonable and reasonably justified by the agency.

With respect to the compliance lead times set forth in the Extension Rule, EPA reasonably determined that obligated parties would have adequate notice and time to comply with the 2020-2022 standards. For the 2020 renewable fuel obligations, obligated parties had more than two-and-a-half years' advance notice of the original 2020 standard before the compliance deadline set by the Extension Rule, *see* 85 Fed. Reg. 7,016 (Feb. 6, 2020); Extension Rule, 87 Fed. Reg. at 5,698—well beyond the 13 months' lead time the Refiners seek. Although EPA issued revised 2020 standards in July 2022, *see* 87 Fed. Reg. at 39,602, it modified parties' obligations downward, making it easier for obligated parties to comply, and thereby justifying the shorter increment of compliance lead time following its revision, *see ACE*, 864 F.3d at 718-19.

For the 2021 compliance year, EPA calibrated the compliance lead time that it chose based on the renewable fuel standards it planned to set. The agency planned to (and ultimately did) set the 2021 volumes "at actual renewable fuel use in the [United States]," RTC 19 (EPA Response) (J.A. 21); *see* 87 Fed. Reg. at 39,602-03. This approach guards against RIN shortages by ensuring that the quantity of RINs already generated during the relevant year will be adequate to satisfy the renewable fuel standards for that compliance year. *See* 87 Fed. Reg. at 39,622; *ACE*, 864 F.3d at 718-19 (citing 80 Fed. Reg. at 77,430, 77,439-40). Given that no further RIN generation would be required, and that "all RINs for [the] 2021 renewable fuel production ha[d] already been generated and all gasoline and diesel fuel production ha[d] already occurred," EPA concluded it was not necessary to provide obligated parties with a full year of compliance lead time to demonstrate

compliance with 2021 obligations.  RTC 32 (EPA Response) (J.A. 34).  Instead, by the Refineries' own count, the Extension Rule ultimately provided obligated parties 10 months between EPA's publication of the 2021 standard and their compliance reporting deadlines.  *See* Extension Rule, 87 Fed. Reg. at 5,698; Pets. Br. 24.  Notably, EPA had given obligated parties approximately eight months' lead time in the past when setting the volumes at actual renewable fuel use—for instance, in the rule we considered in *ACE*, *see* 864 F.3d at 722-23; 80 Fed. Reg. at 77,491—and EPA drew on that "past practice" in crafting the 2021 timeline, RTC 32 & n.12 (EPA Response) (citing, *inter alia*, 80 Fed. Reg. at 77,512-14) (J.A. 34).  The agency's decision to provide a similar timeline under similar circumstances was not unreasonable.

Regarding the 2022 compliance year, the Refineries acknowledge that EPA afforded obligated parties at least 12 months' lead time, just one month short of the 13-month period they request.  *See* Pets. Br. 24; Extension Rule, 87 Fed. Reg. at 5,698; July 2022 Rule, 87 Fed. Reg. at 39,602-03.  The Refineries offer no reason why that one-month discrepancy renders EPA's 2022 deadline unreasonable.  *See* Pets. Br. 22-24.  Moreover, the Rule provided that obligated parties might ultimately receive more than 13 months' lead time for the 2022 compliance year under the Extension Rule, depending on when EPA issues the 2023 renewable fuel standards.  *See* Extension Rule, 87 Fed. Reg. at 5,698 (setting the 2022 compliance deadline as the later of either the next quarterly reporting deadline after the 2021 compliance deadline or the effective date of the 2023 standards).  We thus conclude EPA reasonably balanced its statutory responsibility to ensure the Program's annual fuel requirements are met with its need to extend the 2020-2022 compliance deadlines as part of its efforts to mitigate the harm caused by its delay in issuing those standards.

26

Finally, as for the compliance intervals set by the Rule, EPA drew on its relevant experience. *See* RTC 9 (EPA Response) (J.A. 11). As EPA explained, "[o]ur past experience administering this program has indicated that, where the RFS annual rules have been delayed, [a] 60-day window between compliance deadlines is a workable amount of time for obligated parties to develop their compliance strategy and acquire sufficient RINs to demonstrate compliance." *Id.*; *accord* Extension Rule, 87 Fed. Reg. at 5,699-700 & n.19. EPA further noted that "this amount of time was generally sufficient for obligated parties to comply with the 2013-2016 standards, which had a similar compliance schedule to the one finalized in this action." RTC 9 (EPA Response) (J.A. 11); *see id.* at 46-47 & n.17 (EPA Response) (J.A. 48-49); 80 Fed. Reg. at 77,513-14.

The Refineries counter that a recent Government Accountability Office (GAO) Report calls into question assumptions about RIN market functionality that EPA relied on in crafting the Extension Rule. *See* Reply Br. 12-13 (citing GAO, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program, No. GAO-23-105801 (Nov. 3, 2022) (2022 GAO Report)); Oral Arg. 2:55-3:20, 55:00-40. GAO issued that report after EPA promulgated the Extension Rule, however. *See* 2022 GAO Report 1; 87 Fed. Reg. at 5,696. And we "judge the reasonableness of an agency's decision on the basis of the record before the agency at the time it made its decision." *NTCH, Inc. v. FCC*, 950 F.3d 871, 881 (D.C. Cir. 2020) (per curiam) (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1107 (D.C. Cir. 2009)). Additionally, the report focuses on EPA's policies for resolving small refinery exemption petitions, *see* 2022 GAO Report 1-2, 26, which are not challenged here.

27

To sum up, we conclude that the 2020-2022 compliance lead times and intervals set forth in the Extension Rule are neither arbitrary nor capricious.  We take no position on whether EPA has reasonably mitigated the harm borne by obligated parties due to its delayed issuance of the 2020-2022 standards.  Nor do we opine on the lawfulness of EPA's small refinery exemption policies and decisions.  Rather, we hold simply that the Extension Rule's compliance schedule is reasonable and reasonably explained.

B.

That leaves the Refineries' challenge to the Extension Rule's future compliance schedule.  We refer to this component of the Rule as the Post-2022 Provision.  It establishes that, beginning in 2023, the compliance deadline for each year will be the latest of (a) March 31 of the following calendar year; (b) the next quarterly reporting deadline after the effective date of the subsequent compliance year's standards; or (c) the next quarterly reporting deadline after the compliance deadline for the prior compliance year.  Extension Rule, 87 Fed. Reg. at 5,700-01.  In effect, this provision automatically extends obligated parties' compliance reporting deadline for a given compliance year in the event EPA delays in publishing the renewable fuel standards for the following year, or if EPA extends the prior year's compliance deadline.

The Refineries cast this provision as an "attempt to re-write the statute."  Pets. Br. 30.  They argue that it "expressly anticipates" EPA may miss its statutory deadlines for issuing renewable fuel standards in 2023 and beyond, and therefore contravenes the Act.  *Id.* at 31.

That argument breaks down on closer scrutiny.  As an initial matter, the CAA does not set a deadline for EPA to publish the renewable fuel percentage standards beyond

28

2023.  *See* 42 U.S.C. § 7545(o)(2)(B)(ii).  Recall that, through
2022, the Act requires EPA to publish the percentage standards
for three categories of renewable fuel (total renewable fuel,
advanced biofuel, and cellulosic biofuel) for a given
compliance year "no later than November 30" of the preceding
year.  *Id.* § 7545(o)(2)(B)(i).  But the Act is silent as to when
EPA must publish those renewable fuel standards
thereafter.  *See id.*  Instead, beginning in 2023, the Act requires
EPA to publish the "*applicable volumes*" of renewable fuel—
*i.e.*, the minimum volumes of the relevant renewable fuel types
that must be introduced into the U.S. fuel supply in a given
year—"no later than 14 months before the first year for which
such applicable volume will apply."  *Id.* § 7545(o)(2)(B)(ii)
(emphasis added).  The Refineries identify nothing in the
Extension Rule that expressly anticipates EPA will fail to meet
its statutory deadlines to publish those applicable volumes,
negating the conflict they see between the Extension Rule and
the Act's text.

In any event, even assuming the Extension Rule could be
read to anticipate that EPA will miss a statutorily prescribed
deadline, the Refineries' argument is foreclosed by our
precedent.  Because we have held that EPA may, under certain
conditions, lawfully issue renewable fuel standards even after
its statutory deadlines to do so, *see ACE*, 864 F.3d at 718-21,
*Monroe Energy*, 750 F.3d at 919-20; *Nat'l Petrochemical*, 630
F.3d at 154-58, the Post-2022 Provision does not contravene
the Act by virtue of accounting for that possibility.

The Refineries next contend that the Post-2022 Provision
conflicts with the CAA insofar as it enables EPA to provide
less than the minimum compliance lead time that the Refineries
claim the Act requires.  However, to the extent the provision
could result in a compression of obligated parties' time to
comply should EPA fail to timely issue the renewable fuel

29

standards for a given year, that compression does not contravene the Act for the same reasons discussed in Part III.A.1 *supra*.

Finally, the Refineries argue that EPA failed to reasonably justify the post-2022 compliance schedule, rendering it arbitrary and capricious. They claim EPA's sole justification for the automatic extension feature of the Post-2022 Provision is that it is necessary to "ensure that obligated parties know [next year's] obligations before complying with [the current year's] obligation." Pets. Br. 32 (quoting Extension Rule, 87 Fed. Reg. at 5,700). Because the compliance schedule they claim the statute requires "already achieves" that goal, they argue, EPA's explanation is insufficient. *Id.*

The Refineries' argument is belied by the record. The explanation they identify is not the only one EPA provided in support of the post-2022 compliance schedule. EPA also stated that it will provide greater "regulatory certainty for obligated parties" by establishing predetermined extensions for a given year's compliance reporting deadline in the event obligated parties are still waiting on EPA to publish the next year's renewable fuel standards. Extension Rule, 87 Fed. Reg. at 5,701. And EPA justified the particular compliance intervals and lead times envisioned by the Post-2022 Provision based on its past experience. *See* RTC 41 (EPA Response) (J.A. 43). The Refineries offer no reason why those explanations are insufficient or otherwise unreasoned. *See* Pets Br. 30-32. We thus reject the Refineries' challenge to the Extension Rule's compliance timeline for 2023 onwards.

\*   \*   \*

For the foregoing reasons, we deny the petitions for review.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring in the judgment: We should have dismissed the Refineries' petitions for judicial review for the same reasons we dismissed the petitions in *Concerned Household Electricity Consumers Council v. Environmental Protection Agency*, 2023 WL 3643436 (D.C. Cir. May 25, 2023) (per curiam): the Refineries have failed to establish their standing to sue. *See Sierra Club v. EPA*, 292 F.3d 895, 899–90 (D.C. Cir. 2002).

The traditional standing elements are injury-in-fact, causation, and redressability. "[U]nless standing is clear from the administrative record, the party must submit evidence to prove it." *Viasat, Inc. v. Fed. Commc'ns Comm'n*, 47 F.4th 769, 781 (D.C. Cir. 2022); *Sierra Club*, 292 F.3d at 899; D.C. Cir. R. 28(a)(7) (codifying this requirement in our local rules). In this context as elsewhere, "barebones" statements do not suffice. *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613–14 (D.C. Cir. 2019). To establish standing when it is not self-evident, the petitioner "may carry its burden of production by citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Sierra Club*, 292 F.3d at 900–01.

That the Refineries are regulated by EPA's extension rule does not make their standing self-evident. *See, e.g.*, *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 813–15, 819 (D.C. Cir. 2006). At best, the administrative record suggests one harm from EPA's extension of compliance deadlines: increased RIN prices. *See, e.g.*, Joint Appendix 7. But the Refineries have not shown that the extension or compression of compliance deadlines has caused an injury-in-fact – there is no evidence that RIN prices increased after EPA's rulemaking and there is no evidence the Refineries purchased RINs at higher prices. Even if RIN prices increased, the Refineries have not

2

shown that EPA's extension rule was the cause.[1]    *See Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 381–82, 385 (D.C. Cir. 2020).  And even if the Refineries could show injury-in-fact and causation, they have not shown that setting EPA's extension rule aside would remedy their harms.[2]

The majority opinion purports to identify an injury-in-fact from two sentences in the administrative record.  *See* Maj. Op. 13–14.  But it was the Refineries' burden to show injury and they have not done so.  *Sierra Club,* 292 F.3d at 900; *Twin Rivers*, 934 F.3d at 613.  That in itself "is a sufficient ground to dismiss . . . for lack of standing."  *Concerned Household Elec. Consumers Council*, 2023 WL 3643436, at *2.  Moreover, the two assertions the majority invokes are in the nature of allegations made in comments on the extension rule.  *See* Maj. Op. 14; Joint Appendix 14, 17.  The statements are not backed up with evidence.  Under *Sierra Club* and a long line of cases in this circuit, that is not sufficient to establish standing.  292 F. 3d at 898–901.  To hold otherwise is to disregard those precedents.  *See Twin Rivers*, 934 F.3d at 613 (collecting cases).

---

[1] Counsel for the Refineries conceded this point, stating that the extension of the compliance deadlines did not increase RIN prices. Oral Argument at 2:47–50, *Wynnewood Refining Company, LLC, et al. v. EPA*, No. 22-1015 (consl. 22-1051, 22-1053) ("The thing that has caused RIN prices to rise is not the extension [rule].").

[2] If we set aside the extension rule, the Refineries would likely be immediately out of compliance with EPA's requirements. *Compare* 40 C.F.R. § 80.1451(a) (Mar. 30, 2021), *with* 40 C.F.R. § 80.1451(f)(1)(i) (Jan. 31, 2022).  As to redressability, all the majority opinion comes up with is the possibility that EPA might offer the Refineries some form of relief if their petitions for judicial review were granted.  Maj. Op. 14–15.