ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-1015 and consolidated cases

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

WYNNEWOOD REFINING COMPANY, LLC, ET AL.,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

———————

On Petition for Review of Action by the U.S. Environmental Protection Agency

———————

**EPA'S RESPONSE IN OPPOSITION TO MOTION FOR STAY**

———————

|  |  |
|---|---|
| | TODD KIM |
| | Assistant Attorney General |
| *Of Counsel:* | JEFFREY HUGHES |
| MEREDITH G. MILLER | U.S. Department of Justice |
| U.S. Environmental Protection Agency | Environment & Natural Resources Division |
| Office of General Counsel | Environmental Defense Section |
| Washington, D.C. | P.O. Box 7611 |
| | Washington, D.C. 20044 |
| | |
| | *Counsel for Respondents* |

June 6, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 3

    A. The RFS program ................................................................. 3

    B. The Extension Rule ............................................................... 4

    C. The Small Refinery Exemption Denials ............................... 6

    D. The 2020–2022 RFS Final Rule .......................................... 7

    E. The RIN Retirement Proposal .............................................. 8

STANDARD OF REVIEW ................................................................. 8

ARGUMENT ...................................................................................... 9

I.    EPA Will Likely Prevail on the Merits Because the Extension Rule Reasonably Mitigates Any Potential Hardship to Obligated Parties ......... 9

    A. EPA is likely to prevail on the merits because the Extension Rule permissibly extends the 2019–22 compliance dates ............................ 9

    B. EPA is likely to prevail on the merits because the Extension Rule permissibly extends future compliance dates .................................... 12

    C. EPA is likely to prevail on the merits because the Refineries have not identified a provision of the CAA that mandates any required lead time or interval in setting annual RFS compliance deadlines ............. 13

II.    The Extension Rule Causes the Refineries No Immediate, Certain, Direct Harm, Whereas a Stay of its Effective Date Would Cause Such Harm ... 15

    A. A stay would cause obligated parties, including the Refineries, immediate harm .................................................................................. 16

B. The Extension Rule does not cause the Refineries any loss because it does not impose any substantive obligations ......................................16

C. Recent EPA actions further reduce any purported hardship to obligated parties ...................................................................................18

D. The Refineries have not alleged a potential violation of their due process rights....................................................................................19

III.    A stay of the Extension Rule is not in the public interest ........................22

CONCLUSION ..........................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Action on Smoking & Health v. CAB,*
713 F.2d 795 (D.C. Cir. 1983)................................................................16

*Am. Hosp. Ass'n v. Harris,*
625 F.2d 1328 (7th Cir. 1980).............................................................17

*Americans for Clean Energy v. EPA,*
864 F.3d 691 (D.C. Cir. 2017)............................................... 10, 11, 12

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
772 F.2d 972 (D.C. Cir. 1985)............................................................22

*Davis v. Pension Benefit Guar. Corp.,*
571 F.3d 1288 (D.C. Cir. 2009)............................................... 13, 17

*Ex Parte Young,*
209 U.S. 123  (1908) .........................................................................20

*Gen. Elec. Co. v. Jackson,*
610 F.3d 110 (D.C. Cir. 2010)...........................................................20

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n,*
141 S. Ct. 2172 (2021). ....................................................................6, 7

*Ill. Bell Tel. Co. v. WorldCom Techs., Inc.,*
157 F.3d 500 (7th Cir. 1998) .............................................................16

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ..........................................................................21

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ............................................................................8

*Mexichem Specialty Resins, Inc. v. EPA,*
787 F.3d 544 (D.C. Cir. 2015)...........................................................15

*Monroe Energy, LLC v. EPA*,
    750 F.3d 909 (D.C. Cir. 2014)....................................................... 11, 12

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................8, 9

*Renewable Fuels Ass'n v. EPA*,
    948 F.3d 1206 (10th Cir. 2020) ........................................................6

*United States v. Law*,
    528 F.3d 888 (D.C. Cir. 2008)..........................................................12

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)..........................................................15

**Statutes**

42 U.S.C. § 7524(b) ......................................................................21

42 U.S.C. § 7524(c)(1) .............................................................. 20, 21, 22

42 U.S.C. § 7524(c)(5) ............................................................... 21, 22

42 U.S.C. § 7545(d)(1)...................................................................20

42 U.S.C. § 7545(*o*) ......................................................................3

42 U.S.C. § 7545(*o*)(2)(A)(i) ...............................................................3

42 U.S.C. § 7545(*o*)(2)(A)(iii) .............................................................3

42 U.S.C. § 7545(*o*)(2)(B) ...............................................................22

42 U.S.C. § 7545(*o*)(2)(B)(i)(I) .............................................................3

42 U.S.C. § 7545(*o*)(3)(B) .................................................................3

42 U.S.C. § 7545(*o*)(3)(B)(i) ....................................................... 3, 9, 14

42 U.S.C. § 7545(*o*)(5)(A)-(C) ...................................................................4

42 U.S.C. § 7545(*o*)(5)(D) ......................................................................14

**Rules**

D.C. Cir. R. 18(a)(1) .................................................................................9

**Code of Federal Regulations**

40 C.F.R. § 80.1427(a) ..............................................................................4

40 C.F.R. § 80.1428(c) ..............................................................................4

40 C.F.R. § 80.1451(a) ..............................................................................4

40 C.F.R. § 80.1451(a) (2021) .................................................................14

40 C.F.R. § 80.1451(f)(1)(i) .......................................................................9

**Federal Register Notices**

80 Fed. Reg. 77420 (Dec. 14, 2015) ............................................... 9–10, 11

86 Fed. Reg. 17073 (Apr. 1, 2021) ...................................................... 15–16

87 Fed. Reg. 1676  (Jan. 12, 2022) ......................................................... 21

87 Fed. Reg. 5696 (Feb. 2, 2022) ............................................... 4, 5, 6, 16

## INTRODUCTION

The Renewable Fuel Standard ("RFS") program was established to increase the use of renewable fuels in the United States transportation system, reduce greenhouse gases, and increase energy security. Congress set forth in the Clean Air Act ("CAA") annual volume targets for the domestic use of renewable fuels, and EPA must translate the volume targets into percentage-based compliance obligations that refineries and importers of transportation fuel ("obligated parties") must meet every year. Congress set ambitious timelines, and EPA has, from time to time, promulgated late volume targets and percentage-based compliance obligations. However, this Court has repeatedly held that EPA may issue retroactive standards under this program as long as it reasonably mitigates any hardship experienced by obligated parties. EPA has done so here, and Petitioners' motion for a stay pending review must fail.

With respect to the first of the four elements for a stay, Petitioners have little or no likelihood of success on the merits. These consolidated petitions challenge a February 2022 rule promulgated by EPA to extend certain compliance deadlines. This rule—which gives obligated parties more time to comply with certain aspects of the 2019 through 2022 annual standards but does not change the underlying substantive obligations—mitigates potential hardship to the obligated parties in a reasonable and practical fashion. This common-sense action was well within the

1

agency's discretion, especially since the CAA *nowhere* mandates any interval between the publication of obligations and a compliance date, or length of time between compliance dates.

Petitioners also fail to demonstrate they will suffer the requisite irreparable injury absent a stay. Granting a stay here would aggravate rather than ameliorate any such injuries. The purpose of a stay is to preserve the status quo ante pending judicial review. A stay here would immediately put Petitioners out of compliance with their RFS obligations because certain of the compliance deadlines extended by this rule are long past. Nor can the extension of time for Petitioners to comply with their RFS obligations constitute irreparable injury, because this extension imposes no substantive obligations on Petitioners. Finally, a stay of the RFS compliance deadline extension rule would be contrary to the public interest because it would throw the RFS program and associated markets into disarray by creating uncertainty for many obligated parties not represented in this litigation. Petitioners' motion for a stay should be denied.

## BACKGROUND

### A. The RFS program

In 2005 and again in 2007, Congress amended the CAA to establish the RFS program, now codified at 42 U.S.C. § 7545(*o*). *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007). The purpose of the RFS program is to "move the United States toward greater energy independence and security" and to "increase the production of clean renewable fuels." 121 Stat. 1492. To accomplish this, Congress specified increasing annual "applicable volumes" of four categories of renewable fuel to be used in the transportation sector, 42 U.S.C. § 7545(*o*)(2)(B)(i)(I), and directed EPA to establish a compliance program and annual percentage standards to ensure that the applicable volumes are used each year. *Id.* §§ 7545(*o*)(2)(A)(i), (iii), 7545(*o*)(3)(B). The Act directs EPA to determine the RFS applicable percentages for obligated parties by November 30 for the following compliance year. *Id.* § 7545(*o*)(3)(B)(i). Obligated parties apply the percentage standards to their own annual production or importation of gasoline and diesel to calculate their individual annual renewable volume obligations for each type of renewable fuel.

The CAA requires EPA to establish a credit trading program. Among other things, this program allows any party that possesses more credits than needed to

3

comply with its RFS obligations in a given year either to apply those credits toward compliance in a subsequent year or sell the credits to another obligated party to be used to demonstrate compliance. *Id.* § 7545(*o*)(5)(A)–(C). EPA has implemented this credit program by establishing a system of tradeable credits called "Renewable Identification Numbers" or "RINs." Obligated parties comply with their obligations by acquiring RINs and "retiring" them in an annual compliance demonstration. 40 C.F.R. §§ 80.1427(a), 80.1451(a). RINs are valid for two years, so, for example, a refinery can retire 2019 RINs to satisfy its 2019 or 2020 renewable fuel obligations. 40 C.F.R. § 80.1428(c).

### B. The Extension Rule

The Petitioners (the "Refineries") challenge the rule entitled Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines, 87 Fed. Reg. 5696 (Feb. 2, 2022) (the "Extension Rule"). Relevant to these petitions, the Extension Rule has three critical components. *First*, the Extension Rule delays the 2019 RFS compliance deadline for small refineries until the next quarterly reporting deadline after the effective date of the 2021 RFS standards: that is, September 1, 2022.[1] *Id.* at 5698.

---

[1] Assuming the standard for 2021 issued by EPA on June 3, 2022 is effective on or before August 31, 2022.

4

EPA extended this compliance deadline for small refineries because the Agency anticipated the December 2021 proposal to deny all pending small refinery exemption petitions and revise downward the previously-finalized 2020 RFS volumes—both actions that were finalized last week—would impact small refineries' compliance strategies. *Id.* at 5698–99. All other obligated parties were required to demonstrate compliance with those 2019 standards by March 31, 2020. *Id.* at 5698.

*Second*, the Extension Rule extended the 2020–22 RFS compliance deadlines for all obligated parties, making these deadlines December 1, 2022 for the 2020 compliance year; March 31, 2023 for the 2021 compliance year; and June 1, 2023 for the 2022 compliance year.[2] *Id.* at 5700.

*Third*, in the event future RFS annual standard rulemakings are delayed, the compliance deadline will be the latest of (a) March 31st of the following calendar year; (b) the next quarterly reporting deadline after the effective date of the subsequent compliance year's standards; or (c) the next quarterly reporting deadline after the compliance deadline for the prior compliance year. *Id.* at 5700–01.

---

[2] Again, assuming the standard for 2021 issued by EPA on June 3, 2022 is effective on or before August 31, 2022.

5

## C. The Small Refinery Exemption Denials

On April 25, 2022, and last week on June 3, 2022, EPA took two actions to deny a majority of the pending small refinery exemption petitions covering compliance years 2016–21. *See* April 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program, EPA-420-R-22-005, https://www.epa.gov/system/files/documents/2022-04/420r22005.pdf; June 2022 Denial of Petitions for RFS Small Refinery Exemptions, EPA-420-R-22-011, https://www.epa.gov/system/files/documents/2022-06/420r22011.pdf ("June 2022 SRE Denial") (collectively the "SRE Denials"). These denials were based on the January 2020 decision *Renewable Fuels Association v. EPA*, 948 F.3d 1206 (10th Cir. 2020) (hereinafter "*RFA*"), which invalidated three of EPA's small refinery exemptions. *See* 87 Fed. Reg. at 5699. *RFA* held in part that "extensions of exemptions based at least in part on hardships not caused by RFS compliance was outside the scope of . . . EPA's statutory authority." *RFA*, 948 F.3d at 1254, *rev'd sub nom. HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021) (hereinafter "*HollyFrontier*"). Although the Supreme Court reversed the Tenth Circuit's opinion in part, it did not address this holding because it had not been appealed. Instead, the Court concluded only that EPA may grant exemptions to "small refineries whose exemptions ha[d] lapsed" in prior years. *See*

*HollyFrontier*, 141 S. Ct. at 2177. The Tenth Circuit's alternative holdings therefore remain in effect.

In light of *RFA*, EPA revised its interpretation of the statutory small refinery exemption provisions. Further, the Agency determined that small refineries are able to pass on the cost of RINs at the point of sale and therefore RFS compliance costs do not cause disproportionate economic hardship for any obligated party. *See, e.g.*, June 2022 SRE Denial at 2, 30.

### D.  The 2020–2022 RFS Final Rule

Several other final EPA actions have changed the landscape since the Refineries filed their motion. On June 3, 2022, EPA issued the Renewable Fuel Standard (RFS) Program: RFS Annual Rules, EPA-HQ-OAR-2021-0324 (June 3, 2022), https://www.epa.gov/system/files/documents/2022-06/rfs-2022-annual-rule-frm-2022-06-03.pdf ("2020–2022 RFS Final Rule"). This rule, among other things, establishes applicable volume targets and percentage standards for 2021 and 2022. *Id.* at 5, 9. The 2020–2022 RFS Final Rule also modifies standards that EPA previously established for 2020 downwards in light of new facts and to "ensure sufficient RINs are available for compliance." *Id.* at 7, 40–49

### E. The RIN Retirement Proposal

On the same day EPA issued the June 2022 SRE Denial and the 2020–2022 RFS Final Rule, it also announced a proposed rule, the Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries, EPA-HQ-OAR-2022-0434 (June 3, 2022), https://www.epa.gov/system/files/documents /2022-06/rfs-small-refinery-rin-retire-sched-nprm-2022-06-03.pdf ("RIN Retirement Proposal"). The RIN Retirement Proposal would allow small refineries to satisfy their 2020 RFS obligations by retiring RINs over five quarters; as a result, they would have until February 1, 2024, to fully satisfy those obligations. *See* RIN Retirement Proposal at 12, Table II.1. The proposal would also allow small refineries to use later RIN vintages to comply with their 2020 RFS obligations. *See id.*

### STANDARD OF REVIEW

A stay is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and citation omitted). A movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) lack of harm to other parties from a stay; and (4) a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also* D.C. Cir. R. 18(a)(1). The first two factors "are the

most critical." *Nken*, 556 U.S. at 434, and the third and fourth factors are considered together when the government is the opposing party, *id.* at 435.

## ARGUMENT

### I. EPA Will Likely Prevail on the Merits Because the Extension Rule Reasonably Mitigates Any Potential Hardship to Obligated Parties

EPA permissibly extended the compliance dates for 2019 (for small refineries) and 2020–22 (for all parties), and for future compliance dates if EPA must again reasonably delay setting annual RFS standards. Therefore, the Agency will likely prevail on the merits.

#### A. EPA is likely to prevail on the merits because the Extension Rule permissibly extends the 2019–22 compliance dates.

While the CAA requires EPA to publish the following year's percentage standards by November 30 each year through 2022, *see* 42 U.S.C. § 7545(*o*)(3)(B)(i), it does not set the date by which obligated parties must demonstrate compliance. And it *nowhere* contains an explicit requirement that EPA provide *any* length of time between the publication of standards and the associated compliance deadlines. Instead, EPA—and not the CAA—sets the RFS compliance dates by regulation. *See* 40 C.F.R. § 80.1451(f)(1)(i). This date has varied over the life of the program, *see, e.g.*, Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77420, 77513 (Dec. 14, 2015) (setting later deadlines in connection

with delayed promulgation of standards), as EPA has reasonably altered its regulations.

Moreover, EPA retains significant discretion to delay compliance deadlines when it issues late standards. In fact, this Court has held that if EPA issues late standards, it *must* "reasonably consider[] and mitigate[] any hardship caused to obligated parties by reason of the lateness," *Americans for Clean Energy v. EPA*, 864 F.3d 691, 718 (D.C. Cir. 2017) (hereinafter "*ACE*"), including by extending the normal compliance deadlines, *id.* at 722.

*ACE* demonstrates that EPA will likely prevail on these consolidated petitions. The rule challenged in *ACE* promulgated, among other standards, retroactive biomass-based diesel standards for 2014 and 2015 and provided for compliance deadlines approximately eight and 12 months after the signature of the rule, respectively. 80 Fed. Reg. at 77491. The *ACE* Court held that EPA "made reasonable use of its authority to issue delayed . . . standards," because it, among other actions, provided "very extensive extensions of the normal compliance demonstration deadlines." *See ACE*, 864 F.3d at 722–23 (internal quotation marks and citation omitted).

The same logic applies here. In this case, EPA promulgated the 2019 percentage standards on December 11, 2018, *years* in advance of the September 1, 2022 compliance deadline. EPA has also provided *at least* the eight months

approved by the *ACE* Court between the promulgation of the 2021–22 percentage standards and the compliance deadlines. The 2020 standards, by contrast, were initially published over two years ago on February 6, 2020, and subsequently revised *down* in the 2020–2022 RFS Final Rule. Moreover, obligated parties will have from two to four months between compliance deadlines over the course of approximately one year, not dissimilar from the time between compliance deadlines approved in *ACE*. *See ACE*, 864 F.3d at 722–23; 80 Fed. Reg. at 77491; *see also Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920 (D.C. Cir. 2014) (four-month extension of compliance deadline reasonably mitigated hardship of obligation issued over eight months late).

EPA acted reasonably in extending the compliance deadlines here too. The Agency found that compliance windows of these lengths are "workable amount[s] of time for obligated parties to develop their compliance strategy and acquire sufficient RINs to demonstrate compliance." Extension Rule Response To Comments ("RTC"), EPA-HQ-OAR-2021-0793 at 8–9 (Jan. 2022), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1013XOS.pdf. Nor does EPA believe these intervals will stress the RIN market because, "[i]n the past, when adjusting deadlines due to delay, [EPA] ha[s] not seen an 'overheating' of the RIN market." *Id.* at 9. This additional time will allow obligated parties to plan for compliance by using the deficit carry-forward provision and potentially using

11

additional RIN vintages to satisfy their obligations. *See id.* at 19. EPA was therefore justified and reasonable in delaying the compliance deadlines for the years 2020–22 to mitigate any hardship obligated parties would experience.[3]

### B. EPA is likely to prevail on the merits because the Extension Rule permissibly extends future compliance dates.

EPA is also likely to prevail on the Refineries' challenge to the portion of the Extension Rule setting post-2022 compliance deadlines. Mot. at 12–14. "EPA may promulgate late renewable fuel requirements—and even apply those standards retroactively—so long as EPA reasonably considers and mitigates any hardship caused to obligated parties by reason of the lateness." *ACE*, 864 F.3d at 718; *see also Monroe Energy, LLC*, 750 F.3d at 920 (four-month extension of compliance deadline reasonably mitigated hardship of obligation issued over eight months late). With the Extension Rule, EPA is providing "additional certainty to the implementation of the RFS program" and mitigating any potential future hardship on obligated parties and the RFS program as a whole by establishing a mechanism by which future deadlines will be established without individual time-consuming

---

[3] The Refineries' cryptic argument that the CAA requires 12 months between compliance intervals, raised in a cursory fashion in its background section alone, *see* Mot. at 4, is waived. *See United States v. Law*, 528 F.3d 888, 908 n.11 (D.C. Cir. 2008) (arguments a party fails to develop are waived). In any event, no provision in the CAA requires *any* length of time between compliance deadlines, nor do the Refineries identify one.

rulemakings if RFS standards are again delayed. Extension Rule RTC at 40. Under this Court's precedents, this action is lawful.

### C. EPA is likely to prevail on the merits because the Refineries have not identified a provision of the CAA that mandates any required lead time or interval in setting annual RFS compliance deadlines.

To justify their request for a stay, the Refineries contend that they have raised "serious legal questions," *see* Mot. at 8, implicitly invoking "the old sliding-scale approach to [stays]—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, or vice versa," *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring). However, opinions of this Court have cast serious doubt on the viability of this sliding scale approach. *See, e.g.*, *id.* (Kavanaugh, J., concurring) ("I tend to agree . . . that the old sliding-scale approach to preliminary injunctions . . . is no longer controlling, or even viable." (internal quotation marks and citation omitted)).

Nonetheless, even under the lower standard posited by the Refineries, EPA is likely to prevail. The Refineries have not demonstrated even a serious legal question, because the plain language of the statute and this Court's case law make clear that the Refineries' arguments must fail.

The Refineries claim EPA's action to compress obligated parties' compliance deadlines is unlawful because, "EPA must give obligated parties 16

13

months to plan and comply" with their obligations. Mot. at 11. But, as noted *supra* at 9, this purported requirement appears nowhere in the CAA. The Refineries, however, argue that the § 7545(*o*)(3)(B)(i) November 30 deadline for the promulgation of RFS obligations for compliance years up to 2022 and the deficit carry-forward provision in § 7545(*o*)(5)(D) *imply* such an obligation. But this Court has held that, when EPA promulgates delayed RFS standards, the extension of compliance deadlines reasonably mitigates any hardship experienced by obligated parties, and has done so even where those extensions do not provide 13 months of lead time or 12-month compliance intervals. *See supra* at 10–11.

Moreover, the extended compliance deadlines do not render the ability to carry forward a deficit "effectively useless." Mot. at 10. Instead, this provision still provides obligated parties with compliance flexibility as it "modifies the RIN vintage that they are able to utilize to comply." Extension Rule RTC at 19.

The Refineries' claim that EPA has "bound itself by regulation to give obligated parties 16 months to plan for and demonstrate compliance," Mot. at 4, fails for the same reason. EPA has generally required compliance by March 31 of the year following the associated compliance year, *see* 40 C.F.R. § 80.1451(a) (2021), but has deviated from that date on occasion to mitigate hardship, as discussed *supra* at 10–11, and is not bound to any particular interval.

**II.    The Extension Rule Causes the Refineries No Immediate, Certain, Direct Harm, Whereas a Stay of Its Effective Date Would Cause Such Harm**

The Refineries' motion should also be denied because it fails to establish that Petitioners will be irreparably harmed without a stay. To establish irreparable harm, the Refineries must demonstrate an injury that is "both certain and great," "actual and not theoretical," and "beyond remediation." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotations omitted). Moreover, "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Notably, the Refineries do not even *allege* the portion of the Extension Rule regarding deadlines *after* 2022 irreparably injures them. For that reason alone, the motion for a stay should be denied with respect to this portion of the Extension Rule. *See id.* at 676.

**A. A stay would cause obligated parties, including the Refineries, immediate harm.**

The rule challenged here extends prior modifications of the (1) 2019 compliance deadline for small refineries from November 30, 2021, (2) 2020 compliance deadline from January 31, 2022, and (3) 2021 compliance deadline from March 31, 2022. *See* Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines, 86 Fed. Reg. 17073,

15

17074 (Apr. 1, 2021); 87 Fed. Reg. at 5698–70. These deadlines passed months ago. If this Court stays the Extension Rule, the modifications would not go into effect and the previous deadlines would apply, *see Illinois Bell Tel. Co. v. WorldCom Techs., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998) (Easterbrook, J.) (a Rule 18 stay "delay[s] the effectiveness" of an action); *cf. Action on Smoking & Health v. CAB*, 713 F.2d 795, 797 (D.C. Cir. 1983) (effect of vacatur is to "reinstat[e] the rules previously in force"), putting any Refineries—and many other obligated parties that are not before the Court and have relied on the Extension Rule since it was promulgated in February 2022—that have not yet complied with their RFS obligations out of compliance immediately. A stay of the Extension Rule would render the type of immediate and concrete harm that the Refineries speculate *might* occur in the future if the Extension Rule remains in effect.

### B. The Extension Rule does not cause the Refineries any loss because it does not impose any substantive obligations.

The Extension Rule does not set, or in any way alter, the Refineries' underlying obligations to comply with the RFS; it only sets the deadline for the Refineries' statutorily required compliance. *See* Extension Rule RTC at 20. These deadlines do not cause the Refineries *any* loss. The Refineries have, for years, simply not had to demonstrate their compliance with the annual RFS standards for which deadlines have now been established and profited as a result. That the Refineries now must comply with the RFS, months or years later than would

16

otherwise have been required, does not amount to irreparable harm. *See Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm.").

Moreover, EPA has established that obligated parties recover RFS compliance costs by operation of the RFS RIN market, *see* June 2022 SRE Denial at 30 ("[A]ll obligated parties recover the cost of acquiring RINs by selling the gasoline and diesel fuel they produce at the market price, which reflects these RIN costs.")[4]; these costs are therefore recoverable, *see Davis*, 571 F.3d at 1295 ("recoverable economic losses are not considered irreparable" (internal quotation marks and citation omitted)). As such, there are generally no unrecoverable costs related to RFS compliance, and conclusory statements to the contrary do not rebut EPA's exhaustive analysis. *See, e.g.*, Winchester Decl. ¶ 8.

The Refineries variously suggest that EPA's delay in issuing the standards or shortening the intervals between the annual compliance demonstration deadlines in the Extension Rule have caused the price of RINs to rise. *See, e.g.*, Mot. at 2–3, 15; Winchester Decl. ¶ 4. These assertions are conclusory speculation, "not supported by market realities" as "there are many factors that go into RIN prices, including

---

[4] For further discussion of the RIN discount and RIN cost passthrough, see the SRE Denials at section IV.D.2.

the underlying costs of renewable fuel vs. petroleum fuel production." Extension Rule RTC at 20.

To the extent any Refineries failed to purchase sufficient RINs to timely comply with their 2019 and 2020 standards and must now purchase RINs in a short period of time to demonstrate compliance for renewable fuel volumes already sold in past years, any harm is self-inflicted and not the direct result of the Extension Rule. Even if a Refinery petitioned for a small refinery exemption, *see* Winchester Decl. ¶ 3, EPA has repeatedly said "[c]ompliance obligations exist until such time as an exemption is granted," and small refineries "should plan for compliance," and many small refineries not represented in this case have done so. *See* Extension Rule RTC at 20. Any such alleged harms to the Refineries "directly result" from strategic decisions not to timely comply with their RFS obligations, not EPA's extension of the RFS compliance deadlines.

## C. Recent EPA actions further reduce any purported hardship to obligated parties.

The recently-issued 2020–2022 RFS Final Rule, along with the RIN Retirement Proposal (if finalized), will further mitigate any potential hardship. *First*, EPA's reduction of the 2020 volume requirements will address illiquidity in the RIN market. That is so because EPA "retroactively adjust[ed] [downward] the 2020 volumes and standards to reflect the actual volumes of renewable fuels and transportation fuel consumed in the U.S." that year, 2020–2022 RFS Final Rule at

18

7, and expects additional 2019 RINs—which may be used for compliance with 2019 or 2020 RFS compliance obligations—to come onto the market. *See* Extension Rule RTC at 20.

      Second, the RIN Retirement Proposal will provide additional compliance flexibility for small refineries for 2020. This rule would allow small refineries to retire the RINs needed to comply with their 2020 obligations—into which they may roll their 2019 obligations—over five quarters, thereby giving obligated parties significant additional time to achieve full compliance with their 2020 compliance demonstration deadlines. *See* RIN Retirement Proposal at 12, Table II.1. This alternative RIN retirement schedule would "decrease the number of RINs that small refineries must acquire in the near term, extend the time period over which small refineries can plan and implement their RIN transactions, and allow the use of RINs generated in future compliance years, thereby reducing the immediate financial impacts on small refineries." *Id.* at 9. Together, these actions significantly mitigate any alleged hardship to the Refineries.

      **D. The Refineries have not alleged a potential violation of their due process rights.**

      The Refineries do not assert a viable due process claim. First, claims that any refinery will find itself out of compliance with an RFS standard due to RIN scarcity is speculative. The landscape has changed since the Refineries' filed their motion, given the expected increase in RIN liquidity that will result from

19

downward adjustment of the 2020 standards in the 2020–2022 RFS Final Rule and the expanded compliance timeframe of the RIN Retirement Proposal. *See supra* § II.C.

Second, "a statutory scheme violates due process if 'the penalties for disobedience are by fines so enormous . . . as to intimidate the [affected party] from resorting to the courts to test the validity of the legislation.'" *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 118 (D.C. Cir. 2010) (quoting *Ex Parte Young*, 209 U.S. 123, 147 (1908)). But "statutes imposing fines—even 'enormous' fines—on noncomplying parties may satisfy due process"—and therefore, do not effectively preclude challenge to the law—"if such fines are subject to a 'good faith' or 'reasonable ground[s]' defense" or if a judge has discretion in imposing the penalty. *Jackson*, 610 F.3d at 118 (alteration and ellipses in original) (quoting *Young*, 209 U.S. at 147). Both apply here.

If EPA were to seek an administrative penalty from the Refineries, it would generally be limited to $414,364. *See* 42 U.S.C. §§ 7545(d)(1), 7524(c)(1) (setting the maximum administrative penalty at $200,000, "unless the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment"); Civil Monetary Penalty Inflation Adjustment, 87 Fed. Reg. 1676, 1679 (Jan. 12, 2022) (adjusting penalty to $414,364). Such administrative penalties "shall be by an order made on

20

the record *after opportunity for a hearing*." 42 U.S.C. § 7524(c)(1) (emphasis added). Additionally, "[a]ny person against whom a civil penalty is assessed . . . may seek review of the assessment in the United States District Court for the District of Columbia . . . ." 42 U.S.C. § 7524(c)(5).

In most instances, if EPA wanted to seek penalties above $414,364, it would have to pursue a civil action in federal court. A court must then take into consideration "the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and *such other matters as justice may require*." *Id.* § 7524(b) (emphasis added).

The CAA plainly affords the Refineries more than adequate process. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks and citation omitted). Here, if EPA sought an administrative penalty, the obligated party could obtain a hearing before EPA assessed any penalty, which would be subject to review in federal court. 42 U.S.C. §§ 7524(c)(1), (c)(5). Alternatively, to the extent EPA sought a penalty in federal court, the obligated party would receive the protections provided in federal civil litigation. Therefore, because any hypothetical penalties levied for RFS

21

noncompliance would be accompanied by ample due process, the Refineries have not even alleged, much less shown, a risk of a due process violation occurring.

Petitioners claim that if the Extension Rule deadlines arrive, they could be subject to severe penalties. Mot. at 17–18. But this assertion is speculative. *See supra* at 19–20. Moreover, the Refineries do not, and cannot, claim that $414,364 qualifies as "ruinous"; to the extent a court may impose more costly penalties, those are subject to sufficient safeguards to satisfy due process.

## III.    A Stay of the Extension Rule Is Not in the Public Interest

Finally, the balance of equities and the public interest weigh strongly against the Refineries' motion. The RFS program includes stakeholders beyond the Refineries, and a stay would force obligated parties that have relied on the Extension Rule into immediate noncompliance, thereby harming other parties. *See supra* § II.A.

Moreover, the views of Congress are a "sense by which the public interest should be gauged." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). Congress mandated increasing renewable fuel use in transportation fuel over time, 42 U.S.C. § 7545(*o*)(2)(B), and a stay would undermine that purpose by creating uncertainty in the fuel market. The Refineries' motion should be denied for this reason as well.

22

The Refineries make three principal arguments to support their request for a stay, none of which have merit. *First*, they reiterate their merits assertions and argue that EPA unlawfully delayed issuing obligations and responding to small refinery exemption petitions. *See* Mot. at 19–20. But as discussed above, *EPA* is likely to prevail on the merits. *See supra* § I. Now that EPA has issued the 2020–22 Final Rules and SRE Denials, it is the Refineries' requested relief that would lead to uncertainty in the market. *Second*, the Refineries contend that the delay in promulgating the standards for 2020–22 has caused RIN prices to rise; however, they do not cite a *single* document or analysis to support this speculation. *See supra* at 17–18. *Finally*, the Refineries claim that their employees and contractors will be harmed by the Extension Rule. However, rather than pointing to the compliance *deadlines* as causing alleged losses, any purported harm could only be from the underlying RFS standards themselves*. See supra* § II.B. Therefore, if the small Refineries believe that they suffer disproportionate economic hardship as a result of their RFS compliance costs—despite both their ability to passthrough their compliance costs and the affirmative steps EPA has taken to mitigate harms—they should challenge the SRE Denials rather than the Extension Rule.

## CONCLUSION

For the foregoing reasons, the Refineries' request for a stay should be denied. Alternatively, EPA requests that, instead of staying the compliance

deadlines, this Court consider the merits of this matter on an expedited basis with

45–60 days for EPA to prepare its brief.

Respectfully submitted,

TODD KIM
Assistant Attorney General

*/s/ Jeffrey Hughes*
JEFFREY HUGHES
Environmental Defense Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 532-3080 (tel.)
jeffrey.hughes@usdoj.gov

*Counsel for Respondent*

Dated: June 6, 2022

## CERTIFICATE OF COMPLIANCE

This response to a motion complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this response to a motion contains 5,182 words according to the count of Microsoft Word.

This response to a motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman in 14-point font.

*/s/ Jeffrey Hughes*
Jeffrey Hughes
Counsel for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2022 a copy of the foregoing EPA's

Response in Opposition to Motion for Stay was filed electronically with the

Court's CM/ECF system, which will electronically serve all counsel of record.

*/s/ Jeffrey Hughes*
Jeffrey Hughes
Counsel for Respondent