NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 22-1015 and consolidated cases

---

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

WYNNEWOOD REFINING COMPANY, LLC, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

---

Petition for Review of Action of the
U.S. Environmental Protection Agency

---

**BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

---

TODD KIM
*Assistant Attorney General*

Of Counsel:

JEFFREY HUGHES
*Attorney*

MEREDITH G. MILLER
*Attorney*
U.S. Environmental Protection
Agency
Office of General Counsel
Washington, D.C.

Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 532-3080
jeffrey.hughes@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

All parties, intervenors, and amici appearing in this court are

listed in the Brief for Petitioners at i.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for

Petitioners at i.

**C.    Related Cases**

EPA is unaware of any related cases other than those that have

already been consolidated.

*/s/ Jeffrey Hughes*

JEFFREY HUGHES

Counsel for Respondent(s)

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES ........................................................................i

GLOSSARY ...........................................................................ix

INTRODUCTION .....................................................................1

STATEMENT OF JURISDICTION ................................................3

STATEMENT OF THE ISSUES ...................................................3

PERTINENT STATUTES AND REGULATIONS ..............................4

STATEMENT OF THE CASE ......................................................4

    A.    Statutory and Regulatory Background ......................................4

        1.    The RFS Percentage Standards .................................4

        2.    The RFS Compliance Program ...............................8

    B.    Factual Background ..........................................................12

        1.    The Extension Rule ................................................12

        2.    The 2020–2022 RFS Annual Rule ...................................15

        3.    The Alternative RIN Retirement Schedule ....................15

    C.    Procedural History..........................................................16

SUMMARY OF ARGUMENT......................................................17

STANDARD OF REVIEW .........................................................19

ARGUMENT..........................................................................20

I.   The text and structure of the CAA and this Court's precedents do not mandate inflexible intervals between compliance deadlines. ..............................................................21

   A.   The CAA on its face does not dictate specific compliance deadlines. ...................................................21

   B.   This Court has concluded that compliance deadline intervals like those granted by the Extension Rule mitigate hardship caused by delayed RFS standards. ..............................................23

      1.   This Court has previously held that similar compliance intervals reasonably mitigate the harm to obligated parties caused by the delayed promulgation of RFS standards. ........................23

      2.   The Refineries fail to distinguish the Extension Rule from prior compliance deadline extensions approved by this Court. .................28

   C.   EPA reasonably exercised its authority to extend the RFS compliance deadlines for 2019–2022 ........................37

   D.   The Refineries' arguments find no support in the structure of the CAA. .....................................................38

   E.   The April 2022 Compliance Action has no bearing on these petitions. ...........................................................42

II.   The Extension Rule permissibly extends future compliance dates ....................................................................47

CONCLUSION ................................................................49

CERTIFICATE OF COMPLIANCE ..............................................51

ADDENDUM ..................................................................52

# TABLE OF AUTHORITIES*

## Cases

*Alon Refin. Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019) .............................................................. 46

***Americans for Clean Energy v. EPA ("ACE")*,**
  864 F.3d 691 (D.C. Cir. 2017) ................ 1, 18, 20, 23, 26-29, 32, 37, 48

*Belmont Mun. Light Dep't v. FERC*,
  38 F.4th 173 (D.C. Cir. 2022) ............................................................ 49

*Bluewater Network v. EPA*,
  370 F.3d 1 (D.C. Cir. 2004) ................................................................ 19

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ........................................................................... 20

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*,
  141 S. Ct. 2172 (2021) ................................................................... 11, 44

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ............................................................................. 41

*Lead Indus. Ass'n v. EPA*,
  647 F.2d 1130 (D.C. Cir. 1980) .......................................................... 19

***Monroe Energy, LLC v. EPA*,**
  750 F.3d 909 (D.C. Cir. 2014) ............................. 1, 18, 23, 25, 26, 28, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................. 19

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
  630 F.3d. 145 (D.C. Cir. 2010) ................................................... 1, 24, 41

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Regions Hosp. v. Shalala,*
  522 U.S. 448 (1998) ................................................................. 37

*Renewable Fuels Ass'n v. EPA,*
  948 F.3d 1206 (10th Cir. 2020) ............................................ 11, 44

**Statutes**

42 U.S.C. § 7545(*o*) ................................................................ 4, 40

42 U.S.C. § 7545(o)(1)(B) .............................................................. 8

42 U.S.C. § 7545(o)(1)(D) .............................................................. 8

42 U.S.C. § 7545(o)(1)(E) .............................................................. 8

42 U.S.C. § 7545(o)(1)(J) .............................................................. 8

42 U.S.C. § 7545(*o*)(1)(K) .................................................... 10, 34

42 U.S.C. § 7545(*o*)(2)(A)(i) ................................................... 5, 40

42 U.S.C. § 7545(*o*)(2)(A)(iii)(I) ............................................. 9, 22

42 U.S.C. § 7545(*o*)(2)(A)(iv) ..................................................... 40

42 U.S.C. § 7545(*o*)(2)(B)(i)(I)-(III) ............................................ 5

42 U.S.C. § 7545(*o*)(2)(B)(i)(II) ................................................... 8

42 U.S.C. § 7545(*o*)(2)(B)(i)(I)-(V) ........................................... 6, 8

42 U.S.C. § 7545(*o*)(2)(B)(ii) .......................... 5, 6, 21, 29, 30, 48

42 U.S.C. § 7545(*o*)(3)(A) ............................................................ 5

42 U.S.C. § 7545(*o*)(3)(B) ............................................................ 7

42 U.S.C. § 7545(*o*)(3)(B)(i) ....................................................6, 21, 40

42 U.S.C. § 7545(*o*)(3)(B)(ii) ...............................................................6

42 U.S.C. § 7545(o)(5) ...........................................................................7

42 U.S.C. § 7545(o)(5)(A)(i) ..................................................................7

42 U.S.C. § 7545(o)(5)(B) .......................................................................8

42 U.S.C. § 7545(*o*)(5)(D) ...................................................................16

42 U.S.C. § 7545(*o*)(9)(B)(i)-(ii)........................................................11

42 U.S.C. § 7607(b)(1)............................................................................3

42 U.S.C. § 7607(d)(9)..........................................................................43

42 U.S.C. § 7607(d)(9)(A) ....................................................................19

42 U.S.C. § 7607(d)(9)(B)(i) ................................................................41

Energy Policy Act of 2005,
  Pub. L. No. 109-58, 119 Stat. 594 (2005) .............................................4

Energy Independence and Security Act of 2007,
  Pub. L. No. 110-140, 121 Stat. 1492 (2007) ..........................................4

**Rules**

Fed. R. App. P. 32(a)(5) ........................................................................51

Fed. R. App. P. 32(a)(6) ........................................................................51

Fed. R. App. P. 32(a)(7)(B) ..................................................................51

**Code of Federal Regulations**

40 C.F.R. § 80.1401.................................................................................7

40 C.F.R. § 80.1405(c) ............................................................5

40 C.F.R. § 80.1406(a)(1) ...................................................6, 7

40 C.F.R. § 80.1407 ...............................................................7

40 C.F.R. § 80.1426(a) ...........................................................7

40 C.F.R. § 80.1426(e) ...........................................................7

40 C.F.R. § 80.1427(a) ...........................................................8

40 C.F.R. § 80.1427(a)(3) .......................................................8

40 C.F.R. § 80.1428(c) ..........................................................42

40 C.F.R. § 80.1429(b) ...........................................................7

40 C.F.R. § 80.1451 ...............................................................9

40 C.F.R. § 80.1451(a)(1) (2014) .........................................10

40 C.F.R. § 80.1451(f)(1)(i) .................................................22

40 C.F.R. § 80.1451(f)(2) ......................................................13

40 C.F.R. § 80.1464 ...............................................................9

**Federal Register Notices**

78 Fed. Reg. 49794 (Aug. 15, 2013) .....................................24

79 Fed. Reg. 23414 (Apr. 28, 2014).................................10, 22

80 Fed. Reg. 77420 (Dec. 14, 2015) .....................25, 26, 28, 32

83 Fed. Reg. 63704 (Dec. 11, 2018) .....................................27

85 Fed. Reg. 7016 (Feb. 6, 2020) ....................................................... 27, 30

86 Fed. Reg. 17073 (Apr. 1, 2021) ............................................... 10, 11, 12

*87 Fed. Reg. 5696 (Feb. 2, 2022) ......................... 3, 12, 13, 14, 15, 48, 49

87 Fed. Reg. 24294 (Apr. 25, 2022) ...................................................... 43

87 Fed. Reg. 39600 (July 1, 2022) ......................................... 12, 15, 45, 46

87 Fed. Reg. 54158 (Sept. 2, 2022) ............................................. 16, 35, 42

## GLOSSARY

| CAA | Clean Air Act |
|-----|---------------|
| EPA | Environmental Protection Agency |
| RFS | Renewable Fuel Standard |
| RIN | Renewable Identification Number |
| SRE | Small Refinery Exemption |

## INTRODUCTION

Agency resources are limited. As a consequence of these resource constraints, along with intervening judicial decisions and other factors, agencies invariably miss some statutory deadlines. It is undisputed that missing a statutory deadline, while unlawful, does not negate an agency's power to act. In such circumstances, a missed deadline may require an agency to take additional action to mitigate the hardship on regulated parties caused by the delay. This Court has repeatedly recognized as much in a series of cases addressing the Environmental Protection Agency's ("EPA" or the "Agency") authority to issue late regulations under the Renewable Fuel Standard ("RFS") program. *See Americans for Clean Energy v. EPA*, 864 F.3d 691 (D.C. Cir. 2017); *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014); *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d. 145 (D.C. Cir. 2010).

Petitioners argue that EPA's mitigation measures at issue in these consolidated petitions for review—the Agency's extension of the RFS program's regulatory compliance deadlines—both violate rights purportedly guaranteed by the Clean Air Act (the "CAA" or the "Act") and are arbitrary and capricious because they do not adequately

mitigate harm caused by EPA's delay. Petitioners' statutory argument is easily dispensed with because the CAA does not prescribe deadlines for compliance demonstrations by regulated parties, instead committing that issue to EPA's discretion. In addition to being atextual, Petitioners' position is irrational. It would mean that the RFS program could *never* get back on track if EPA ever misses a deadline or revises its requirements—even if, as is the case here, the revision *favors* Petitioners—on its own initiative or as required by a court. Petitioners' argument that the Agency acted unreasonably fails because under this Court's precedents, the new compliance deadlines set by EPA are indistinguishable from those this Court has previously determined form part of required mitigation by EPA.

Finally, Petitioners' challenge to EPA's advance announcement of automatic adjustment to compliance dates for future years fails for the same reasons. It is Petitioners' rigid interpretation of the CAA, not EPA's practical, good-government approach, that would weaken the Agency's incentive to timely issue renewable fuel volumes for future program years. This Court should deny these petitions for review.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1). The petition for review was timely filed because the challenged final action, "Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines," 87 Fed. Reg. 5696 (Feb. 2, 2022) (the "Extension Rule"), was published on February 2, 2022, *see* JA __, and the refinery petitioners (the "Refineries") filed their petitions for review on February 4, 2022 (Case No. 22-1015, Dkt. No. 1934274), March 31, 2022 (Case No. 22-1051, Dkt. No. 1941984), and April 1, 2022 (Case No. 22-1053, Dkt. No. 1941978).

## STATEMENT OF THE ISSUES

These consolidated petitions raise the following issues:

1.    Whether EPA's extension of its regulatory deadlines to demonstrate compliance with EPA's late-issued annual standards for renewable fuels comports with the CAA, which does not guarantee specific deadline intervals between program years, and is consistent with this Court's decisions concluding that similar extensions mitigate hardship to obligated parties?

2.    Whether EPA acted lawfully by announcing in advance clear rules for automatically extending compliance deadlines for its late-issued 2023 volume target, and any future program years in which EPA's regulations might be delayed?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations that are not included in the Statutory Addendum accompanying the Refineries' opening brief are included in the statutory and regulatory addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

### 1.    The RFS Percentage Standards

In 2005 and again in 2007, Congress amended the CAA to establish the RFS program, now codified at 42 U.S.C. § 7545(*o*). *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (2007). The RFS program is intended to "move the United States toward greater energy independence and security" and "increase the production of clean renewable fuels." 121 Stat. 1492. To accomplish this, Congress directed EPA "to ensure that transportation

fuel sold or introduced into commerce in the United States . . . , on an average annual basis, contains at least the applicable volume of [total] renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel." 42 U.S.C. § 7545(*o*)(2)(A)(i). For all of the fuel types other than biomass-based diesel, Congress specified the "applicable volumes" through 2022. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(III). For years after 2022—and for biomass-based diesel after 2012—EPA determines the applicable volumes after considering express statutory factors and a review, in coordination with the Secretaries of Energy and Agriculture, of the implementation of the program. 42 U.S.C. § 7545(*o*)(2)(B)(ii).

To ensure that the applicable volumes are sold or introduced into commerce in the United States each year, EPA sets annual percentage standards. 42 U.S.C. § 7545(*o*)(3)(A), (B)(i); 40 C.F.R. § 80.1405(c). These percentage standards are calculated using a formula that divides the applicable volume for each renewable fuel type by an estimate of the national volume of gasoline and diesel that will be used that year, with certain adjustments. 40 C.F.R. § 80.1405(c). The CAA provides that the percentage standards "shall . . . be applicable to refineries, blenders, and importers, as appropriate." 42 U.S.C. § 7545(o)(3)(B)(ii). By

regulation, EPA identified refiners and importers of gasoline and diesel fuel as the "appropriate" obligated parties. *See* 40 C.F.R. § 80.1406(a)(1).[2]

The statute additionally provides the deadlines by which EPA must publish the applicable annual percentage standards or volumes, as appropriate. Through compliance year 2022, EPA must determine the percentage standards for each calendar year by November 30 of the prior year. *Id.* § 7545(*o*)(3)(B)(i). For years in which EPA must determine the applicable volumes by considering the statutory criteria—after 2012 for biomass-based diesel and after 2022 for all the other renewable fuel types, *see* 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(IV)—EPA must determine those volumes fourteen months before the year in which they will apply. *Id.* § 7545(*o*)(2)(B)(ii). As an example, for compliance year 2022, the deadline for issuing the percentage standards was November 30, 2021, and the deadline for issuing the volumes for biomass-based diesel was November 1, 2020. For a comprehensive

---

[2] With respect to EPA's designation of refiners and importers as obligated parties—as well as other elements of the RFS program—the Refineries make arguments in their brief that are irrelevant to the Extension Rule. *See, e.g.*, Br. at 7.

description of the deadlines at issue in this case, see the chart contained in the addendum to this brief.

The annual volume percentages established by the EPA are used to impose obligations on individual refiners and importers of gasoline and diesel fuel, based on the amount of non-renewable fuel each party produces or imports. 42 U.S.C. § 7545(*o*)(3)(B); *see* 40 C.F.R. §§ 80.1406(a)(1), 80.1407. Refiners and importers may comply with their obligations by blending renewable fuels into transportation fuels or by purchasing credits from other parties in a market-based system. 42 U.S.C. § 7545(*o*)(5).

The credit system works by assigning "Renewable Identification Numbers" or "RINs" to represent volumes of renewable fuel that are produced or imported. 42 U.S.C. § 7545(*o*)(5)(A)(i); *see* 40 C.F.R. §§ 80.1401, 80.1426(a), (e). When a batch of renewable fuel is sold to an obligated party or blended into transportation fuel, the RINs are separated from the batch and the holder of the RINs can retain or sell them. 40 C.F.R. § 80.1429(b). Refiners and importers meet their annual obligations by amassing or purchasing RINs. 42 U.S.C. § 7545(*o*)(5)(B); 40 C.F.R. § 80.1427(a).

The percentage standards for cellulosic biofuel and biomass-based diesel are "nested" within the standard for advanced biofuel. This means that volumes of cellulosic biofuel and biomass-based diesel may be used not only to satisfy the cellulosic biofuel and biomass-based diesel requirements (as applicable), but also to satisfy the advanced biofuel requirement. *See* 42 U.S.C. § 7545(*o*)(1)(B), (D), (E), (J), (*o*)(2)(B)(i)(I)–(IV); 40 C.F.R. § 80.1427(a)(3). The advanced biofuel standard, in turn, is nested within the total renewable fuel standard. *See* 42 U.S.C. § 7545(*o*)(2)(B)(II). Thus, for example, any renewable fuel that qualifies as biomass-based diesel may simultaneously be used to satisfy the biomass-based diesel, advanced biofuel, and total renewable fuel requirements.

### 2.    The RFS Compliance Program

While the CAA sets the deadlines by which EPA must issue percentage standards and applicable volumes, it does not set the date by which obligated parties must demonstrate compliance with those requirements. Rather, the Act provides that EPA must issue regulations that contain "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate." 42 U.S.C.

8

§ 7545(*o*)(2)(A)(iii)(I). Under this authority, EPA by regulation sets the compliance deadlines for all obligated parties to submit two reports: one detailing how it has complied with its annual RFS obligations, 40 C.F.R. § 80.1451, and the other an "attest engagement" report required by 40 C.F.R. § 80.1464, verifying the contents of the first report.[3]

While these are the deadlines by which every obligated party must demonstrate to EPA that it has complied with its statutory and regulatory obligations for each year, most obligated parties can continually plan their compliance for the current and future years by projecting and acquiring the number of RINs that will be needed to demonstrate compliance for each year throughout the preceding year or years, and not only at the time of the compliance deadline.

By regulation, EPA set in 2014 the annual RFS compliance date as March 31 following the compliance year at issue. *See* "Control of Air Pollution from Motor Vehicles: Tier 3 Motor Vehicle Emission and Fuel Standards," 79 Fed. Reg. 23414, 23576–77 (Apr. 28, 2014) (amending

---

[3] Because the Refineries challenge the compliance reporting deadlines but not the attest engagement reporting deadlines, *see* Br. at 16 (identifying the compliance reporting deadlines, but not the attest engagement reporting deadlines), EPA uses "compliance deadline" throughout this brief to refer to just the compliance reporting deadlines.

the RFS reporting program by, among other actions, changing the compliance deadline from the last day of February to March 31); 40 C.F.R. § 80.1451(a)(1) (2014) ("Annual compliance reports for the previous compliance period shall be submitted by March 31 of each year . . . ."). For 2019 and 2020, EPA first extended that deadline on April 1, 2021. *See* "Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines," 86 Fed. Reg. 17073 (Apr. 1, 2021) (the "2019–2020 Deadline Rule"). As relevant to these consolidated petitions, the 2019–2020 Deadline Rule (which no one challenged) had two components.

First, it extended the compliance deadline for 2019 for small refineries—refineries "for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels," 42 U.S.C. § 7545(*o*)(1)(K)—to November 30, 2021. 86 Fed. Reg. at 17074. EPA extended the compliance deadline for only small refineries due to uncertainty regarding the availability of small refinery exemptions ("SREs"), *see* 86 Fed. Reg. at 17075, which are exemptions given to small refineries when compliance with the RFS standards or volumes

10

would cause "disproportionate economic hardship," 42 U.S.C.

§ 7545(*o*)(9)(B)(i)–(ii).

The Tenth Circuit, in *Renewable Fuels Association v. EPA*, 948

F.3d 1206 (10th Cir. 2020) (hereinafter, "*RFA*"),[4] had invalidated

several SREs granted by EPA and, at the time EPA published the

2019–2020 Deadline Rule, the Supreme Court had granted certiorari

but not yet issued its decision. 86 Fed. Reg. at 17075. Because EPA

determined that "it would [not] be appropriate to require small

refineries to demonstrate compliance with their 2019 obligations until

the Supreme Court render[ed] a decision," the Agency extended the

2019 compliance deadline for small refineries. *Id.*

Second, the 2019–2020 Deadline Rule extended the 2020

compliance deadline from March 31, 2021, until January 31, 2022. *Id.*

at 17074. EPA recognized "the importance to obligated parties of

planning their compliance for a given calendar year by understanding

their obligations for the years before and after[,] . . . particularly . . .

given the two-year 'lifespan' for RINs, such that 2020 RINs can be used

_____

[4] *Rev'd in part HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021).

for compliance with either 2020 or 2021 obligations." *Id.* at 17075.

Additionally, extension of the 2020 compliance deadline allowed small

refineries to comply with the 2019 compliance deadline and provided

them with "60 days between the 2019 and 2020 compliance deadlines to

allow for obligated parties to make additional RIN acquisitions,

transfers, transactions, and retirements prior to the 2020 compliance

deadline." *Id.* at 17076.

### B.    Factual Background

### 1.    The Extension Rule

The Refineries challenge the Extension Rule published at 87 Fed.

Reg. 5696 (Feb. 2, 2022), JA__. Relevant to these petitions, the

Extension Rule has four key components.

*First*, the Extension Rule further delays the 2019 RFS compliance

deadline for small refineries until the next quarterly reporting deadline

after the effective date of the 2021 RFS standards. *Id.* at 5698, JA__.

Because the effective date for those standards was August 30, 2022,

"Renewable Fuels Standard (RFS) Program: RFS Annual Rules," 87

Fed. Reg. 39600 (July 1, 2022) ("2020–2022 RFS Annual Rule"), the

2019 RFS compliance deadline for small refineries moved nine months

from November 30, 2021, to September 1, 2022.[5]  The Refineries do not

challenge this element of the Extension Rule. Br. at 24–25.

*Second*, for all obligated parties, the Extension Rule extended the

2020 and 2021 RFS compliance deadlines to the next quarterly

reporting deadline after the prior compliance year's reporting deadline.

87 Fed. Reg. at 5698, JA__. Based on the small refineries' September 1,

2022 compliance deadline for the 2019 compliance year, the subsequent

deadlines fall on the next quarterly reporting deadlines which are

December 1, 2022, for the 2020 compliance year, and March 31, 2023,

for the 2021 compliance year.[6] In practice, the Extension Rule delayed

the compliance reporting deadlines for 2020 and 2021 by ten and twelve

months, respectively.

*Third*, the Extension Rule also set the compliance deadline for

2022 as the later of the next quarterly reporting deadline after (1) the

effective date of the 2023 RFS standards or (2) the compliance deadline

for 2021, whichever is later. 87 Fed. Reg. at 5700, JA__. Because EPA

---

[5] All other obligated parties were required to demonstrate compliance
with their 2019 obligations by March 31, 2020. *Id.* at 5698, JA__.

[6] 40 C.F.R. § 80.1451(f)(2) sets each year's quarterly reporting deadlines
as March 31, June 1, September 1, and December 1.

has not yet finalized the 2023 applicable volumes but is obligated to do so pursuant to a consent decree by June 2023, *see* Order, *Growth Energy v. EPA*, Case No. 22-cv-01191-RC (D.D.C.), Dkt. No. 12, EPA expects that the compliance deadline for 2022 will be September 1, 2023.

This table summarizes the relevant deadlines:

| Compliance Year | Subject of Compliance Deadline | Compliance Deadline Before Extension Rule Issued | Compliance Deadline Prescribed By Extension Rule |
|---|---|---|---|
| 2019 | Small refineries | November 30, 2021 | September 1, 2022 |
| 2020 | All obligated parties | January 31, 2022 | December 1, 2022 |
| 2021 | All obligated parties | March 31, 2022 | March 31, 2023 |
| 2022 | All obligated parties | March 31, 2023 | September 1, 2023 |

*Fourth*, for subsequent years—including 2023, for which EPA already had missed its statutory volume-setting deadline by the time the Extension Rule issued—the Extension Rule provides that the compliance deadline for each year will be the latest of (a) March 31st of the following calendar year; (b) the next quarterly reporting deadline after the effective date of the subsequent compliance year's standards;

14

or (c) the next quarterly reporting deadline after the compliance deadline for the prior compliance year. 87 Fed. Reg. at 5700–01, JA__.

### 2. The 2020–2022 RFS Annual Rule

On June 3, 2022, EPA issued the 2020–2022 RFS Annual Rule. *See* "Final Volume Standards for 2020, 2021, and 2022," *available at* https://www.epa.gov/renewable-fuel-standard-program/final-volume-standards-2020-2021-and-2022. This rule, among other things, modifies downward the applicable volumes for 2020 and establishes percentage standards for 2021 and 2022. 87 Fed. Reg. at 39602–03. Given the late promulgation of the rule, EPA set the 2021 standards "at the volumes of renewable fuel actually used in 2021" in order to avoid disruption in the RIN market. *Id.* at 39622–23. The 2020–2022 RFS Annual Rule also adjusts downward the 2020 applicable volumes that EPA had previously promulgated more than two years earlier in light of new facts and to "ensure sufficient RINs are available for compliance . . . [to] relieve burdens on obligated parties . . . ." *Id.* at 39620.

### 3. The Alternative RIN Retirement Schedule

Third in the suite of actions to relieve the potential burden on obligated parties such as the Refineries, EPA promulgated the

15

"Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries," 87 Fed. Reg. 54158 (Sept. 2, 2022) (the "Alternative RIN Retirement Schedule"). The Alternative RIN Retirement Schedule allows small refineries to satisfy their 2020 RFS obligations by delaying the first retirement date and retiring RINs over five quarters; as a result, they will not have to retire any RINs for the 2020 compliance year until February 1, 2023 and will have until February 1, 2024, to fully satisfy those obligations if they elect to follow the alternative schedule. *See id.* at 54162, Table III.1. This action also allows small refineries to use later RIN vintages (that is, RINs generated in later years) to comply with their 2020 RFS obligations. *See id.* This action provides relief to small refineries faced with 2019 RFS obligations resulting from EPA's recent SRE denial actions because they may carry forward their 2019 obligations as a deficit into 2020, 42 U.S.C. § 7545(*o*)(5)(D), and then satisfy those combined obligations on the Alternative RIN Retirement Schedule's longer timeline.

## C.    Procedural History

The Refineries moved for a stay of the Extension Rule pending review on May 9, 2022, *see* Dkt. No. 1946052, and the United States

opposed the motion, *see* Dkt. No. 1949473. This Court denied the Refineries' motion because, among other reasons, "the [Refineries] ha[d] not shown a likelihood of success on their claim that the 2019–2022 compliance deadlines established in the challenged rule . . . violate a statutorily-guaranteed, minimum compliance lead time of 13 months," and because they failed to "adequately substantiate[] their allegations that the deadlines will cause them great and certain harm absent a stay, particularly in light of the Agency's actions since the publication of the challenged rule." Dkt. No. 1954347.

## SUMMARY OF ARGUMENT

The Court should deny these consolidated petitions for review. EPA properly extended the deadlines for the 2020–2022 RFS compliance reports as part of a broad strategy to mitigate potential hardship that may result from, among and in combination with other things, the issuance of late volume standards for those years. The CAA does not set any date by which obligated parties must demonstrate compliance with a given year's standards; rather, it commits that task to the Agency's discretion and EPA sets that deadline by regulation. Moreover, the statute does not—explicitly or implicitly—provide for any

17

mandatory length of time for obligated parties to demonstrate compliance with their annual obligations. Here, consistent with past practice and case law from this Court, *see Americans for Clean Energy v. EPA*, 864 F.3d 691, 721–22 (D.C. Cir. 2017) (hereinafter "*ACE*"); *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920–21 (D.C. Cir. 2014), EPA extended the deadlines for the 2020–2022 RFS compliance reports to give obligated parties the time needed to acquire RINs and demonstrate compliance.

The Refineries' argument that the CAA guarantees obligated parties 12 months between compliance intervals, and 13 months between the issuance of volume standards and the related compliance deadlines, finds no support in the text, structure, or purpose of the statute. It is also inconsistent with this Court's case law, *see ACE*, 864 F.3d at 721–22; *Monroe Energy*, 750 F.3d at 920–21, which has concluded that analogous compliance deadline extensions form part of a *necessary* effort to mitigate hardship to obligated parties resulting from delayed issuance of RFS standards.

Finally, through the Extension Rule, EPA has reasonably set the compliance date for future compliance years. Contrary to the Refineries'

18

contention, EPA has not changed the date by which the CAA requires the Agency to issue standards; it has simply provided the date for the required compliance demonstrations, as it must do because the CAA does not specify any such date. In doing so, EPA has reasonably exercised its authority to set the compliance date, as this action provides certainty and consistency for obligated parties.

## STANDARD OF REVIEW

Under the CAA, the Court may reverse EPA's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). This standard is narrow, and the Court does not substitute its judgment for EPA's. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its regulatory choices must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980) ("That the evidence in the record may also support other conclusions, even those that are inconsistent with the [EPA] Administrator's, does not prevent [the court] from

concluding that his decisions were rational and supported by the record."). "The task of the reviewing court is to apply [this] . . . standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (internal citation omitted).

## ARGUMENT

The Extension Rule permissibly extends the compliance dates. The CAA does not set compliance deadlines for the RFS program; rather, the Act leaves that task to EPA's discretion. Moreover, this Court has held that, when EPA issues late standards or volumes, it must mitigate potential hardship to obligated parties that may result from the delay, including by extending the compliance deadline, as it did here. *See ACE*, 864 F.3d at 721–23. The Refineries do not identify any explicit textual source for their claimed rights to specific compliance deadline lead time, and the structure and purpose of the Act support EPA's—not the Refineries'—position.

## I.    The text and structure of the CAA and this Court's precedents do not mandate inflexible intervals between compliance deadlines.

The CAA does not provide that any length of time must elapse before an RFS compliance deadline; rather, it commits that task to Agency discretion. The deadlines set by the Extension Rule are consistent with this Court's case law and EPA exercised its authority reasonably in setting them. The Refineries' contrary argument from the structure of the Act fails, because the structure of the CAA supports EPA's interpretation. Finally, the alternative compliance demonstration EPA instituted on a limited basis for the 2018 compliance year—and that the Refineries claim represents the *only* reasonable response to EPA's delayed deadlines—has no application to the instant case.

### A.    The CAA on its face does not dictate specific compliance deadlines.

While the CAA requires EPA to publish the following year's percentage standards by November 30 each year through 2021, *see* 42 U.S.C. § 7545(*o*)(3)(B)(i), and requires EPA to establish the applicable volumes for years not specified in the Act 14 months before the applicable volume will apply, *see* 42 U.S.C. § 7545(*o*)(2)(B)(ii), it does not set the date by which obligated parties must demonstrate

compliance. And the CAA *nowhere* contains an explicit requirement that EPA provide *any* length of time between the publication of standards and the associated compliance deadlines, or between compliance deadlines. The Refineries do not contend otherwise. *See* Reply in Supp. of Mot. for Stay Pending Appeal at 3 (Dkt. No. 1951086) (arguing that the claimed intervals flow from "the context and structure of the statute").

Instead, the Act directs EPA to issue regulations that "contain compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate." *Id.* § 7545(*o*)(2)(A)(iii)(I). Under this authority, EPA sets the RFS compliance dates by regulation. *See* 40 C.F.R. § 80.1451(f)(1)(i) (setting compliance deadline for obligated parties). This date has varied over the life of the program as EPA has reasonably altered its deadlines year-to-year as needed. *See, e.g.*, 79 Fed. Reg. at 23576–77 (amending the RFS reporting program by, among other actions, changing the compliance deadline from the last day of February to March 31).

**B.    This Court has concluded that compliance deadline intervals like those granted by the Extension Rule mitigate hardship caused by delayed RFS standards.**

EPA retains significant discretion to delay compliance deadlines when it issues late standards, as this Court has repeatedly held in cases stretching back over a decade. In fact, this Court has held that if EPA issues late standards, it *must* "reasonably consider[] and mitigate[] any hardship caused to obligated parties by reason of the lateness," including by extending the normal compliance deadlines, and has concluded that similar extensions have helped to mitigate such hardship. *ACE*, 864 F.3d at 718, 722.

**1.    This Court has previously held that similar compliance intervals reasonably mitigate the harm to obligated parties caused by the delayed promulgation of RFS standards.**

This Court's decisions in *Monroe Energy* and *ACE* demonstrate that EPA has permissibly extended the compliance deadlines for the years 2020–2022 with the Extension Rule. In *Monroe Energy*, this Court denied a petition for review in which the petitioner challenged a rule setting annual standards for 2013 because EPA issued them eight months late. *See Monroe Energy*, 750 F.3d at 919 (describing challenge

to standards that, according to the CAA, had "to be issued no later than November 30, 2012"); "Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards," 78 Fed. Reg. 49794 (Aug. 15, 2013). EPA also extended the compliance deadline by four months, to June 30, 2014, which was approximately 11 months after the Agency had set the volume standard. *Id.* at 49830 (final action signed on August 6, 2013); *see Nat'l Petrochemical & Refiners Ass'n v. EPA*, 630 F.3d 145, 166 (D.C. Cir. 2010) (measuring notice from issuance of the standards). EPA determined that this compliance deadline provided "adequate lead time" to comply because the obligated parties only needed to purchase RINs. *Id.* at 49800. The obligated party petitioner disputed this claim, arguing that EPA failed to "exercise [its] authority [to issue delayed standards] in a reasonable manner" because "the statutory deadline is critically important to market participants, who need to know the volume percentage requirements to make informed business decisions that will affect their ultimate compliance obligations." Br. of Pet'r Monroe Energy, LLC at 25, *Monroe Energy, LLC v. EPA*, Case No. 13-1265, Dkt. No. 1469540.

This Court rejected that argument. Noting that "[o]bligated parties had long been aware of the applicable volumes prescribed in the statute," the Court concluded that "[t]hey could readily have estimated their respective obligations" and held that EPA's decision to issue delayed 2013 standards, "while extending the compliance deadline to June 30, 2014[,] was reasonable." *Monroe Energy*, 750 F.3d at 920–21. In other words, *Monroe Energy* concluded that 11 months—less than the lead time the Refineries claim that the CAA requires—provided sufficient lead time for obligated parties to comply with their 2013 RFS obligations.

*ACE* further supports EPA's reading of the statute. The rule challenged in *ACE* promulgated, among other standards, biomass-based diesel volumes for 2014, 2015, and 2016 approximately 37, 25, and 13 months after the statutory deadlines, respectively. "Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017," 80 Fed. Reg. 77420, 77430 (EPA "must establish applicable volumes for biomass-based diesel 14 months in advance of the corresponding compliance year"), 77517 (final action signed November 30, 2015) (Dec. 14, 2015). In addition to setting the

volume requirements for these fuel categories, the rules also amended the regulation setting the compliance deadlines for 2014 and 2015. *Id.* at 77512–13, 77518. Specifically, the rule provided for compliance deadlines approximately eight, 12, and 16 months after signature of the rule for the 2014, 2015, and 2016 standards, respectively, and approximately four months between compliance deadlines. 80 Fed. Reg. at 77491 (compliance deadline for 2014 eight months after signature and compliance deadline for 2015 12 months after signature), 77513 (March 31, 2017 compliance deadline for 2016).

The *ACE* Petitioners attempted to distinguish *Monroe Energy* by pointing to the longer lead time required for biomass-based diesel volumes after 2012 and contending that "[t]he much lengthier lead time requirement demonstrates Congress's view of the importance of giving obligated parties adequate notice." Opening Br. for Obligated Party Pet'rs on Cellulosic Biofuel and Biomass-Based Diesel at 29, *ACE*, Case No. 16-1005, Dkt. No. 1634754. As a result, according to the *ACE* petitioners, EPA could not increase the volume of biomass-based diesel from the statutory floor without providing the statutorily provided lead time for compliance. *Id.* at 27. This Court rejected this argument and

held that EPA made "reasonable use of its authority to issue delayed
Renewable Fuel Program volume requirements," because it, among
other actions, provided "very extensive extensions of the normal
compliance demonstration deadlines." *See ACE*, 864 F.3d at 722–23
(cleaned up).

The same logic applies here. In this case, EPA promulgated the
2019 percentage standards on November 30, 2018, almost four *years* in
advance of the Extension Rule's September 1, 2022, compliance
deadline for small refineries. "Renewable Fuel Standard Program:
Standards for 2019 and Biomass-Based Diesel Volume for 2020," 83
Fed. Reg. 63704, 63744 (Dec. 11, 2018) (signed on November 30, 2018).
EPA has also provided *at least* the eight months approved by the *ACE*
Court between the promulgation of the 2021–2022 percentage
standards and the compliance deadlines. Further, the 2020 standards
were initially published over two years ago on December 19, 2019,
"Renewable Fuel Standard Program: Standards for 2020 and Biomass-
Based Diesel Volume for 2021 and Other Changes," 85 Fed. Reg. 7016,
7069 (Feb. 6, 2020) (signed December 19, 2019), and subsequently
revised *downward* in the 2020–2022 RFS Annual Rule, which was

27

signed on June 3, 2022. The compliance deadline for these standards is December 1, 2022. Thus, obligated parties will have from three to five months between compliance deadlines over the course of over a year, not dissimilar from the time between compliance deadlines approved in *ACE*. *See ACE*, 864 F.3d at 722–23; 80 Fed. Reg. at 77491.

### 2. The Refineries fail to distinguish the Extension Rule from prior compliance deadline extensions approved by this Court.

The Refineries make five arguments in an attempt to distinguish the Extension Rule from *ACE*; none has merit. First, they argue that the Extension Rule involves four late volumes, whereas *ACE* upheld a rule that only included two. Br. at 25. Second, the Refineries claim that the 2020–2022 RFS Annual Rule set volumes later and with less future guidance than the rule upheld in *ACE*. *Id.* at 26. Third, the intervals between compliance deadlines are shorter than the rule upheld in *ACE*, according to the Refineries. *Id.* Fourth, the Refineries argue the volume standards are higher for the years 2020–2022 than the years at issue in *ACE*. *Id.* at 27. Fifth, and finally, the Refineries assert that the price of RINs has risen due to EPA's delay in issuing the annual volumes. *Id.* at 27–28.

The Refineries misconstrue the issues and holding of *ACE*. In *ACE*, EPA issued biomass-based diesel standards for 2014–2017 in November of 2015; for calendar years after 2012, EPA must issue biomass-based diesel volumes 14 months before the compliance year. 42 U.S.C. § 7545(*o*)(2)(B)(ii). Therefore, the biomass-based diesel volumes for 2014–2017 were *all* late, *ACE*, 864 F.3d at 719–20 (noting that EPA "missed the statutory deadline for promulgating the biomass-based diesel volume requirements" for 2014–2017)—not just those for 2014–2015, as the Refineries claim. Br. at 22–23, 25. The obligated parties, moreover, received less than the "26 months' lead time" the Refineries incorrectly claim the statute requires when EPA—and not the CAA—sets the volumes of renewable fuel, *see id.* at 10,[7] and for the years 2014–2016, *far* less.

---

[7] The Refineries claim that "starting with the 2023 compliance year, EPA is required to give obligated parties *at least* 26 months' lead time to plan for and demonstrate annual compliance." Br. at 10 (citing 42 U.S.C. § 7545(*o*)(2)(B)(ii)). However, the provision cited applies to the applicable volumes of cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel "for calendar years after the calendar years" for which volumes are supplied in the CAA. 42 U.S.C. § 7545(*o*)(2)(B)(ii). As noted *supra* at 5, while the CAA provides volumes for three of the fuels through 2022, it provides volumes for biomass-based diesel only through 2012.

The Refineries cannot seriously complain about the "lateness" of the 2019 or 2020 standards as a legal flaw of the Extension Rule. Their brief expressly does not challenge the 2019 deadline, which falls "more than 16 months after EPA issued the 2019 volumes and more than 12 months after the 2018 compliance deadline." Br. at 24–25. With respect to the 2020 volumes, EPA originally established the volumes for that year in a final rule notice published in December 2019, 85 Fed. Reg. at 7069, more than two years before the Extension Rule was published, and almost three years before the 2020 compliance deadline established by the Extension Rule. As a result, the Refineries have had years to plan for compliance, which became easier—not harder—when the 2020 standards were revised downward in June of this year as part of the 2020–2022 RFS Annual Rule because excess 2020-vintage RINs can be used to satisfy part of obligated parties' 2021 compliance obligations. Therefore, with regard to the number of obligations at issue, the rule upheld in *ACE* addressed *more* delayed volumes—issued later—than the Extension Rule.

The Refineries claim that while "some parties challenged EPA's authority to issue late volumes at all . . . *none* [of the parties in *ACE*]

argued that EPA failed to provide the minimum compliance lead time required by the CAA," Br. at 23, however the obligated party petitioners in that case *also* argued that they lacked sufficient notice to comply with the delayed volumes set by EPA. The petitioners in that case contended that because EPA had not provided the statutorily required lead time for issuing biomass-based diesel—14 months before the compliance year—EPA could not increase the volumes above the floor provided in the CAA. *See ACE*, Case No. 16-1005, Dkt. No. 1634754 at 30 (arguing that "EPA . . . cannot increase the mandate without providing the requisite leadtime" (emphasis omitted)). In fact, they tried to distinguish, among other cases, *Monroe Energy*, by arguing that "the past cases challenged EPA's authority to issue annual RFS rules *at all* when it missed the statutory deadline," exactly the distinction the Refineries attempt to draw here. *See* Br. at 23. To be sure, the petitioners in *ACE* did not argue for the specific intervals claimed by the Refineries; however, like the Refineries here, they contended that EPA did not provide the requisite lead time mandated in the CAA, depriving obligated parties of the required notice. Moreover, the obligated party petitioner in *Monroe Energy* explicitly argued that EPA

failed to exercise its authority to issue late standards reasonably, because it had not provided sufficient lead time for obligated parties to comply. *See supra* at 24. This Court rejected this argument. *Id.* at 25.

Nor does *ACE* suggest that the length of the compliance extensions in the rule at issue in that case represented the minimum required. Just the opposite; the *ACE* court approved of "*very extensive extensions of the normal compliance deadlines.*" 864 F.3d at 722 (internal quotation marks omitted and quoting 80 Fed. Reg. at 77491) (emphasis added). Here, EPA reasonably determined that these intervals provided obligated parties adequate time to acquire the RINs necessary to demonstrate compliance. *See infra* at 37–38.

The Refineries also fail to draw any significant distinctions between the intervals at issue in *ACE* and those provided in the Extension Rule. The Refineries erroneously state that obligated parties will be required to comply with "4 annual volumes in a 9-month span." Br. at 26. However, they do not challenge the deadline for the 2019 compliance year. The Refineries additionally have 14 months to comply with the remaining three annual volumes from the date the 2020–2022 Annual Rule was signed on June 3, 2022. *See supra* at 14. Moreover,

setting aside the fact that the Refineries had *years* of lead time to prepare for compliance with the 2019 and 2020 volumes, *see supra* at 27, the six, 10, and 15 months of lead time for the 2020–2022 volumes are very similar to three of the four compliance extensions of eight, 12, and 16 months provided by the rule upheld in *ACE*. Nor do the Refineries offer any support for the proposition that six months before the first challenged compliance deadline—as opposed to eight months— makes a dispositive difference here.

The Refineries also fail to distinguish *ACE* by comparing the annual volume obligations required in the rule at issue there with the standards set in the 2020–2022 RFS Annual Rule. Any objections to the volumes required by the 2020–2022 RFS Annual Rule should be raised in the ongoing challenges the Refineries have filed against that rule and not in this action.

Nor do the Refineries identify any basis for their assertion that the delay in promulgating the annual standards has caused RIN prices to rise. They argue that the extension of the compliance deadline only for small refineries in 2019 meant that, when other parties retired RINs to demonstrate compliance with their 2019 obligations, there were

fewer RINs available on the market for small refineries to use to comply later. *See* Br. at 27–28. But the Refineries expressly *do not challenge* the 2019 compliance date and, at any rate, small refineries—which do not run more than 75,000 barrels of average aggregate daily crude oil, 42 U.S.C. § 7545(*o*)(1)(K)—necessarily have lower compliance obligations than larger refineries. Moreover, they do not suggest that longer compliance intervals would have lowered RIN prices or compliance costs. EPA was unpersuaded that they would. *See* "Extension Rule Response To Comments" ("RTC"), EPA-HQ-OAR-2021-0793 at 9 (Jan. 2022), JA__ ("We are not convinced that additional time between these deadlines will result in lower RIN prices or lower compliance costs.").

For 2020 and 2021, the Refineries cite EPA's findings regarding the distribution of available RINs for those years, which are not in the record in this case, but fail to put those facts in context. While it is true that EPA determined that a small number of obligated parties hold a majority of the RINs, *see* Br. at 28, it is for this reason that the Agency promulgated the Alternative RIN Retirement Schedule, which allows small refineries to use RINs from *future years* for compliance with their

34

2020 RFS obligations. *See* 87 Fed. Reg. at 54161–62 (stating that because few parties hold the majority of the RINs and some small refineries may not be able to comply with their 2020 obligations, EPA is "providing small refineries with more time to acquire RINs and allow the use of a broader range of RIN vintages").

Ultimately, the Refineries' arguments are irreconcilable with the holdings of *Monroe* and *ACE*. According to the Refineries, these decisions approved *unlawful* extensions of the compliance deadlines. This assertion cannot be squared with this Court's precedents. And while the Refineries attempt to distinguish their contention from arguments "challeng[ing] EPA's authority to issue late volumes at all," Br. at 23, by seeking essentially a waiver of compliance requirements for 2020–2022, *see infra* at 42–47, they make exactly the same argument.

This Court's common-sense approach to mitigating potential hardship to obligated parties that may result from delay in promulgating the RFS standards stands in stark contrast to the Refineries' rigid interpretation of the CAA. Their approach would imperil the Agency's ability to administer the RFS program. According

to the Refineries, the RFS program can *never* get back on track if EPA misses the deadline to promulgate volumes: if this Court accepts their argument, EPA cannot require compliance with the 2020 volumes until, at the earliest, August 2023,[8] and with the 2021 volumes a year later, so that the compliance deadline would forever fall at least three years after the applicable compliance year. Br. at 25. This interpretation makes little sense, as it applies even to instances in which, in a related regulatory action, EPA revises the volumes downward—and therefore *in the obligated parties' favor*—as it did by revising the 2020 volumes in the 2020–2022 RFS Annual Rule. The Refineries' interpretation, then, would constrain the Agency's options in unique circumstances that might arise again in implementing the RFS program that potentially warrant mitigation measures, ultimately harming obligated parties.

---

[8] The Refineries appear to misapply their own argument, contending that EPA can require compliance for the 2020 standards by August 1, 2023, 13 months after publication of the revised 2020 standards in the Federal Register, but *fewer* than 12 months after the 2019 compliance deadline for small refineries, September 1, 2022. *See* Br. at 24–25.

36

### C.     EPA reasonably exercised its authority to extend the RFS compliance deadlines for 2019–2022.

An agency's "failure to meet [a] deadline" is "a not uncommon occurrence when heavy loads are thrust on administrators," but "does not mean that official lacked power to act beyond it." *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 n.3 (1998). Nonetheless, the agency must exercise that power reasonably. *See ACE*, 864 F.3d at 718. EPA acted reasonably in extending the compliance deadlines here.

The Agency found that compliance windows of these lengths are "workable amount[s] of time for obligated parties to develop their compliance strategy and acquire sufficient RINs to demonstrate compliance." RTC at 8–9, JA__. Nor does EPA believe these intervals will stress the RIN market because, "[i]n the past, when adjusting deadlines due to delay, [EPA] ha[s] not seen an 'overheating' of the RIN market." *Id.* at 9. The additional time provided by the Extension Rule will allow obligated parties, including the Refineries, to plan for compliance by using the deficit carry-forward provision. *See id.* at 19. EPA was therefore justified and reasonable in extending the compliance deadlines for the years 2020–2022 to mitigate potential hardship.

Further, the Extension Rule forms just part of the overall strategy EPA has undertaken to mitigate potential hardship that all obligated parties might experience by reason of the delayed promulgation of the 2020–2022 RFS Annual Rule. In addition to the Extension Rule, EPA has issued the 2020–2022 RFS Annual Rule and the Alternative RIN Retirement Schedule. *See supra* at 15–16. The standards set for 2020–2022, in particular, informed the Agency's decisionmaking in issuing the Extension Rule. EPA's (at that time proposed) reduction of the 2020 volume requirements addressed illiquidity in the RIN market, because EPA set the standards for 2020 in accordance with "actual renewable fuel use in the U.S.," Extension Rule RTC at 19, JA\_\_, and as a result EPA expected additional 2019 RINs—which may be used for compliance with 2019 or 2020 RFS compliance obligations—to come onto the market. *See id.* at 20. JA\_\_.

### D. The Refineries' arguments find no support in the structure of the CAA.

Recognizing that their argument finds no support in the plain text of the CAA, the Refineries argue from its structure. They contend that because the Act (1) requires compliance according to "calendar years"; (2) provides that an obligated party may carry a compliance deficit

forward to be satisfied in the following calendar year; and (3) sets a deadline of November 30 for EPA to issue the following year's standards, these intervals impliedly constrain EPA's discretion to set by regulation the related compliance deadlines. Br. at 20–22.

The Refineries' argument that a twelve-month interval is required between promulgation of a volume rule and that rule's compliance deadline fails on its own terms. That EPA cannot require a demonstration of compliance with a year's RFS standards before January 1 of the following year does not imply that a year *must* elapse between deadlines.

For example, as the Refineries note, starting with compliance year 2014, EPA set the compliance deadline as March 31 after the calendar year to which the volume rule applied. Br. at 16 n.11. Nothing in the text or structure of the CAA precludes EPA from requiring, for example, compliance by March 31 of one year and then setting the compliance deadline for the following year's volume rule as January 1, eight months after the previous deadline. In other words, even in years in which EPA issues timely standards and volumes, nothing in the statute

requires specific intervals between compliance deadlines, and so obligated parties have no statutory right to a specific interval.

More fundamentally, the structure of Section 7545(*o*) does not mandate any specific duties or requirements in the event EPA does not issue RFS standards by the deadline set in Section 7545(*o*)(3)(B)(i). Other provisions of Section 7545(*o*) *do* provide default rules that apply in the event EPA does not comply with certain mandatory deadlines. For example, Section 7545(*o*)(2)(A)(i) states that by August 8, 2006, EPA "shall" issue "regulations to ensure that gasoline sold into commerce in the United States" contains specific volumes of renewable fuels. If, however, EPA did not promulgate those regulations by August 8, 2006, then the CAA supplied the percentage-based compliance standard for 2006. 42 U.S.C. § 7545(*o*)(2)(A)(iv). In other words, the statute provided the compliance standard in the event EPA did not issue timely regulations. Section 7545(*o*) similarly provides explicit rights to obligated parties, such as a temporary exemption for small refineries from the RFS program and a right to petition for an extension of an exemption for "disproportionate economic hardship." *See* 42 U.S.C. § 7545(*o*)(9)(B)(i).

40

By contrast, the CAA does not provide any background rules in the event EPA does not promulgate annual standards by November 30, *see Nat'l Petrochemical*, 630 F.3d at 154 (noting that Congress did not provide a default standard that would apply in the event EPA missed the deadline to issue standards), or require particular periods of time to elapse before EPA can require compliance, enforceable by obligated parties. Because "[d]rawing meaning from silence is particularly inappropriate" where Congress shows that it knows how to address an issue in express terms, *Kimbrough v. United States*, 552 U.S. 85, 87 (2007), the Court should reject the Refineries' attempt to convert the intervals they would have in a typical year into an inviolable right.

Nor do the extended compliance deadlines in the Extension Rule render the ability to carry forward a deficit "useless." Br. at 11. Rather, obligated parties can still carry forward a deficit into a later compliance year, such that they can use a different RIN vintage to comply. Extension Rule RTC at 19, JA__. In other words, a party can carry forward a 2020 deficit forward into the 2021 compliance year and use 2021-vintage, instead of 2020-vintage, RINs to satisfy the obligation. 40 C.F.R. § 80.1428(c). Obligated parties may still take advantage of this

41

feature even with more compressed compliance intervals.[9] *See* RTC at

19, JA __ ("Obligated parties are still able to weigh the financial and

business sense of their decisions under a compressed compliance

schedule.").

### E.    The April 2022 Compliance Action has no bearing on these petitions.

Recognizing the implications of their interpretation, the Refineries

contend that "the *only* reasonable mitigation" EPA can implement is an

alternative compliance approach for the years 2020–2022 like the one

put in place for 31 small refineries for 2018 only. Br. at 28. This

approach allows those small refineries to demonstrate compliance

without retiring any additional RINs to meet their RFS obligations.

"April 2022 Alternative RFS Compliance Demonstration Approach for

Certain Small Refineries," EPA-420-R-22-006 (April 2022) ("April 2022

Compliance Action"); *see* 87 Fed. Reg. 24294 (April 25, 2022) (notice of

availability). The Refineries assert that compliance with the 2019–

---

[9] This flexibility was extended even further by the Agency's promulgation of the Alternative RIN Retirement Schedule. 87 Fed. Reg. 54158. That Alternative RIN Retirement Schedule Rule provides small refineries with five quarters to comply with their 2020 RFS obligations, allowing them to use later RIN vintages to do so. *See supra* at 15–16.

2021[10] standards is "impossible," just as compliance with the 2018 standards was "impossible" for the 31 refineries subject to the April 2022 Compliance Action; therefore, according to this argument, the Refineries should be treated like those 31 refineries because, "[i]t makes no sense to treat materially identical situations differently." Br. at 28–29.

At the outset, the Court cannot here order the relief the Refineries request, nor are the actual standards set for 2019–2021 at issue in this litigation. This Court "may reverse" unlawful agency action. 42 U.S.C. § 7607(d)(9). But the Refineries do not supply any authority for the proposition that this Court may order relief from their 2019–2021 obligations (which, again, for the years 2020–2021, are subject to challenge in a different proceeding). *Center for Biological Diversity v. EPA*, Case No. 22-1164. Indeed, they do not seriously make such a request. *Compare* Br. at 28 (stating that "the only reasonable mitigation is to provide an alternative compliance demonstration approach"), *with* Br. at 33 (asking only that the Extension Rule "be set aside").

---

[10] Notably, the Refineries argue that reasonable mitigation requires relief from the 2019 standards, *see* Br. at 29, which they also claim they do not challenge, *see id.* at 24–25, but not from the 2022 standards.

43

Moreover, contrary to the Refineries' assertions, Br. at 28–29, (1) the Refineries face materially different circumstances than the 31 small refineries, rendering their situations distinguishable, and (2) the April 2022 Compliance Action shows that EPA has taken actions fitted to the particular situation to mitigate potential hardship associated with particular circumstances for certain subsets of obligated parties appropriately.

First, the Refineries misrepresent the context in which EPA finalized the April 2022 Compliance Action governing the 31 small refineries with 2018 RFS obligations. That action addressed circumstances that are not applicable to the Refineries.

Specifically, in August 2019, EPA granted 31 2018 SRE petitions in a decision subsequently challenged through petitions for review, which were ultimately consolidated in this Court. April 2022 Compliance Action at 6–7. After the Tenth Circuit and Supreme Court issued their opinions addressing the SRE exemptions, *see RFA*, 948 F.3d 1206, *HollyFrontier*, 141 S. Ct. 2172, this Court granted EPA's motion for voluntary remand without vacatur to enable the Agency to "evaluate the impacts of [those] decisions on its SRE policy and the

44

decisions made on those SRE petitions." April 2022 Compliance Action at 7.

On remand, EPA denied the previously granted SRE petitions for 2018. *Id.* As a result, the 31 small refineries had newly unmet compliance obligations for 2018. *Id.* Because EPA determined that "there [were] not sufficient RINs available . . . and the impacts a significant drawdown of the carryover RIN bank[11] would have on the RFS program as a whole," *id.* at 9, the Agency permitted the 31 small refineries to demonstrate compliance without retiring any additional RINs, *id.* at 1. The April 2022 Compliance Action addresses unique circumstances, not applicable to the Extension Rule.

Here, by contrast, EPA has addressed the situation faced by the Refineries—delayed issuance of the annual standards—by setting the annual volume standards at the actual levels of fuel consumed for the years 2020 and 2021. The Agency has thereby preserved the liquidity and functioning of the RIN market, *see* 87 Fed. Reg. at 39614–15, such

---

[11] The sum of all RINs carried over from a prior year is known as the "carryover RIN bank." 87 Fed. Reg. at 39613 n.75. As an example, the carryover RIN bank for 2022 consists of all available 2021-vintage RINs available for demonstrating compliance with the 2022 standards. *Id.*

that a similar alternative compliance approach is not needed for years post-dating 2018.

Second, the April 2022 Compliance Action shows that the Agency appropriately mitigates potential hardship related to particular circumstances for certain subsets of obligated parties, and particularly small refineries, in implementing the RFS program. EPA determined that a shortage of RINs would create a hardship on certain obligated parties and could potentially wreak havoc on the RIN market generally. As a result, it took aggressive steps to protect the functionality of the RFS program. April 2022 Compliance Action at 7–9. Such action is neither necessary nor required in connection to this action.

Finally, EPA's action in extending the compliance deadlines need not alleviate all harms alleged by petitioners on its own. Although petitioners may have preferred that EPA address their issues comprehensively in a single rulemaking action, EPA does not need to address every issue tangentially related to the matters before it in the same rulemaking. *See Alon Refin. Krotz Springs v. EPA*, 936 F.3d 628, 659 (D.C. Cir. 2019) (agency "discretion properly includes judgments

about the scope of rulemakings and when to relegate ancillary issues to separate proceedings").

For all of the foregoing reasons, it is clear that EPA used its authority lawfully to extend the 2020–2022 RFS compliance deadlines via promulgation of the Extension Rule.

## II. The Extension Rule permissibly extends future compliance dates.

The Refineries' challenge to the portion of the Extension Rule setting post-2022 compliance deadlines also fails. As noted *supra* at 22, the CAA does not set or provide guidance regarding the compliance deadline—EPA does. With the post-2022 portion of the Extension Rule, EPA is providing "additional certainty to the implementation of the RFS program" and mitigating future potential hardship on obligated parties that may result from delays that might occur in the promulgation of future standards and reducing uncertainty regarding the RFS program as a whole, by establishing a mechanism by which future deadlines will be established without individual, time-consuming rulemakings that leave obligated parties in limbo. Extension Rule RTC at 40. Under this Court's precedents, this action is lawful.

The Refineries' argument that this portion of the Extension rule "is a naked attempt to re-write the statute" misunderstands what it achieves. Br. at 30. There is no dispute that the CAA deadlines to promulgate the applicable volumes for compliance years after 2022 are mandatory. The Extension Rule does not purport to reset EPA's deadlines set by Section 7545(*o*)(2)(B)(ii); rather, it sets the compliance reporting deadlines, which EPA has always set by regulation, and for which EPA retains significant discretion. In the normal course, this will fall on March 31 following the RFS compliance year. *See* 87 Fed. Reg. at 5700, JA__. In the event that EPA does miss a future deadline to issue standards, the Extension Rule provides certainty for obligated parties and mitigates potential hardship associated with the late issuance of volumes by establishing how the compliance deadlines will be determined without requiring a separate notice-and-comment process.

Such an action is permissible, and desirable, under this Court's precedents. *See ACE*, 864 F.3d at 718 ("*National Petrochemical* and *Monroe Energy* together establish that EPA may promulgate late renewable fuel requirements—and even apply those standards

retroactively—so long as EPA reasonably considers and mitigates any

hardship caused to obligated parties by reason of the lateness.").[12]

## CONCLUSION

For the foregoing reasons, the Court should deny these

consolidated petitions for review.

---

[12] To the extent that the Court concludes that this portion of the Extension Rule is arbitrary and capricious, but the portion extending the 2020–2022 compliance deadlines is not (or vice-versa), this Court should sever and invalidate only the offending provision. In determining whether a provision is severable, this Court looks to the agency's intent and "whether the remainder of the regulation could function sensibly without the stricken provision." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187–88 (D.C. Cir. 2022) (cleaned up). Here, EPA made an express finding of severability, stating that it intends for the extension of the compliance deadlines for 2019–2022 "to be severable from [the Agency's] modifications of the regulations relating to future compliance deadlines (*i.e.*, for compliance years 2023 and beyond)." *See* 87 Fed. Reg. at 5701, JA__. Additionally, the two parts are not interdependent and can stand on their own. Therefore, to the extent the Court determines that one portion is arbitrary and capricious, it should set aside only that portion of the Extension Rule.

Respectfully submitted,

/s/ *Jeffrey Hughes*
TODD KIM
*Assistant Attorney General*

Of Counsel:

JEFFREY HUGHES
Environmental Defense Section
MEREDITH G. MILLER
*Attorney*
United States Department of Justice
P.O. Box 7611
U.S. Environmental Protection
Agency
Washington, D.C. 20044
(202) 532-3080 (tel.)
Office of General Counsel
jeffrey.hughes@usdoj.gov
Washington, D.C.

October 21, 2022

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 9,762 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

*/s/ Jeffrey Hughes*
JEFFREY HUGHES

Counsel for Respondent

| Compliance Year | CAA deadline to set percentage standard (or, after 2022, the volume target) | Date EPA published percentage standard | Date EPA published revised (and lowered) volumes | Original compliance reporting deadline | Compliance reporting deadline after 2019–2020 Deadline Rule (April 2021) | Compliance reporting deadline after Extension Rule (Feb. 2022) | Earliest compliance reporting deadline that the CAA allows, according to Petitioners |
|---|---|---|---|---|---|---|---|
| 2019 (small refiners) | November 30, 2018 | November 30, 2018 | | March 31, 2020 | November 30, 2021 | September 1, 2022 | |
| 2019 (other refiners) | November 30, 2018 | November 30, 2018 | | March 31, 2020 | | | |
| 2020 | November 30, 2019 | December 19, 2019 | June 3, 2022 | March 31, 2021 | January 31, 2022 | December 1, 2022 | September 1, 2023 |
| 2021 | November 30, 2020 | June 3, 2022 | | March 31, 2022 | | March 31, 2023 | September 1, 2024 |
| 2022 | November 30, 2021 | June 3, 2022 | | March 31, 2023 | | September 1, 2023* | September 1, 2025 |
| 2023 | November 1, 2021 | | | March 31, 2024 | | The latest of (1) March 31 after end of program year, (2) next quarterly reporting deadline after effective date of subsequent compliance year's standards, and (3) next quarterly reporting deadline after compliance reporting deadline for prior compliance year. | September 1, 2026 |
| 2024 and later | 14 months before start of program year | | | March 31 after end of program year | | The latest of (1) March 31 after end of program year, (2) next quarterly reporting deadline after effective date of subsequent compliance year's standards, and (3) next quarterly reporting deadline after compliance reporting deadline for prior compliance year. | The latest of (1) 12 months after compliance reporting deadline for prior compliance year, and (2) 26 months after EPA sets volume targets for compliance year. |

*EPA is obligated by the *Growth Energy* consent decree to finalize (not necessarily publish) 2023 volume targets by June 14, 2023.