**SCHEDULED FOR ORAL ARGUMENT JANUARY 19, 2023**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 22-1015, 22-1051, 22-1053

WYNNEWOOD REFINING COMPANY, LLC, et al.,

*Plaintiffs-Appellants,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Defendants-Appellees.*

*On Petitions for Review of Final Agency Action
of the U.S. Environmental Protection Agency*

**FINAL OPENING BRIEF OF PETITIONERS**

Ian S. Shelton
EVERSHEDS SUTHERLAND (US) LLP
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
(916) 844-2965
ianshelton@eversheds-sutherland.com

*Attorney for Kern Oil & Refining Co.*

Jonathan G. Hardin
LeAnn Johnson Koch
Alexandra Magill Bromer
Eric B. Wolff
Karl J. Worsham
PERKINS COIE LLP
700 13th Street, N.W., Suite 800
Washington, D.C. 20005
(202) 654-6200
JHardin@perkinscoie.com
LeAnnJohnson@perkinscoie.com
ABromer@perkinscoie.com
EWolff@perkinscoie.com
KWorsham@perkinscoie.com

*Attorneys for Coffeyville Resources Refining & Marketing, LLC,
Wynnewood Refining Co., LLC,
and Small Refineries Coalition*

## CERTIFICATE AS TO PARTIES,
## RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to Circuit Rule 28(a), the following is a statement of the parties, amici, rulings under review, and related cases:

### I.    Parties and Amici

Petitioners:

| | |
|---|---|
| No. 22-1015 | Wynnewood Refining Company, LLC, and Coffeyville Resources Refining & Marketing, LLC |
| No. 22-2051 | American Refining Group, Inc.; Calumet Montana Refining, LLC; Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; Hunt Refining Company; Par Hawaii Refining, LLC; Placid Refining Company LLC; U.S. Oil & Refining Company; and Wyoming Refining Company (collectively, the "Small Refineries Coalition") |
| No. 22-1053 | Kern Oil & Refining Co. |

Respondents:

United States Environmental Protection Agency

Amici:

None

### II.    Rulings Under Review

EPA Final Rule, titled "Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement

Reporting Deadlines," 87 Fed. Reg. 5696 (Feb. 2, 2022), which this Brief refers to as the "Extension Rule." JA 62–68.

## III.  Related Cases

Each of the Petitions for Review consolidated with No. 22-1015 is related. The consolidated cases have not been reviewed by this or any other Court.

## CORPORATE DISCLOSURE STATEMENT

Under FRAP and Circuit Rule 26.1, Petitioners provide the following disclosures:

**Wynnewood Refining Company, LLC**, is a wholly owned subsidiary of CVR Refining, LLC, a Delaware limited liability company. CVR Refining, LLC is a wholly owned subsidiary of CVR Refining, LP, which is an indirect wholly owned subsidiary of CVR Energy, Inc., a Delaware corporation that is publicly traded on the NYSE under the symbol "CVI."

**Coffeyville Resources Refining & Marketing, LLC** is a Delaware limited liability company. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of CVR Refining, LP, which is an indirect wholly owned subsidiary of CVR Energy, Inc., a Delaware corporation that is publicly traded on the NYSE under the symbol "CVI."

**American Refining Group, Inc.** is a Pennsylvania corporation. It is a refiner of petroleum products, has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

**Calumet Montana Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty

Products Partners, L.P. is a refiner of petroleum products. Calumet Specialty Products Partners, L.P. is a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

**Calumet Shreveport Refining, LLC** is a Delaware corporation. It is owned 100% by Calumet Specialty Products Partners, L.P., which is a Delaware limited partnership. Calumet Specialty Products Partners, L.P. is a refiner of petroleum products. Calumet Specialty Products Partners, L.P. is a publicly traded company. The Heritage Group owns 12.28% of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than 10% of it.

**Ergon Refining, Inc.** is a Mississippi corporation. It is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**Ergon-West Virginia, Inc.** is a Mississippi corporation. Ergon-West Virginia, Inc. is a refiner of petroleum products, is wholly owned by parent company Ergon, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**Hunt Refining Company** is a Delaware corporation. It is a refiner of petroleum products, an indirect wholly owned subsidiary of Hunt Consolidated, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**Par Hawaii Refining, LLC** is a Delaware limited liability company. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly traded corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

**Placid Refining Company LLC** is a Delaware limited liability company. It is a refiner of petroleum products, is owned 100% by its parent companies Placid Holding Company and RR Refining, Inc., and no publicly held company has a 10% or greater ownership interest in it.

**U.S. Oil & Refining Co.** is a Delaware corporation. It is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific

Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

**Wyoming Refining Company** is a trade name for Hermes Consolidated, LLC, a Delaware limited liability company. Wyoming Refining Company is a refiner of petroleum products and is an indirect wholly owned subsidiary of Par Pacific Holdings, Inc., a publicly held corporation. BlackRock, Inc., pursuant to its recent 13F filing, reported that it or funds or accounts managed by it, owns more than 10% of Par Pacific Holding's stock; no other publicly held company has a 10% or greater ownership interest in it.

**Kern Oil & Refining Co**., is a wholly-owned subsidiary of Casey Co., a privately-held California corporation. Neither Kern Oil & Refining Co. nor Casey Co. has any ownership relationship with a publicly held company.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER
    REVIEW, AND RELATED CASES ................................................... i

CORPORATE DISCLOSURE STATEMENT ......................................... iii

GLOSSARY ................................................................................. xiii

STATEMENT REGARDING ORAL ARGUMENT ................................ 1

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF ISSUES ................................................................. 1

STATUTES AND REGULATIONS ...................................................... 3

STATEMENT OF THE CASE .............................................................. 3

    A.    The Renewable Fuel Standard program, the
        setting of annual volume obligations, and small
        refinery hardship relief ............................................... 4

    B.    EPA's untimeliness in setting annual volume
        obligations and adjudicating small refinery
        hardship petitions ...................................................... 11

    C.    EPA's Extension Rule ................................................. 14

SUMMARY OF ARGUMENT ............................................................ 17

STANDING ................................................................................... 18

STANDARD OF REVIEW ................................................................ 19

ARGUMENT .................................................................................. 19

I.    The Extension Rule's compressed compliance timeline
    for 2019–2022 violates the CAA. ................................................ 19

# TABLE OF CONTENTS
(continued)

**Page**

A.    The Extension Rule deprives Petitioners of their right to a minimum of 12 months between compliance deadlines. ........................................................... 20

B.    The Extension Rule deprives Petitioners of their right to a minimum of 13 months after volumes are issued to prepare for compliance. ................................... 22

C.    EPA has not adequately mitigated under *ACE* ................... 25

II.    The Extension Rule unlawfully attempts to regulate around the lead time Congress requires for setting volumes for 2023 and beyond .......................................................... 30

CONCLUSION ...................................................................... 32

CERTIFICATE OF COMPLIANCE ...................................... 34

CERTIFICATE OF SERVICE ............................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alon Refin. Krotz Springs, Inc. v. EPA,*
  936 F.3d 628 (D.C. Cir. 2019)..............................................................19

*Americans for Clean Energy v. EPA,*
  864 F.3d 691 (D.C. Cir. 2017)................................ 18, 22, 23, 25, 26, 29

*Ark Initiative v. Tidwell,*
  816 F.3d 119 (D.C. Cir. 2016)..............................................................32

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................30

*City of Providence v. Barr,*
  954 F.3d 23 (1st Cir. 2020)..................................................................21

*Dilley v. Alexander,*
  603 F.2d 914 (1979), *decision clarified*, 627 F.2d 407 (D.C.
  Cir. 1980)............................................................................................30

*Hearth, Patio & Barbecue Ass'n v. EPA,*
  11 F.4th 791 (D.C. Cir. 2021)................................................... 19, 25, 32

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n,*
  141 S. Ct. 2172 (2021) ...............................................................2, 3, 10

*Koshland v. Helvering,*
  298 U.S. 441 (1936) ............................................................................31

*Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue,*
  297 U.S. 129 (1936) ............................................................................31

*Miller v. Comm'r,*
  836 F.2d 1274 (10th Cir. 1988)............................................................31

*Monroe Energy, LLC v. EPA,*
  750 F.3d 909 (D.C. Cir. 2014)..............................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nat'l Petrochem. & Refiners Ass'n v. EPA,*
  287 F.3d 1130 (D.C. Cir. 2002) ........................................... 19

*New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife*
  *Serv.,*
  248 F.3d 1277 (10th Cir. 2001) ........................................... 21

*Orion Rsrvs. Ltd. P'ship v. Salazar,*
  553 F.3d 697 (D.C. Cir. 2009) ........................................... 31

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ........................................... 31

**STATUTES**

42 U.S.C. § 7545(o) ........................................... 3, 4

42 U.S.C. § 7545(o)(1)(K) ........................................... 8

42 U.S.C. § 7545(o)(2)(A) ........................................... 5, 7

\* 42 U.S.C. § 7545(o)(2)(B) ........................ 5, 8, 9, 10, 16, 17, 20, 25, 26, 30

42 U.S.C. § 7545(o)(3)(A) ........................................... 5

\* 42 U.S.C. § 7545(o)(3)(B) ........................................... 5, 6, 7, 8, 10, 22

42 U.S.C. § 7545(o)(5)(D) ........................................... 9, 18, 21, 22

42 U.S.C. § 7545(o)(7) ........................................... 6

42 U.S.C. § 7545(o)(9)(B) ........................................... 11, 12

42 U.S.C. § 7607(b)(1) ........................................... 1

42 U.S.C. § 7607(d)(1)(E) ........................................... 19

42 U.S.C. § 7607(d)(9) ........................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Energy Independence and Security Act of 2007, Pub. L. No. 110–140, 121 Stat 1492 ........................................................... 4

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat 594 ................... 4

## RULES

Circuit Rule 26.1 ........................................................................... iii

Circuit Rule 28(a) .......................................................................... i

## REGULATIONS

40 C.F.R. § 80.1406 ............................................................. 6, 7, 18

40 C.F.R. § 80.1407 ..................................................................... 6

40 C.F.R. § 80.1426 ..................................................................... 7

40 C.F.R. § 80.1427 ..................................................................... 7

40 C.F.R. § 80.1428 ..................................................................... 7

40 C.F.R. § 80.1429 ..................................................................... 7

40 C.F.R. § 80.1451(a) (2021) .................................................. 10, 16, 25

72 Fed. Reg. 23,900 (May 1, 2007) ..................................................... 8

75 Fed. Reg. 14,670 (Mar. 26, 2010) ................................................... 7

80 Fed. Reg. 77,420 (Dec. 14, 2015) .................................................. 23

81 Fed. Reg. 89,746 (Dec. 12, 2016) .................................................. 23

85 Fed. Reg. 7016 (Feb. 6, 2020) ...................................................... 11

86 Fed. Reg. 17,073 (Apr. 1, 2021) .................................................... 12

87 Fed. Reg. 5696 (Feb. 2, 2022) ................................................... i, xiv

## TABLE OF AUTHORITIES
### (continued)

Page(s)

87 Fed. Reg. 34,873 (June 8, 2022)..........................................................13

87 Fed. Reg. 35,711 (June 13, 2022)................................................16, 28

87 Fed. Reg. 39,600 (July 1, 2022)...................................................11, 24

OTHER AUTHORITIES

Biofuels and the Environment: Second Triennial Report to
    Congress (June 2018), https://cfpub.epa.gov/
    si/si_public_record_report.cfm?Lab=IO&dirEntryId=341491 .............6

David DeGennaro, National Wildlife Federation, Fueling
    Destruction: The Unintended Consequences of the
    Renewable Fuel Standard on Land, Water, and Wildlife
    (2016) available at https://www.nwf.org/Educational-
    Resources/Reports/2016/12-15-2016-Fueling-Destruction..................6

Economics of Biofuels, https://www.epa.gov/environmental-
    economics/economics-biofuels (last updated April 14, 2022) ..............6

Kate McMahon & Victoria Witting, Friends of the Earth, Corn
    Ethanol and Climate Change: How the Renewable Fuel
    Standard Mandates the Consumption of Biofuels that
    Contribute to Climate Change (July 2011) *available at*
    https://foe.org/wp-content/uploads/2017/legacy/
    Corn_ethanol_and_climate_change.pdf ...............................................6

Order, *Growth Energy v. EPA*, No. 22-cv-01191 (D.C. Cir. July
    26, 2022), ECF No. 12 ...............................................................26, 31

*   Authorities upon which we chiefly rely are marked with asterisks

**GLOSSARY**

| | |
|---|---|
| CAA | Clean Air Act |
| EPA | United States Environmental Protection Agency |
| Extension Rule | Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines, 87 Fed. Reg. 5696 (Feb. 2, 2022) (JA 62–68) |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| RVO | Renewable Volume Obligation |

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request oral argument. This case presents new issues regarding EPA's authority to compress compliance periods set by statute and to preauthorize compressed compliance schedules on an assumption that EPA will continue to violate statutory deadlines in the future.

## STATEMENT OF JURISDICTION

EPA finalized the Extension Rule on February 2, 2022. The petitioning refiners timely filed petitions for review in this Court on or before April 4, 2022—within the required 60 days. 42 U.S.C. § 7607(b)(1).[1] This Court has jurisdiction to hear this challenge under § 7607(b)(1).

## STATEMENT OF ISSUES

Congress structured the Renewable Fuel Standard (RFS) program to require at least 13 months' lead time between the date EPA sets the annual renewable fuel volumes and the date obligated parties must demonstrate compliance with those volumes. Further, Congress required that obligated parties be given at least 12 months between annual compliance deadlines, and obligated parties are permitted to carry forward a compliance obligation deficit into the next year, which provides a two-year span to achieve RFS compliance for a given year. Of the parties in need of that lead time, the most vulnerable are small

_____

[1] Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

1

refineries—many of which are in rural areas, critical to local consumers, and provide high-paying local jobs—which cannot self-generate blended fuel credits and must purchase them on an unregulated secondary "market" easily distorted when EPA misses deadlines or otherwise mishandles the statute.

EPA has fallen dramatically behind in setting the annual renewable fuel volumes. Just one example of why is the agency's reversal of positions to be adverse to small refineries in litigation before the U.S. Supreme Court, leading to EPA's loss in *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*, 141 S. Ct. 2172 (2021). Now, over three years behind for self-inflicted reasons, EPA has promulgated the oddly named "Extension Rule" (the "extension" is for EPA, not obligated parties) to revise annual compliance deadlines in the event EPA fails to timely set renewable fuel volumes. Specifically, the Extension Rule set deadlines for compliance with the 2019–2022 annual volumes for each quarter from September 1, 2022 to June 1, 2023. The Rule thereby requires compliance with *four* annual volume obligations in the span of *nine* months.

This case raises two issues. **First**, whether the Extension Rule's extremely compressed compliance deadlines for 2019–2022 violate the statute on its face, or alternatively, are unlawful because EPA did not reasonably mitigate the harm caused by the agency's failure to timely promulgate the annual volumes as required by this Circuit's case law.

**Second**, whether EPA can preauthorize compressed compliance schedules on an assumption that it will commit future violations of the statutory deadlines for promulgating annual renewable fuel volumes.

## STATUTES AND REGULATIONS

The pertinent statutory provisions are found in § 7545(o). Pertinent statutes and regulations are included in the Addendum.

## STATEMENT OF THE CASE

To be very generous and euphemistic, EPA has had a difficult time with the deadlines Congress set to govern the RFS program. EPA has missed statutory deadline for setting the annual volumes many times, and small refineries in particular have received nothing close to the consistency and certainty the statute requires. EPA has missed those deadlines because of political changes, interest-group-driven hostility toward small refineries, and serious miscalculations regarding reviewing courts, most notably EPA's change of position before the U.S. Supreme Court leading to its loss in *HollyFrontier*, 141 S. Ct. 2172. Having put itself in a deep regulatory hole—essentially three years behind with total chaos for small refineries—a sensible approach would be to acknowledge the regulatory mess it has made, accept some responsibility, put the past reasonably behind, and move forward.

Alas, EPA has chosen to keep digging. EPA's Extension Rule tries to turn back the clock. In conjunction with the agency's years-late publication of the 2020–2022 renewable fuel volumes on July 1, 2022,

EPA's Extension Rule demands compliance with multiple years of volume obligations on a new, aggressive timeline forcing obligated parties like Petitioners to bear the burden of the agency's multi-year regulatory fugue state.

The Orwellian "*Extension* Rule" is a significant compression of the lead time the statute guarantees obligated parties. It may very well be that the statute does not give EPA, with its tangled agendas and political mood swings, enough time to set annual volume requirements in harmony with the lead-time requirements for obligated parties. Experience certainly suggests that is the case. But whatever EPA's challenges, it does not get to re-write the statute. And even though it does not lose its power merely by missing deadlines, as this Court has held, EPA is still required to follow the rest of the statute *and* provide reasonable mitigation for how its untimeliness affects obligated parties. The Extension Rule comes up woefully short of those requirements.

### A.    The Renewable Fuel Standard program, the setting of annual volume obligations, and small refinery hardship relief

**The RFS program.** Congress amended the Clean Air Act (CAA) in 2005 to establish the RFS program and significantly revised the program in 2007. § 7545(o); *see* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat 594; Energy Independence and Security Act of 2007, Pub. L. No. 110–140, 121 Stat 1492. The RFS program requires biofuels, such as ethanol and biodiesel, to be blended into petroleum-based transportation

fuels (gasoline and diesel) sold in the United States. The CAA establishes annually increasing volumes of the four types of biofuel that must be blended. § 7545(o)(2)(B)(i)(I)–(IV). Congress directed EPA to promulgate regulations "to ensure that transportation fuel sold or introduced into commerce in the United States . . . on an annual average basis, contains at least the applicable volume of renewable fuel" set by the statute. § 7545(o)(2)(A)(i).

To accomplish Congress's annual mandate, the Energy Information Administration—a division of the U.S. Department of Energy—calculates the total volume of transportation fuel projected to be sold in the United States in the next calendar year. § 7545(o)(3)(A). Based on that estimate, EPA sets a "renewable fuel obligation" expressed as a "volume percentage of transportation fuel sold or introduced into commerce in the United States," for each of four categories of biofuel. § 7545(o)(3)(B)(ii). For example, if the total projected consumption in the United States in a particular year were 100 billion gallons of non-renewable transportation fuel, and if the statute called for the use of 10 billion gallons of renewable fuel, then EPA would set a volume percentage standard of 10 percent for that year.

But the statutory volumes are just the starting point. EPA has the authority to reduce the volumes set by Congress "in whole or in part" if the statutory volumes "would severely harm the economy or

environment[2] of a State a region or the United States" or if "there is an inadequate domestic supply" of the biofuels in question. § 7545(o)(7).

Only "obligated parties" are responsible for ensuring that the volume targets are met each year. § 7545(o)(3)(B)(ii)(I); 40 C.F.R. §§ 80.1406, 80.1407. An obligated party must meet its Renewable Volume Obligation (RVO) every year. 40 C.F.R. § 80.1406(b). To calculate its RVO, an obligated party multiplies EPA's volume percentage for the year by the volume of transportation fuel the company produced or imported. While the statute defines "obligated parties" as "refineries, blenders,

---

[2] The environmental benefits of the RFS program are the subject of considerable debate. EPA's 2018 report to Congress detailed the widespread habitat destruction the RFS program has caused by increasing demand for biofuels. Biofuels and the Environment: Second Triennial Report to Congress at 20–44, 84–85 (June 2018), *available at* https://cfpub.epa.gov/si/si_public_record_report.cfm?Lab=IO&dirEntryI d=341491. Increased biofuel production also decreases water and air quality. Economics of Biofuels, https://www.epa.gov/environmental-economics/economics-biofuels (last updated April 14, 2022). Finally, replacing gasoline with biofuels does not reduce greenhouse gases or otherwise address climate change; indeed, some studies indicate that biofuels risk making climate change worse. Kate McMahon & Victoria Witting, Friends of the Earth, Corn Ethanol and Climate Change: How the Renewable Fuel Standard Mandates the Consumption of Biofuels that Contribute to Climate Change, (July 2011), *available at* https://foe.org/wp-content/uploads/2017/legacy/Corn_ethanol_and_ climate_change.pdf; *see also* David DeGennaro, National Wildlife Federation, Fueling Destruction: The Unintended Consequences of the Renewable Fuel Standard on Land, Water, and Wildlife (2016), *available at* https://www.nwf.org/Educational-Resources/Reports/2016/12-15-2016 -Fueling-Destruction.

distributors, and importers," *see* 42 U.S.C. § 7545(o)(2)(A)(iii)(I), (o)(3)(B)(ii)(I), EPA has imposed compliance obligations exclusively on refiners and importers, *see* 40 C.F.R. § 80.1406(a)(1). "Refiners," like petitioners, produce petroleum-based fuels and other products from crude oil, whereas "blenders" blend renewable fuel into petroleum-based fuels to create the gasoline and diesel products actually sold to consumers.

**Renewable Identification Numbers (RINs).** Obligated parties demonstrate compliance by securing blending credits called RINs. 40 C.F.R. § 80.1427. A RIN is created when a biofuel is manufactured— ethanol, for example. *Id.* § 80.1426. Until the biofuel is blended into petroleum-based transportation fuel, the RIN remains attached to the physical volume of biofuel. *Id.* § 80.1428. The RIN is "separated" when the biofuel is blended with transportation fuel. *Id.* § 80.1429. Obligated parties use separated RINs to demonstrate RFS compliance. *Id.* § 80.1427.

Because EPA arbitrarily chose to obligate transportation fuel refiners but not renewable fuel blenders, the agency's implementation of the RFS has created classes of haves and have-nots. Obligated parties that cannot self-generate enough RINs to meet their RVOs are forced to buy RINs on an unregulated secondary market. RINs are usually traded on a spot market or bought and sold through private contracts. 75 Fed. Reg. 14,670, 14,722 (Mar. 26, 2010). This marketplace for RINs is

necessary because "[m]any obligated parties"—particularly small refineries[3]—"do not have access to renewable fuels or the ability to blend them, and so must use credits to comply." 72 Fed. Reg. 23,900, 23,904 (May 1, 2007). Buying RINs is the only way for these obligated parties to comply with the RFS program.

**Statutory deadlines to set volume obligations.** Congress sets deadlines for EPA to promulgate the annual volumes and the earliest date on which EPA can require annual compliance. For each compliance year through 2022, the CAA requires EPA to set the applicable volume requirements by November 30 of the year preceding the compliance year in question. § 7545(o)(3)(B)(i). For example, the statutory deadline for promulgating the 2021 annual volumes was November 30, 2020. *See id.* But Congress required EPA to set the annual volumes even earlier starting with 2023. At that point, the CAA no longer gives EPA guidance on the appropriate volume for each type of biofuel. § 7545(o)(2)(B). Instead, the statute requires EPA to consider various factors to determine the appropriate volumes. § 7545(o)(2)(B)(ii). Therefore, Congress required EPA to set volumes for 2023 and beyond much further in advance—at least 14 months before the start of the relevant compliance year:

> **The Administrator shall promulgate rules establishing the applicable volumes under this**

---

[3] "The term 'small refinery' means a refinery for which the average aggregate daily crude oil throughput for a calendar year . . . does not exceed 75,000 barrels." § 7545(o)(1)(K).

> clause no later than 14 months before the first year
> for which such applicable volume will apply.

§ 7545(o)(2)(B)(ii). For example, the statutory deadline for promulgating the 2023 annual volumes was November 1, 2021. *See id.*

As to compliance, Congress structured the RFS program to give obligated parties at least 12 months between annual compliance deadlines. Congress indexed RFS compliance on blending fuel in a "calendar year," § 7545(o)(2)(B), therefore the earliest EPA can possibly require compliance for a particular year is the following January 1.

Congress also required EPA to offer additional compliance flexibility via the deficit carry-forward provision:

> The regulations promulgated under paragraph (2)(A) shall include provisions allowing any person that is unable to generate or purchase sufficient credits to meet [their RVO] to carry forward a renewable fuel deficit on condition that the person, in the calendar year following the year in which the renewable fuel deficit is created--
>
> > (i) achieves compliance with [their RVO]; and
> >
> > (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year.

§ 7545(o)(5)(D). By combining the deficit carry-forward provision with the 12-month annual compliance interval, Congress ensured that obligated parties would have the option of taking 24 months to comply with two years' worth of volume obligations.

When the explicit statutory deadlines for issuing annual volumes are matched with how the CAA structures compliance, Congress's intent becomes clear. Through the 2022 compliance year, EPA was required to give obligated parties *at least* 13 months' lead time to plan for and demonstrate annual compliance (from November 30 before the compliance year to January 1 following it). § 7545(o)(3)(B)(i). And starting with the 2023 compliance year, EPA is required to give obligated parties *at least* 26 months' lead time to plan for and demonstrate annual compliance (from "14 months before the first year for which such applicable volume will apply" to January 1 following the compliance year). § 7545(o)(2)(B)(ii).

Until now, EPA had provided obligated parties with even more lead time than the statute requires. Rather than the minimum 13 months, the agency bound itself by regulation to give obligated parties 16 months' lead time to plan for and demonstrate compliance through 2022. *See* 40 C.F.R. § 80.1451(a) (2021) ("Annual compliance reports for the previous compliance period shall be submitted by March 31 of each year . . . ."). The initial compliance deadlines for 2019, 2020, and 2021 were March 31 of 2020, 2021, and 2022, respectively. *Id.*

**Small refinery hardship relief.** In addition to the minimum planning and compliance periods for obligated parties of all sizes, Congress provided an additional protection for small refineries—an annual "safety valve." *HollyFrontier*, 141 S. Ct. at 2182. Congress granted small

refineries relief from RFS compliance "for the reason of disproportionate economic hardship." § 7545(o)(9)(B)(i). Small refineries are free to petition EPA for annual hardship relief "at any time." *Id.* And because petitioning small refineries do not know whether they will be required to comply with the RFS until EPA has decided their hardship petitions, Congress gave EPA a relatively short deadline—EPA must grant or deny each petition "not later than 90 days after" receiving it. § 7545(o)(9)(B)(iii).

### B. EPA's untimeliness in setting annual volume obligations and adjudicating small refinery hardship petitions

By statute, the deadline for EPA to set the 2020 annual volumes was November 30, 2019, but EPA originally promulgated it on February 6, 2020—more than two months late. *See* Renewable Fuel Standard Program: Standards for 2020 and Bio-mass-Based Diesel Volume for 2021 and Other Changes, 85 Fed. Reg. 7016 (Feb. 6, 2020). But EPA then issued new, revised volumes for 2020 on July 1, 2022—31 months late. *See* Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39,600, 39,601 (July 1, 2022). The deadline for the 2021 volumes rule was November 30, 2020; EPA did not promulgate them until July 1, 2022, *id.* —19 months late. And the deadline for the 2022 volumes rule was November 30, 2021; again, EPA issued those volumes on July 1, 2022—seven months late. *Id.*

EPA has also repeatedly ignored the statutory deadline for deciding small refinery hardship petitions. For example, a small refinery in rural Wynnewood, Oklahoma, petitioned for hardship relief from the 2019 annual compliance obligations on September 20, 2019, making EPA's decision statutorily due by December 19, 2019. *See* § 7545(o)(9)(B)(iii). The Wynnewood refinery petitioned for hardship relief from the 2020 annual compliance obligations on December 6, 2020, making EPA's decision due March 6, 2021. *See id.* And Wynnewood petitioned for hardship relief from the 2021 annual compliance obligations on September 23, 2021, making EPA's decision due December 22, 2021. EPA did not decide any of those hardship petitions until June 3, 2022—six months late for the 2021 petition, 15 months late for the 2020 petition, and more than 29 months late for the 2019 petition. Those missed deadlines are unfortunately typical for hardship petitions filed by other small refineries for the 2019–2021 compliance years.

EPA's untimeliness has required pushing back annual compliance deadlines. *See, e.g.*, Extension of 2019 and 2020 Renewable Fuel Standard Compliance and Attest Engagement Reporting Deadlines, 86 Fed. Reg. 17,073 (April 1, 2021). These ad hoc adjustments resulted in EPA choosing to split the 2019 compliance deadline. Obligated parties other than small refineries were required to retire their RINs on March 31, 2020—the original compliance deadline for 2019—which drastically reduced supply in the RIN market, while small refineries were left in

limbo for more than two years until their hardship petitions were decided in June 2022. *See* JA 66.

These fits and starts have caused RIN prices to skyrocket. For example, on November 30, 2018—the day EPA set the 2019 volumes—the price of 2019 ethanol RINs was $0.145.[4] On December 2, 2019—the first business day after EPA was statutorily required to set the 2020 volumes—the price of 2020 ethanol RINs was $0.205.[5] But as of August 19, 2022, the price of 2019 and 2020 ethanol RINs were both $1.62,[6] an increase of *1,017%* and *690%*, respectively. 2021 and 2022 ethanol RINs are similarly expensive due to EPA's delays, trading at $1.615 and $1.61, respectively.[7]

Despite knowing the price of RINs was near all-time highs, EPA chose to deny all 69 pending hardship petitions on the same day. June 2022 Denial of Petitions for RFS Small Refinery Exemptions at 1, 87 Fed. Reg. 34,873 (June 8, 2022).[8] Not only that, EPA also completely changed

---

[4] These prices were acquired from the OPIS End of Day Ethanol Assessment Report for November 30, 2018.

[5] These prices were acquired from the OPIS End of Day Ethanol Assessment Report for December 2, 2019.

[6] These prices were acquired from the OPIS End of Day Ethanol Assessment Report for August 19, 2022.

[7] These prices were acquired from the OPIS End of Day Ethanol Assessment Report for August 19, 2022.

[8] EPA published only a notice of the Denials in the Federal Register. The text of the Denials can be found at https://www.epa.gov/renewable-fuel-

the criteria it had been using since the inception of the RFS program to evaluate and decide small refinery hardship petitions. *Id.* at 24–25, 72–73. And the agency used this newly announced criteria to deny *en masse* hardship petitions that were submitted under the old criteria and had been pending for years. Thus, under the Extension Rule, small refineries that had regularly received hardship exemptions under the old criteria, including most of Petitioners, are now suddenly faced with having to comply with the RFS for the first time in many years (and, in some cases, for the first time ever). As if that were not bad enough, they must comply with four years' worth of RVOs within just nine months during arguably the worst RIN market in history due to EPA's delays. Consistent with elementary economics, EPA's actions have significantly increased demand for a limited supply of RINs, which has further driven up prices and exacerbated RIN scarcity.

### C.    EPA's Extension Rule

In light of the uncertainty and confusion caused by its delays, EPA promulgated the Extension Rule. Under that Rule, the annual RFS compliance deadline is no longer a fixed target but moves around based on EPA's adherence (or non-adherence) to the statute. For compliance years through 2022, the annual compliance deadlines are now indexed to

standard-program/june-2022-denial-petitions-rfs-small-refinery-exemptions. Citation to the Denials references the pagination of the document found on EPA's website.

the previous year's compliance deadline or the effective date of the subsequent compliance year's volume requirements, whichever is later. JA 64 n.10. After both next year's volumes have become effective and last year's compliance deadline has passed, the new compliance deadline falls on the "next quarterly reporting deadline."[9]

For compliance years 2023 and beyond, the Extension Rule anticipates more missed deadlines. For all future years, the annual compliance deadline falls on the latest of "March 31st of the subsequent calendar year," or the "next quarterly reporting deadline after" either "the effective date of the subsequent compliance year's standards" or "the annual compliance reporting deadline for the prior compliance year." JA 66–67. EPA justifies these roving deadlines as necessary to "avoid EPA having to repeatedly extend compliance reporting deadlines for obligated parties should promulgation of the subsequent year's standards be delayed." JA 67.

The Extension Rule attempts to resolve the multi-year backlog of EPA's own creation by compressing the statutory timeline for compliance. Instead of allowing parties to comply with four annual RVOs in the 48 months required by statute, the Extension Rule forces them to demonstrate compliance for those years (2019–2022) within just a

---

[9] "The RFS quarterly reporting deadlines are March 31, June 1, September 1, and December 1, as specified by 40 CFR 80.1451(f)(2)." JA 64.

nine-month span.[10] As reflected in the chart below, because the 2021 and 2022 volumes will become effective on August 30, 2022, the 2019 compliance deadline (for small refineries) and the 2020, 2021, and 2022 compliance deadlines (for all obligated parties) are September 1, 2022, December 1, 2022, March 31, 2023, and June 1, 2023, respectively. JA 66.

| Compliance Year | Statutory Volumes Deadline | Original Compliance Deadline[11] | Actual Date Final Volumes Published | Extension Rule Compliance Deadline |
|---|---|---|---|---|
| 2019 | Nov. 30, 2018 | Mar. 31, 2020 | Dec. 11, 2018 | Sept. 1, 2022 |
| 2020 | Nov. 30, 2019 | Mar. 31, 2021 | July 1, 2022 | Dec. 1, 2022 |
| 2021 | Nov. 30, 2020 | Mar. 31, 2022 | July 1, 2022 | Mar. 31, 2023 |
| 2022 | Nov. 30, 2021 | Mar. 31, 2023 | July 1, 2022 | June 1, 2023 |
| 2023 | Nov. 1, 2021 | Mar. 31, 2024 | Not yet issued | Unknown |

---

[10] EPA has recently proposed—but not finalized—an action that would slightly alter, but not alleviate, this compressed compliance schedule. *See* Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 35,711 (June 13, 2022). That proposed action would require small refineries to retire RINs for *five* compliance years (2019–2023) within just a *14-month* span.

[11] Prior to the Extension Rule, EPA regulations had fixed the annual compliance deadline at March 31 of the following year. 40 C.F.R. § 80.1451(a) (2021). As explained above, the statute sets a floor for the compliance deadline—no earlier than January 1 of the following year—not a ceiling. *See* § 7545(o)(2)(B). Thus, prior to the Extension Rule, obligated parties had 16 months' lead time after the annual volumes were set in which to plan for and demonstrate RFS compliance.

The Extension Rule also appears to anticipate that EPA will miss the statute's post-2022 volumes deadlines, purporting to grant EPA authority to extend and compress future compliance deadlines in the same way the agency has done for 2019–2022. *Compare* Extension Rule (JA 66–67), *with* § 7545(o)(2)(B)(ii).

**SUMMARY OF ARGUMENT**

The Extension Rule is unlawful. It compresses the 2019–2022 annual RFS compliance obligations without regard for either the 12-month period required by the CAA between annual compliance deadlines or the 13-month period required by the CAA between the dates EPA sets the annual volumes and obligated parties must comply with them. It also does not represent "reasonable mitigation"—because it only exacerbates the harm—as required by this Court's caselaw when EPA misses volume deadlines.

To enable planning for and demonstration of annual RFS compliance, Congress guarantees obligated parties at least a year between annual compliance deadlines and more than a year between the date EPA sets the volumes and the date obligated parties must comply with them. In addition, Congress created a deficit carry-forward provision that "allow[s] any person that is unable to generate or purchase sufficient credits to meet the [RFS] requirements . . . to carry forward a renewable fuel deficit" into "the calendar year following the year in which

- 17 -

the renewable fuel deficit is created." § 7545(o)(5)(D). The Extension Rule violates each of those statutory, lead-time requirements.

Petitioners expect EPA to try to confuse the issues here by noting that this Court has in the past permitted EPA to issue late volumes rules if "EPA reasonably mitigates any burdens that its lateness imposes on obligated parties." *Americans for Clean Energy v. EPA* ("*ACE*"), 864 F.3d 691, 717 (D.C. Cir. 2017). The "reasonable mitigation" standard cannot displace statutory lead-time requirements. It is, if anything, an *additional* consideration on top of statutory requirements when EPA misses deadlines. In any event, what EPA has done here is not "reasonable mitigation" at all. EPA is so far behind and has so distorted the market for RINs with its delays and dysfunction that the only reasonable course left is some type of alternative compliance demonstration for compliance years that have already passed (2019–2021), exactly as EPA recently did for small refineries for the 2018 RFS compliance year. There, EPA allowed small refineries to demonstrate compliance without retiring RINs because, like here, EPA's delays made doing so impossible.

## STANDING

As obligated parties, Petitioners are refiners subject to annual RFS compliance deadlines, 40 C.F.R. § 80.1406, and thus are directly regulated by the Extension Rule. Accordingly, they have Article III standing. *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014).

Petitioners also fall within the statute's zone of interests. *See Nat'l Petrochem. & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147–48 (D.C. Cir. 2002).

STANDARD OF REVIEW

Because the Extension Rule is a regulation "involving the RFS program," this Court's review is governed by § 7607(d)(9). *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 641 (D.C. Cir. 2019) (citing § 7607(d)(1)(E)). Under that section, courts must set aside EPA's action "if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or in excess of statutory authority." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 805 (D.C. Cir. 2021) (citing § 7607(d)(9)(A), (C)).

ARGUMENT

I.    **The Extension Rule's compressed compliance timeline for 2019–2022 violates the CAA.**

Other than the purchasing of crude oil, RFS compliance is typically the highest operating expense for small refineries. The price tag of the RFS easily reaches into the tens of millions of dollars annually, sometimes into the hundreds of millions, depending on the magnitude of the volumes that year and the current price of RINs. Annual RFS compliance is not the kind of expense a small refinery can cover on a compressed timeline, much less if that expense is multiplied many times over due to EPA's actions.

To provide enough time to plan for and demonstrate compliance, Congress provides two lines of protection for obligated parties. **First**, Congress forecloses compressing compliance deadlines by guaranteeing obligated parties at least a year between annual compliance deadlines. **Second**, Congress mandates the minimum lead time it intended obligated parties to have to comply with new volume obligations: at least 13 months (through 2022) and at least 26 months (2023 and beyond) between the dates EPA sets the volumes and obligated parties must comply with them.

The Extension Rule violates the CAA on both counts. And even without these statutory guarantees, EPA's extreme compression of the 2019–2022 compliance deadlines and near abolition of any lead time is arbitrary and capricious.

A. **The Extension Rule deprives Petitioners of their right to a minimum of 12 months between compliance deadlines.**

Congress structured the RFS program to give obligated parties at least 12 months between annual compliance deadlines. Congress indexed RFS compliance on blending fuel in a "calendar year," § 7545(o)(2)(B), therefore the earliest EPA can possibly require compliance for a particular year is the following January 1.

The mandatory nature of this 12-month period between annual compliance deadlines is evident from the statutory provisions granting obligated parties compliance flexibility. One example is the deficit

carry-forward provision. *See* § 7545(o)(5)(D). Congress ordered EPA to promulgate regulations that "allow[] any person that is unable to generate or purchase sufficient credits to meet the [RFS] requirements . . . to carry forward a renewable fuel deficit" into "the calendar year following the year in which the renewable fuel deficit is created." *Id.* Under Congress's scheme—which assumes that EPA meets the statutory deadlines to promulgate annual biofuel blending volumes—an obligated party can carry a deficit for one compliance year into the next before achieving compliance for the first year. Thus, in a typical year, an obligated party can decide whether to carry forward a deficit after weighing the financial and business sense of that decision in light of its volume obligations and the current price of RINs, and then have 24 months to comply for both years.

Under the Extension Rule, EPA renders the carry-forward provision useless because each of the four compliance deadlines for 2019–2022 is within three months of the next. This means even if an obligated party carries forward a deficit—say, for 2019—it will be required to satisfy that deficit only three months later when the compressed 2020 deadline occurs. Agency attempts to render statutory provisions useless should be rejected. *See City of Providence v. Barr*, 954 F.3d 23, 43 (1st Cir. 2020) (rejecting an agency determination that would "render meaningless" statutory provisions); *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1285 (10th Cir. 2001) (same).

The Extension Rule contradicts Congress's intent and violates EPA's mandate to allow obligated parties to utilize the CAA's compliance flexibilities. *See* § 7545(o)(5)(D).

**B.    The Extension Rule deprives Petitioners of their right to a minimum of 13 months after volumes are issued to prepare for compliance.**

For 2005 through 2022, the CAA *requires* the EPA Administrator to "determine and publish in the Federal Register" the "renewable fuel obligation" by November 30 of the year proceeding the compliance year in question. § 7545(o)(3)(B)(i). Because the earliest possible deadline for compliance for any particular calendar year is the following January 1, obligated parties are entitled *at least* 13 months' lead time between publication of the final annual volume obligation and the deadline for reporting compliance with that obligation.

Although this Court has previously permitted EPA to issue a late volumes rule if "EPA reasonably mitigates any burdens that its lateness imposes on obligated parties," *ACE*, 864 F.3d at 717, it does not follow that EPA may disregard the CAA's guaranteed lead time. EPA's legal duty to mitigate is not a license to rewrite the statute however EPA wishes. The statute creates lead time for Petitioners that EPA cannot take away.

In fact, *ACE* does not dictate how this case should be resolved. In *ACE*, this Court upheld two late annual volumes rules that did not

provide the necessary 13 months of lead time. But that is not surprising because *no one* in *ACE* challenged the compliance deadlines—the issue was not litigated. There, the challengers were in two camps—some thought the *amount* of the volumes was "too high" and others "too low." *ACE*, 864 F.3d at 696. Although some parties challenged EPA's authority to issue late volumes at all, *id*. at 719–20, *none* argued that EPA failed to provide the minimum compliance lead time required by the CAA. There is no credible argument that this Court already spoke in *ACE* about the minimum compliance period provided in the statute.

Moreover, in *ACE* the annual volumes were significantly lower, and EPA provided substantially more lead time than in the Extension Rule. There, EPA set volumes for four years—2014, 2015, 2016, and 2017—in 2015. *Id*. at 696. The total average annual volume obligation over that four-year period was approximately 23 billion gallons of biofuel.[12] And obligated parties had 8 and 12 months to demonstrate compliance for 2014 and 2015. But for 2016 and 2017, EPA provided *more* than the statutory minimum lead-time: 15 months for 2016 and 28 months for 2017. *Id*. at 722.

---

[12] The 2014–2017 volumes were set at 20.613, 21.663, 23.85, and 25.871 billion gallons, respectively. *See* Renewable Fuel Stand Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015); Renewable Fuel Standard Program: Standards for 2017 and Biomass-Based Diesel Volume for 2018, 81 Fed. Reg. 89,746 (Dec. 12, 2016).

The Extension Rule does not set any volumes. It provides a system for setting compliance deadlines for all future compliance years, starting with 2019 (for small refineries) and 2020 (for all obligated parties). The Extension Rule does not set any fixed deadlines because at the time EPA issued it, the agency *still* had not issued *any* final volumes beyond 2019. Despite that uncertainty, the Extension Rule requires obligated parties to meet four annual compliance obligations in just a nine-month span. Now that the 2020–2022 volumes are out, we know the total average annual volume obligation over those three years is 27.07 billion gallons [13]—an increase of over *five billion* gallons—and the Extension Rule provides only 6, 10, and 12 months' lead time to comply with those increased volumes, JA 64–67, all short of the 13-month statutory minimum.

In sum, *ACE* cannot not save the Extension Rule because the *ACE* Court was not confronted with the CAA's minimum compliance lead time, and because the Extension Rule causes EPA's late actions to impose substantially more prejudicial burdens than those at issue in *ACE*.

\*    \*    \*

Petitioners do not challenge the current 2019 deadline set for September 1, 2022. It comes more than 16 months after EPA issued the

---

[13] The 2020–2022 volumes are set at 24.7, 26.88, and 29.65 billion gallons, respectively. *See* Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39,600, 39,626 (July 1, 2022).

2019 volumes and more than 12 months after the 2018 compliance deadline. But the compression of the 2020, 2021, and 2022 deadlines violates the CAA and Petitioners' reliance on EPA's prior regulations. The 2020 volumes were finalized July 1, 2022, so the earliest EPA can require compliance with those volumes is August 1, 2023—13 months later. *See* 40 C.F.R. § 80.1451(a) (2021). The statute anticipates that the 2021 compliance deadline could then be set no earlier than 12 months later, with the 2022 deadline 12 months after that. *See* § 7545(o)(2)(B).

The Extension Rule's compression of the 2019–2022 compliance deadlines and disregard for the minimum statutory lead time is "in excess of [EPA's] statutory authority," so it must be set aside. *Hearth, Patio & Barbecue*, 11 F.4th at 805.

### C.    EPA has not adequately mitigated under *ACE*.

Even if *ACE* applies to this case, it condemns the Extension Rule. Given the dubious history of the RFS program, it is abundantly clear that EPA cannot timely manage it. And *ACE* requires "EPA [to] reasonably mitigate[] any burdens that its lateness imposes on obligated parties." 864 F.3d at 717. Rather than mitigate, the Extension Rule *exacerbates* the consequences of EPA lateness.

EPA has not even attempted to mitigate to the same degree it did in *ACE*. *ACE* upheld two late annual volumes. Here, the Extension Rule exposes Petitioners to four. The 2020, 2021, and 2022 volumes were 31, 19, and 7 months late, respectively. And although the deadline for issuing

the 2023 annual volumes was November 1, 2021, § 7545(o)(2)(B)(ii), EPA still has not promulgated them. In fact, EPA has entered into a consent decree with a biofuels interest group delaying them until June 2023, approximately 20 months late. Order, *Growth Energy v. EPA*, No. 22-cv-01191 (D.C. Cir. July 26, 2022), ECF No. 12.

In *ACE*, EPA set volumes for four years (2014–2017) in 2015, giving obligated parties notice of volumes multiples years down the road. 864 F.3d at 696. Here, EPA set 2020–2022 volumes *halfway through 2022* without any notice of what volumes to expect in 2023. That lack of notice is compounded by the statutory transition from 2022 to 2023. The CAA no longer provides a statutory starting point for the annual volumes, leaving obligated parties completely in the dark.

There is also a significant disparity between the lead time in *ACE* and the lead time here. Under the Extension Rule, obligated parties must comply with 4 annual volumes in a 9-month span (or if EPA finalizes a recently proposed rule, 5 annual volumes in a 14-month span) and provides them with only 6, 10, and 12 months' lead time to plan for and comply with those annual volumes. (It is not yet clear how much lead time obligated parties will get for 2023.) But in *ACE*, obligated parties were required to comply with 4 annual volumes over a 21-month span and were allowed 8, 12, 15 and 28 months' lead time. 864 F.3d at 700, 722.

In addition, the volumes (and, thus, RFS compliance obligations) at issue here are significantly higher than those at issue in *ACE*. *See supra* Section I.B. The demands on obligated parties have increased by billions of gallons, yet they will have to comply with higher annual volumes, in a tighter window, and with far less notice. Moreover, RIN prices have increased dramatically. As already noted, since EPA missed the 2020 deadlines, the price of ethanol RINs has increased by at least 690%.

The dramatic difference between the state of the RFS program and the RIN market now and when *ACE* was decided further illustrates the unreasonableness of the burdens the Extension Rule imposes on obligated parties. Because of the uncertainty and confusion caused by EPA's delays, the RIN market has become unstable and illiquid, making it impossible for Petitioners to do the long-term planning necessary for their businesses to succeed.

EPA's recent description of the 2019, 2020, and 2021 RIN markets verifies this. According to EPA, of the hundreds of obligated parties out there, a mere **9** hold 75% of all available 2019 RINs. EPA, April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries (ACDA) at 13–14 (April 2022, EPA-420-R-22-006).[14] This was perhaps inevitable given that EPA's unlawful delays in deciding small refinery hardship petitions led to the agency creating separate 2019

---

[14] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1014EK3.pdf.

compliance deadlines for larger obligated parties versus small refineries. Larger obligated parties retired RINs for 2019 compliance way back in March 2020, leaving only scraps for small refineries at exorbitant prices due to low supply. Even more concerning was EPA's report on 2020–2021 RIN holdings: just **11** obligated parties hold 75% "of all available 2020 and 2021 RINs." Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg, 35,711, 35,714 n.23 (June 13, 2022). Because of this near monopolistic hold on the RIN market, EPA acknowledged that those parties will "choose to sell their RINs *only* at very high costs or in the alternative choose to *not* sell their RINs" at all. ACDA at 14 (emphasis added). In other words, the only way Petitioners can comply—if they can comply at all—is by paying "very high costs" for the RINs they need. And those "very high costs" are on top of the already 690% increase in RIN prices due to EPA's delays.

It is in those untenable circumstances that EPA promulgated and plans to enforce the Extension Rule. Considering all the circumstances and the Extension Rule's extreme compression, the only reasonable mitigation is to provide an alternative compliance demonstration approach for compliance years that have already passed until EPA gets its RFS house in order. EPA already has the blueprint for doing this—in April 2022, EPA provided such an alternative compliance approach to all small refineries for the 2018 compliance year. Because EPA's past actions—there, EPA delayed until more than three years after the 2018

compliance deadline before denying all small refineries' 2018 hardship petitions—had made it impossible for small refineries to comply, EPA provided an alternative way to demonstrate compliance that did not require parties to retire RINs. *See* ACDA at 10. Here, EPA's delays have similarly made compliance impossible—even more so on the Extension Rule's compressed timeline—so it should adopt the same remedy. It makes no sense to treat materially identical situations differently.

Moreover, providing a similar alternative compliance avenue for 2019–2021 will not undermine the purposes of the RFS program or cause any harm to the environment. The biofuels governed by those annual volumes have *already* been blended into transportation fuel and sold. Neither excusing nor requiring compliance for prior calendar years will do anything to increase or decrease the amount of biofuel blended, nor will it do anything to protect the environment. Indeed, the only consequence of requiring compliance would be to punish obligated parties for EPA's delays and provide a financial windfall to the handful of speculators with a monopolistic hold on RINs. In other words, all the Extension Rule will do is reshuffle blending credits to line the pockets of biofuel producers and put small refineries out of business.

Because the Extension Rule does not reasonably mitigate the "burdens that its lateness imposes on obligated parties," it must be set aside. *ACE*, 864 F.3d at 717.

II.   **The Extension Rule unlawfully attempts to regulate around the lead time Congress requires for setting volumes for 2023 and beyond.**

For 2023 and later years, the Extension Rule is a naked attempt to re-write the statute. Starting with the 2023 compliance year, the CAA no longer gives EPA a starting point for setting annual volume requirements. § 7545(o)(2)(B)(i)(I)–(IV), (o)(2)(B)(ii). Instead, Congress left it up to EPA's discretion—informed by various factors—to determine the appropriate volumes. § 7545(o)(2)(B)(ii). But Congress conditioned this added discretion on providing even more lead time for obligated parties to plan for and demonstrate compliance. The result: EPA "*shall* promulgate rules establishing the applicable volumes . . . *no later than* 14 months before the first year for which such applicable volume will apply." *Id.* (emphasis added).

The "shall" and "no later than" language makes clear the deadline and lead-time requirements are mandatory. *Bennett v. Spear*, 520 U.S. 154, 175 (1997) ("[A]ny contention that the relevant provision of [the statute] is discretionary would fly in the face of its text, which uses the imperative 'shall.'"). EPA is not free to ignore the statute. *Dilley v. Alexander*, 603 F.2d 914, 920 (1979), *decision clarified*, 627 F.2d 407 (D.C. Cir. 1980) ("It is a basic tenet of our legal system that a government agency is not at liberty to ignore [the] laws and that agency action in contravention of applicable statutes and regulations is unlawful.").

Despite that unambiguous statutory command, the Extension Rule expressly anticipates that EPA will "delay[]" "promulgation of the subsequent year's standard" so consistently that, without the Extension Rule, the agency would have to "repeatedly extend compliance reporting deadlines." Extension Rule at 5700. As noted above, EPA has *already* indicated it will delay promulgation of the 2023 annual volumes until June 2023—some 20 months late. Order, *Growth Energy*, No. 22-cv-01191. And the Extension Rule purports to give EPA the authority in advance to force obligated parties to comply with their 2023 RVOs on yet another unlawfully compressed timeline.

The Extension Rule cannot authorize future deviations from statutory deadlines and lead-time requirements. After all, a "statute cannot be amended by regulation." *Miller v. Comm'r*, 836 F.2d 1274, 1286 (10th Cir. 1988) (citing *Koshland v. Helvering*, 298 U.S. 441, 447 (1936) ("[W]here, as in this case, the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation.")). And EPA "may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). "A regulation which operates to create a rule out of harmony with the statute is a mere nullity." *Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) (quoting *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936)) (alterations omitted).

Moreover, EPA's reasoning is arbitrary and capricious. EPA tries to justify the Extension Rule as necessary to "ensure that obligated parties know [next year's] obligations before complying with [the current year's] obligations." JA 66. But Congress already addressed that concern in the statute. By requiring 26 months of lead time to prepare for and demonstrate compliance for 2023 and subsequent years, Congress ensured that obligated parties would always know the next year's volume obligations at least two months before the current compliance year begins. *Id.* EPA need do nothing more than follow the statute to "ensure that obligated parties know [next year's] obligations before complying with [the current year's] obligations." *Id.*

Because the statute already achieves what EPA claims justifies the Extension Rule, EPA's explanation is "implausible" and only makes sense if understood as an attempt to get around the CAA's 26-month lead-time requirement. *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016). Such implausible explanations are, by their nature, "arbitrary and capricious." *Id.* EPA's attempt to regulate around clear statutory deadlines and lead-time requirements is "not in accordance with law," so it must be set aside. *Hearth, Patio & Barbecue*, 11 F.4th at 805.

## CONCLUSION

For the foregoing reasons, the Extension Rule must be set aside.

Dated: November 22, 2022

Respectfully submitted,

*s/ Jonathan G. Hardin*

Jonathan G. Hardin
LeAnn Johnson Koch
Alexandra Magill Bromer
Eric B. Wolff
Karl J. Worsham
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6297
Facsimile: 202.654.6211
JHardin@perkinscoie.com
LeAnnJohnson@perkinscoie.com
ABromer@perkinscoie.com
EWolff@perkinscoie.com
KWorsham@perkinscoie.com

*Attorneys for Coffeyville Resources Refining & Marketing, LLC, Wynnewood Refining Co., LLC, and Small Refineries Coalition*

*s/ Ian S. Shelton*

Ian S. Shelton
EVERSHEDS SUTHERLAND (US) LLP
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
(916) 844-2965
ianshelton@eversheds-sutherland.com

*Attorney for Kern Oil & Refining Co.*

- 33 -

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains 7,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Century Schoolbook).

Date: November 22, 2022          */s/ Jonathan G. Hardin*
                                 Jonathan G. Hardin

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: November 22, 2022          */s/ Jonathan G. Hardin*
                                 Jonathan G. Hardin