**SCHEDULED FOR ORAL ARGUMENT JANUARY 19, 2023**

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Nos. 22-1015, 22-1051, 22-1053**

WYNNEWOOD REFINING COMPANY, LLC, et al.,

*Plaintiffs-Appellants*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Defendants-Appellees*.

*On Petitions for Review of Final Agency Action*
*of the U.S. Environmental Protection Agency*

**FINAL REPLY BRIEF OF PETITIONERS**

Ian S. Shelton
EVERSHEDS SUTHERLAND (US)
LLP
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
(916) 844-2965
ianshelton@eversheds-sutherland.com

*Attorney for Kern Oil & Refining Co.*

Jonathan G. Hardin
LeAnn Johnson Koch
Alexandra Magill Bromer
Eric B. Wolff
Karl J. Worsham
PERKINS COIE LLP
700 13th Street, N.W., Suite 800
Washington, D.C. 20005
(202) 654-6200
JHardin@perkinscoie.com
LeAnnJohnson@perkinscoie.com
ABromer@perkinscoie.com
EWolff@perkinscoie.com
KWorsham@perkinscoie.com

*Attorneys for Coffeyville Resource*
*Refining & Marketing, LLC,*
*Wynnewood Refining Co., LLC,*
*and Small Refineries Coalition*

TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.............................................................................i

TABLE OF AUTHORITIES.....................................................................ii

GLOSSARY............................................................................................ v

SUMMARY OF ARGUMENT................................................................ 1

ARGUMENT......................................................................................... 3

I.    EPA's argument that a statute setting annual
      compliance obligations with multiple references to the
      "calendar year" is somehow "silent" as to whether
      parties have a full year to comply, and that EPA may
      set whatever deadlines it wishes, is unreasonable and
      must be vacated. ...................................................................... 3

II.   *ACE* and *Monroe Energy* did not address Petitioners'
      statutory argument and, in any event, are
      distinguishable........................................................................ 6

III.  This Court can grant the relief Petitioners seek.......................... 14

CONCLUSION.................................................................................... 17

CERTIFICATE OF COMPLIANCE ...................................................... 19

CERTIFICATE OF SERVICE ............................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACE v. EPA*,
 864 F.3d 691 (D.C. Cir. 2017)..............................................2, 7, 8, 9, 13

*Doe v. Exxon Mobil Corp.*,
 473 F.3d 345 (D.C. Cir. 2007)................................................................7

*Ergon-W. Va., Inc. v. EPA*,
 980 F.3d 403 (4th Cir. 2020) ...............................................................14

*Esch v. Yeutter*,
 876 F.2d 976 (D.C. Cir. 1989)..............................................................17

*iTech U.S., Inc. v. Renaud*,
 5 F.4th 59 (D.C. Cir. 2021) ....................................................................4

*Kern Oil & Refin. Co. v. EPA*,
 No. 21-71246, 2022 WL 3369528 (9th Cir. Aug. 16, 2022)................15

*Kimbrough v. United States*,
 552 U.S. 85 (2007) ..................................................................................6

*Kirk v. Comm'r of Soc. Sec. Admin.*,
 987 F.3d 314 (4th Cir. 2021) ...............................................................15

*Monroe Energy v. EPA*,
 750 F.3d 909 (D.C. Cir. 2014) .................................................2, 7, 8, 13

*Niz-Chavez v. Garland*,
 141 S. Ct. 1474 (2021) ............................................................................4

*Transactive Corp. v. United States*,
 91 F.3d 232 (D.C. Cir. 1996)................................................................15

*United States v. L. A. Tucker Truck Lines, Inc.*,
 344 U.S. 33 (1952) ..................................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

STATUTES

\* 42 U.S.C. § 7545(o)(2)(B)......................................................................4, 6

\* 42 U.S.C. § 7545(o)(3)(B)(i) ...............................................................5, 6

\* 42 U.S.C. § 7545(o)(5)(D)........................................................4, 5, 11, 12

42 U.S.C. § 7545(o)(7) ...............................................................................7

42 U.S.C. § 7607(d)(9) .............................................................................15

REGULATIONS

80 Fed. Reg. 77420 (Dec. 14, 2015)...........................................................9

87 Fed. Reg. 24294 (Apr. 25, 2022) ...........................................................7

87 Fed. Reg. 35711 (June 13, 2022)..........................................................10

87 Fed. Reg. 39600 (July 1, 2022).........................................................8, 9

87 Fed. Reg. 54158 (Sept. 2, 2022)..........................................8, 9, 10, 12

OTHER AUTHORITIES

April 2022 Alternative RFS Compliance Demonstration
    Approach for Certain Small Refineries at 13-14 (April
    2022, EPA-420-R-22-006),
    https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1014EK3.p
    df .............................................................................................. 10, 12, 15

Brief of Petitioner Monroe Energy, LLC at 23–26, *Monroe
    Energy v. EPA*, No. 13-1265 (D.C. Cir. Dec. 9, 2013), Doc.
    No. 1469540................................................................................................8

Opening Brief for Obligated Party Petitioners on Cellulosic
    Biofuel and Biomass-based Diesel at 10, *ACE v. EPA*, No.
    16-1047 (D.C. Cir. Sept. 8, 2016), Doc. No. 1634754............................8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Government Accountability Office, Actions Needed to
  Improve Decision-Making in the Small Refinery
  Exemption Program, No. GAO-23-105801 (Nov. 3, 2022),
  https://www.gao.gov/assets/gao-23-105801.pdf ........................2, 13, 14

OPIS End of Day Ethanol Assessment Report for November
  4, 2022 ..............................................................................................13

\*  Authorities upon which we chiefly rely are marked with
   asterisks

**GLOSSARY**

| | |
|---|---|
| ACDA | Alternative RFS Compliance Demonstration Approach for Certain Small Refineries (April 2022, EPA-420-R-22-006), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1014EK3.pdf |
| CAA | Clean Air Act |
| EPA | United States Environmental Protection Agency |
| Extension Rule | Renewable Fuel Standard (RFS) Program: Extension of Compliance and Attest Engagement Reporting Deadlines, 87 Fed. Reg. 5696 (Feb. 2, 2022) (JA 62–68) |
| GAO | Government Accountability Office |
| JA | Joint Appendix |
| RFS | Renewable Fuel Standard |
| RINs | Renewable Identification Numbers |
| RVO | Renewable Volume Obligation |

SUMMARY OF ARGUMENT

EPA is effectively three years behind in its management of the RFS program, and for years now it has flagrantly ignored the statutory deadlines for its actions. Unlike regulated parties who have zero flexibility when they miss *EPA's* deadlines, this Court has held that EPA's violation of RFS statutory deadlines is permissible so long as EPA provides "reasonable mitigation." But instead of taking accountability for its mistakes and providing reasonable mitigation for the harm it has caused, EPA is attempting to "catch up" by forcing regulated parties to bear the brunt of its unlawful delays by shortening the statutorily mandated compliance periods and, consequently, increasing compliance costs exponentially.

The misnamed "Extension Rule" compresses the deadlines for *four years' worth* of *annual* RFS compliance obligations (2019–2022) into just a *nine-month* period. It does so without regard for either the 12-month interval required by the CAA between *annual* compliance deadlines or the 13-month required lead time between the date EPA must set annual volumes and the deadline for obligated parties to comply. The Rule also does not even come close to constituting "reasonable mitigation" because it perversely exacerbates the harm.

EPA's Response Brief adds a new chapter to this Orwellian saga. Along with an "Extension Rule" that dramatically compresses deadlines, EPA now claims its mismanagement of the RFS program is actually an

example of "practical, good[ ]government." As if the unlawful delays, flip-flopping positions, and Supreme Court loss were not evidence enough, a recently published Government Accountability Office ("GAO") report[1] chastises EPA for the significant delays and maladministration of the RFS program. And EPA's legal arguments ask this Court not to believe its lying eyes. The statute expressly creates "calendar year" compliance obligations set annually, and yet EPA says it is "silen[t]" as to whether parties receive a year to comply. Similarly, EPA blithely assures the Court that *ACE* and *Monroe Energy* have already answered most of the questions here, but again, review of those decisions easily demonstrates otherwise. What EPA has done, and how it is depicting things, has moved beyond run-of-the-mill arbitrary into the dystopian.

EPA has multiple options to reasonably mitigate the harm to obligated parties caused by its unlawful delays, and it recently used one of those options to mitigate harm in an identical situation for the 2018 RFS compliance year. EPA's decision not to apply the same 2018 mitigation approach to 2019–2022 compliance is baffling, arbitrary, and capricious. There is no plausible justification for EPA to treat 2018 compliance differently than 2019–2022. Indeed, EPA effectively concedes that the Extension Rule itself is not reasonable mitigation by relying on its purported subsequent remedial measures to defend its actions here.

---

[1] https://www.gao.gov/assets/gao-23-105801.pdf.

This Court should vacate the Extension Rule and remand to the agency with instructions to EPA to *actually* and *reasonably* mitigate the harm it has caused, as this Court's cases *actually* require.

## ARGUMENT

I.     **EPA's argument that a statute setting annual compliance obligations with multiple references to the "calendar year" is somehow "silent" as to whether parties have a full year to comply, and that EPA may set whatever deadlines it wishes, is unreasonable and must be vacated.**

It is well-settled that a court discerns statutory meaning from statutory structure and context, in addition to the text. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1482 (2021); *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021). Construing the RFS statute as a whole, it is clear that Congress intended to give obligated parties 12 months between *annual* compliance deadlines and 13 months between the issuance of the annual RVOs and the deadline for complying with them.

Congress structured the RFS program to give obligated parties 12 months between *annual* compliance deadlines. Congress indexed compliance with the RFS on blending fuel in a "calendar year," § 7545(o)(2)(B),[2] therefore the earliest EPA can require compliance for a particular year is the following January 1.

Further support for this 12-month interval between annual compliance deadlines comes from the deficit carry-forward provision. *See*

---

[2] Unless otherwise noted, all statutory citations are to Title 42, U.S. Code.

§ 7545(o)(5)(D). Congress ordered EPA to promulgate regulations that "allow[ ] any person that is unable to generate or purchase sufficient credits to meet the [RFS] requirements . . . to carry forward a renewable fuel deficit" into "the calendar year following the year in which the renewable fuel deficit is created." *Id.* Under Congress's scheme—which assumes that EPA meets the statutory deadlines to promulgate annual biofuel blending volumes—an obligated party can carry a deficit for one compliance year into the next before achieving compliance for the first year. Thus, Congress contemplated that an obligated party could decide whether to carry forward a deficit and then have 24 months to comply for two years' worth of RVOs.

For 2005 through 2022, the CAA requires the EPA Administrator to "determine and publish in the Federal Register" the "renewable fuel obligation [n]ot later than November 30" of the year proceeding the compliance year in question. § 7545(o)(3)(B)(i). Because the earliest possible deadline for compliance for any particular calendar year is the following January 1, obligated parties are entitled at least 13 months' lead time between publication of the annual volume obligations and the deadline for demonstrating compliance.

When the explicit statutory deadlines for issuing annual volumes are matched with how the CAA structures compliance, Congress's intent is clear. Through the 2022 compliance year, EPA was required to give obligated parties at least 13 months' lead time to plan for and

demonstrate annual compliance (from November 30 before the compliance year to January 1 following it). § 7545(o)(3)(B)(i).

EPA's argument that the statute is "silen[t]" on compliance periods is absurd. EPA Br. at 22. A statute that expressly requires EPA to set *annual* compliance obligations, § 7545(o)(2)(B), and to announce those *annual* obligations far ahead of time, § 7545(o)(3)(B)(i), clearly intends EPA to give obligated parties at least a year to comply with their *annual* obligations. Aruging that these express statutory provisions do not set minimum compliance intervals is like saying that a rule establishing four 15-minute quarters for a football game is silent on whether a team can score a touchdown the next day. Does Congress really have to spell out that obligated parties should get one year to comply with an *annual* compliance obligation?

The situation here is very different from the one in *Kimbrough v. United States*, 552 U.S. 85 (2007). There, the Anti-Drug Abuse Act mandated only maximum and minimum sentences, and the Court declined to read in any directive about the appropriate sentence within that range. *Id.* at 102–03. Here, Congress was not silent on compliance deadlines. For example, would it be lawful for EPA to demand compliance with an annual compliance obligation a mere month after promulgation? If the answer is no (and it is), then Congress imposed limits on EPA's regulation of compliance deadlines, contrary to EPA's belief. The statute is not silently delegating to EPA to set whatever deadlines it wishes.

EPA's argument that, under Petitioners' position, the RFS program could never "get back on track" if EPA misses the volumes deadline once (EPA Br. at 2, 36) ignores the obvious mitigation option Congress provided right in the statute. Congress allows EPA to waive the annual volumes requirement, § 7545(o)(7), which could get EPA back on track. EPA has also provided alternative compliance mechanisms, such as the 2018 Alternative Compliance Demonstration Approach issued in April 2022,[3] that would also avoid the harm inflicted by the illiquid and exorbitantly priced RIN market caused by EPA's unlawful delays.

The miasma of word games and technocratic assurances in EPA's brief should fool no one; it is the agency's position that is "irrational," not Petitioners'. EPA Br. at 2.

## II.   *ACE* and *Monroe Energy* did not address Petitioners' statutory argument and, in any event, are distinguishable.

Petitioners' argument about the compliance intervals guaranteed in the statute was not presented in *ACE* or *Monroe Energy*, as EPA itself concedes (EPA Br. at 31–32). Therefore, those decisions are not binding on these issues. *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case

---

[3] Notice of April 2022 Alternative Compliance Demonstration Approach for Certain Small Refineries Under the Renewable Fuel Standard Program, 87 Fed. Reg. 24294 (Apr. 25, 2022).

is not a binding precedent on this point."); *see also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 352 (D.C. Cir. 2007).

As relevant here, the Obligated Party Petitioners argued in *ACE* that they had insufficient notice to plan for and meet the 2016 and 2017 volume requirements, *ACE v. EPA*, 864 F.3d 691, 721 (D.C. Cir. 2017), but they did not challenge the compliance deadlines or argue that EPA failed to provide the minimum lead time or compliance interval required by the CAA. *See* Opening Brief for Obligated Party Petitioners on Cellulosic Biofuel and Biomass-based Diesel at 10, *ACE v. EPA*, No. 16-1047 (D.C. Cir. Sept. 8, 2016), Doc. No. 1634754.

Nor does *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014), dictate the outcome of this case. Monroe Energy argued only that EPA's eight-and-a-half-month delay deprived it of the authority to issue the 2013 Rule and that the delay meant market participants did not have adequate time to "make informed business decisions that will affect their ultimate compliance obligation," Brief of Petitioner Monroe Energy, LLC at 23–26, *Monroe Energy v. EPA*, No. 13-1265 (D.C. Cir. Dec. 9, 2013), Doc. No. 1469540. Monroe Energy did not address the period between compliance deadlines or argue that Congress contemplated a 13-month period between the issuance of volumes and compliance. *Id.*

In any event, EPA's mitigation efforts here are not "reasonable" even under those decisions. EPA's Response Brief attempts to defend itself by pointing to *other subsequent* agency actions—the 2020–2022

Renewable Fuel Standard (RFS) Program: RFS Annual Rules, 87 Fed. Reg. 39600 (July 1, 2022), and the Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 54158 (Sept. 2, 2022). EPA Br. at 37–38. The Annual Rule sets the total average annual volume obligations for 2020 through 2022 at 27.07 billion gallons [4]—an increase of over *five billion* gallons when compared with the annual volumes for the three years at issue in *ACE*. *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77420, 77422 (Dec. 14, 2015). The Retirement Schedule slightly alters but does not alleviate the current compressed compliance schedule; small refineries would have to retire RINs for *five* compliance years (2019–2023) within just *14 months*. (The Extension Rule requires compliance for four years within nine months.)

*First*, one of EPA's subsequent mitigation efforts does not even apply to one of the petitioners in this case: Coffeyville Refining. Because Coffeyville is not a small refinery, the Retirement Schedule does not apply to it. *Second*, in *ACE* the annual volumes were significantly lower, and EPA had provided substantially more lead time than in the Extension Rule. Opening Br. at 23. Although EPA reduced the annual volume standards for 2020 to match the actual level of fuel consumed, the decrease is not very significant: only 14.7% overall, with zero change

---

[4] The 2020–2022 volumes are set at 24.7, 26.88, and 29.65 billion gallons, respectively. *See* RFS Annual Rules, 87 Fed. Reg. at 39626.

for biomass-based diesel and only a 9% reduction for advanced biofuel. 87 Fed. Reg. at 39622. Moreover, the reduction is insufficient given the Extension Rule's compression of the compliance deadlines and resulting skyrocketing RIN prices. EPA has already admitted that the market for 2020 and 2021 RINs is illiquid. EPA's report on 2020–2021 RIN holdings indicated that just 11 obligated parties hold 75% "of all available 2020 and 2021 RINs." Renewable Fuel Standard (RFS) Program: Alternative RIN Retirement Schedule for Small Refineries, 87 Fed. Reg. 35711, 35714 n.23 (proposed June 13, 2022). And EPA acknowledged that, because of this near monopoly, those parties will "choose to sell their RINs only at very high costs or in the alternative choose to not sell their RINs" at all. April 2022 Alternative RFS Compliance Demonstration Approach for Certain Small Refineries ("ACDA") at 13–14 (April 2022, EPA-420-R-22-006), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P101 4EK3.pdf. Those "very high costs" are on top of the already 731% increase in RIN prices due to EPA's delays.[5]

*Third*, although EPA will argue that it addressed the high cost of compliance by allowing small refineries "to potentially use 2021, 2022, 2023, and 2024 RINs to satisfy a portion of their 2020 RVOs" with the

---

[5] The mean price for 2021 ethanol RINs was $1.705 as of November 4, 2022. On December 2, 2019—the first business day after EPA was statutorily required to set the 2020 volumes—the price of 2020 ethanol RINs was just $0.205.

Retirement Schedule, that merely kicks the harm down the road instead of fixing it. *See* 87 Fed. Reg. at 54161–62. If there are not enough RINs available in the market for Petitioners to meet present obligations, as EPA concedes, allowing refineries to draw down RINs from future years means those RIN deficits will persist going forward, and RIN prices will remain exorbitant. The number of 2021-vintage RINs is already set—and the number of 2022-vintage RINs soon will be too. No additional biofuels can be blended in years that have ended, so drawing down those RINs cannot be made up by additional blending. In addition, the Retirement Schedule further compresses the compliance timeline by requiring small refineries to comply with five annual volume obligations in the span of 14 months—an unprecedented task. *See* Opening Br. at 16 n.10.

*Fourth*, contrary to EPA's assertion (EPA Br. at 41–42), the deficit carry-forward cannot fix the problem here. Instead, the Extension Rule is a *flagrant violation* of the statutory flexibility Congress intended to give all obligated parties with the carry-forward provision. In a typical year (if EPA follows the law), an obligated party can decide whether to carry forward a deficit after weighing the financial and business sense of that decision in light of its volume obligations and the current price of RINs, and then have 24 months to comply for two years' worth of RVOs. § 7545(o)(5)(D). But now, due to EPA's violations of law and lack of reasonable mitigation, a party carrying forward a deficit from 2019 to 2020 gets only a three-month reprieve. (And EPA effectively forced some

small refineries to carry a deficit from 2019 to 2020, because it was impossible to obtain RINs to comply with 2019 due to EPA's actions, as the agency acknowledged. ACDA at 13–14.) EPA's compression of the compliance deadlines cannot be reasonable mitigation when this "mitigation" just violates a separate part of the CAA: the deficit carry-forward provision.

And a party cannot carry forward a deficit for any compliance year after 2020 until it fully satisfies the 2020 obligation. "Under the alternative RIN retirement schedule, a participating small refinery will not be permitted to carry forward a RIN deficit from 2021 or a subsequent year into the following compliance year unless it had fully complied with its 2020 RFS obligations." 87 Fed. Reg. at 54164; *see also* § 7545(o)(5)(D) ("any person . . . [may] carry forward a renewable fuel deficit *on condition that* the person, in the calendar year following the year in which the renewable fuel deficit is created (i) achieves compliance with the renewable fuel requirement under [§ 7545(o)(2)]; and (ii) generates or purchases additional renewable fuel credits to offset the renewable fuel deficit of the previous year" (emphasis added)). Under EPA's Retirement Schedule, compliance for 2020 is spread out and not fully satisfied until February 1, 2024, 87 Fed. Reg. at 54162, while the Extension Rule sets the deadline for 2022 compliance at September 1, 2023, well before a small refinery will have fully satisfied the 2020 RVOs under the Retirement Schedule.

Moreover, even if a party could carry forward a deficit from 2021 into 2022, that is still insufficient to meet the reasonable mitigation standard. The prices for 2021 and subsequent RINs are *just as high* as the prices for the short supply of 2020 RINs, and those high prices are due to EPA's unlawful actions. The mean prices for 2020–2023 ethanol RINs range from $1.70 to $1.72.[6] In sum, through delays and a lack of mitigation, EPA deprived Petitioners of the benefits, protections, and flexibility that Congress intended.

EPA's behavior is far from the "practical, good-government" approach it claims. EPA Br. at 2. EPA is not the victim of outside forces. *ACE* and *Monroe Energy*, though not controlling here, are examples of EPA's long history of mismanging the RFS program. Indeed, the GAO recently concluded that EPA's administration of the RFS program has been dysfunctional. GAO, Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program at 2, 9, 26, No. GAO-23-105801 (Nov. 3, 2022), https://www.gao.gov/assets/gao-23-105801.pdf. The GAO report undermines EPA's claims of reasonable mitigation. At a minimum, reasonable mitigation should have accounted for RIN market manipulation (i.e., speculation, including from non-obligated parties, on the direction of RIN prices), which is still an open investigation at the

---

[6] These prices were acquired from the OPIS End of Day Ethanol Assessment Report for November 4, 2022.

Agency. *Id.* at 13 n.14. EPA only "recently" took steps to study RIN prices and RIN market efficiency and still "has not completed its work." *Id.*

Moreover, not only are EPA's actions—including the inadequate mitigation here—based on faulty and incomplete information, *id.* at 9–14, but also "EPA routinely misses statutory deadlines" and "does not have procedures to ensure that it meets these deadlines," *id.* at 20. Decisions "appear ad hoc." *Id.* at 26. For example, between 2013 and 2021, EPA has missed the 90-day statutory deadline to decide small refinery hardship petitions a whopping *89 percent of the time*. *Id.* at 20. No wonder the table in EPA's Response Brief (at 52) includes only the "Original compliance reporting deadline" and extended deadline but not EPA's promulgation date, conspicuously omitting that EPA promulgated the volume obligations for 2020 and 2021 *after* the original *compliance* deadlines for those years had passed, Opening Br. at 16. EPA admitted that its delays and unpredictability cause volatility in the RIN market, harming refineries. GAO Report at 24, 26, 30, 47–48 (EPA's failure to adhere to statutory deadlines "likely increased uncertainty and, hence, volatility in the D4 and D6 RIN markets."). As the GAO report exposed, this Court cannot rely on EPA's self-serving, Orwellian description of its actions.[7]

---

[7] This mischaracterization is unfortunately becoming a pattern in RFS cases. *See, e.g.*, *Ergon-W. Virginia, Inc. v. EPA*, 980 F.3d 403, 421 (4th Cir. 2020) ("the supplemental materials directly call into question both

III.    **This Court can grant the relief Petitioners seek.**

Petitioners ask this Court to set aside the Extension Rule, which EPA concedes this Court can do, because EPA's actions are arbitrary, capricious, and contrary to law. EPA Br. at 43 (citing § 7607(d)(9)). Specifically, EPA can provide reasonable mitigation for its missed deadlines, as it did for the 2018 compliance year with the ACDA, and its decision not to reasonably mitigate here is arbitrary and capricious. A federal agency acts arbitrarily when it treats similar situations differently without a reasoned explanation. *Transactive Corp. v. United States*, 91 F.3d 232, 239 (D.C. Cir. 1996); *Kirk v. Comm'r of Soc. Sec. Admin.*, 987 F.3d 314, 321 (4th Cir. 2021). In addition, a recent Ninth Circuit decision held that EPA is required to issue a remedy order when its unlawful delay results in economic harm to a small refinery, *Kern Oil & Refin. Co. v. EPA*, No. 21-71246, 2022 WL 3369528, at *3 (9th Cir. Aug. 16, 2022), and the same holds true here. EPA has the "authority under the RFS statute to remedy" the economic injury from its delays "via [an alternative compliance demonstration], authority that the agency has exercised before when its own legal errors have deprived [obligated parties] of a benefit that they otherwise would have received" had the agency timely acted. *See Kern Oil*, 2022 WL 3369528, at *3.

the DOE and the EPA's unequivocal representations during the agency proceedings").

- 14 -

EPA has many tools to reasonably mitigate the harm here; contrary to the agency's assertion (EPA Br. at 21) the ACDA is not necessarily the only reasonable response. As mentioned above, EPA could use its waiver authority. Or EPA could give small refineries a credit for the difference in RIN prices between the dates the agency was statutorily required to decide Petitioners' hardship petitions and current RIN prices, which have skyrocketed due to EPA's unlawful delays and actions and thereby exponentially increased Petitioners' costs to comply with the RFS. RIN prices have increased over 700% between December 2019 and November 2022. *See supra* n.4.

That EPA has refused to reasonably mitigate the harm to Petitioners here is plainly arbitrary, capricious, an abuse of discretion, and contrary to the law of this Circuit.

Finally, this Court should not allow EPA to avoid the consequences of its arbitrary and capricious actions by pointing to other lawsuits challenging different rules. *See, e.g.*, EPA Br. at 43. EPA's position that each case should be limited to a single issue, *id.* at 33, ignores the practical realities of litigation and would allow EPA to escape accountability for the cumulative impact of its various actions on Petitioners. In addition, EPA chose to act piecemeal when issuing these various rules and should bear the consequences of that choice. Notably, EPA did not publish the Retirement Schedule until *after* Petitioners challenged the Extension Rule and filed their opening brief. Then, in its Response Brief, EPA

repeatedly relies on the Retirement Schedule as another "in [its] suite of actions to relieve the potential burden on obligated parties." *Id*. at 15–16, 34, 38, 42 n.9.

EPA cannot have it both ways—that Petitioners must limit their arguments in each challenge but EPA can rely on *all of* its piecemeal, inadequate mitigation attempts *in every case*.[8] This Court should not play EPA's shell game. First, EPA is relying on extra-record evidence here, since the Retirement Schedule is not part of this administrative record. EPA's Certified Index of Documents Comprising the Administrative Record at 5, Nos. 22-1015, 22-1051, 22-1053 (D.C. Cir. May 19, 2022), Doc. No. 1947368. Judicial review of agency action is typically confined to the administrative record. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). Second and more importantly, EPA's reliance on subsequent, purportedly remedial measures to defend its actions here is a tacit admission that the Extension Rule, standing on its own, failed to reasonably mitigate the harm caused by EPA's unlawful actions.

---

[8] To the extent this Court thinks it advisable to consider the totality of EPA's inadequate mitigation at once, Petitioners would not object to the Court designating their petitions for review of the Retirement Schedule as related cases and participating in expedited briefing there. All of the small refinery petitioners in this appeal have also appealed the Retirement Schedule. *See* Case Nos. 22-1276, 22-1277, 22-1279, 22-1281, 22-1282 (all D.C. Cir.).

## CONCLUSION

For the foregoing reasons, the Extension Rule must be vacated and remanded to the agency with instructions to actually and reasonably mitigate the harm EPA's unlawful actions have caused Petitioners.

Dated: November 22, 2022

Respectfully submitted,

*s/ Jonathan G. Hardin*
Jonathan G. Hardin
LeAnn Johnson Koch
Alexandra Magill Bromer
Eric B. Wolff
Karl J. Worsham
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6297
Facsimile: 202.654.6211
JHardin@perkinscoie.com
LeAnnJohnson@perkinscoie.com
ABromer@perkinscoie.com
EWolff@perkinscoie.com
KWorsham@perkinscoie.com

*Attorneys for Coffeyville Resources Refining & Marketing, LLC, Wynnewood Refining Co., LLC, and Small Refineries Coalition*

*s/ Ian S. Shelton*
Ian S. Shelton
EVERSHEDS SUTHERLAND (US) LLP
500 Capitol Mall, Suite 1750
Sacramento, CA 95814
(916) 844-2965
ianshelton@eversheds-sutherland.com

*Attorney for Kern Oil & Refining Co.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. As measured by the word-processing system used to prepare this brief, the brief contains 3,906 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a 14 point proportionally spaced roman-style typeface (Century Schoolbook).


Date: November 22, 2022        */s/ Jonathan G. Hardin*
                                Jonathan G. Hardin

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: November 22, 2022          */s/ Jonathan G. Hardin*
                                Jonathan G. Hardin